

SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**

JUL 17 2019

ARTHUR JOHNSTON
BY_____ DEPUTY

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
~~GULFPORT~~ DIVISION**
*Southern*

IN RE: *EX PARTE* APPLICATION OF )
LAURA ZÚNIGA CÁCERES, BERTHA )
ZÚNIGA CÁCERES, AND SALVADOR )
ZÚNIGA CÁCERES FOR ASSISTANCE )
BEFORE A FOREIGN TRIBUNAL )
—————————————————————— )

CASE NO.: *1,19 mc 405 LS-RHW*

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE*
APPLICATION OF LAURA ZÚNIGA CÁCERES, BERTHA ZÚNIGA CÁCERES,
AND SALVADOR ZÚNIGA CÁCERES FOR DISCOVERY FOR USE IN A FOREIGN
TRIBUNAL PURSUANT TO 28 U.S.C. § 1782**

---

Amelia S. McGowan, MSB# 103610
MISSISSIPPI CENTER FOR JUSTICE
5 Old River Place, Suite 203 (39202)
P. O. Box 1023
Jackson, Mississippi 39215
Telephone: (769) 230-8003
Facsimile: (601) 352-4769
Email: amcgowan@mscenterforjustice.org

OF COUNSEL:
Leo P. Cunningham, *Pro Hac Vice Forthcoming*
Ralitza S. Dineva, *Pro Hac Vice Forthcoming*
Sean P. Killeen, *Pro Hac Vice Forthcoming*
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: lcunningham@wsgr.com
          rdineva@wsgr.com
          skilleen@wsgr.com

Roxanna Altholz, *Pro Hac Vice Forthcoming*
INTERNATIONAL HUMAN RIGHTS LAW
CLINIC, UNIVERSITY OF CALIFORNIA
BERKELEY
489 Simon Hall,
Berkeley, California 94720
Telephone: (510) 643-8781
Facsimile: (510) 643-4625
Email: raltholz@law.berkeley.edu

*Attorneys for Applicants
Laura Zúniga Cáceres, Bertha Zúniga Cáceres,
and Salvador Zúniga Cáceres*

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ............................................................................................ 1

II.     FACTUAL BACKGROUND ........................................................................... 2

        A.      Ms. Cáceres Successfully Campaigned against the DESA-led Agua Zarca
                Dam ...................................................................................................... 2

        B.      Ms. Cáceres was Murdered in Order to Silence Her Opposition to the
                Agua Zarca Dam .................................................................................. 4

        C.      The Cáceres Children Seek Justice for their Mother's Murder ............. 5

III.    LEGAL STANDARDS .................................................................................... 6

IV.     ARGUMENT ................................................................................................... 8

        A.      Hancock Whitney Bank Resides in This District .................................. 8

        B.      The Discovery is Sought for Use in a Criminal Trial in Honduras ........ 8

        C.      The Cáceres Children are "Interested Persons" in the Honduran
                Proceedings ......................................................................................... 10

        D.      The Court Should Exercise Its Discretion and Grant This Application ............... 11

                1.      The discovery sought is outside of the jurisdictional reach of
                        Honduran courts, and thus inaccessible absent assistance under
                        Section 1782 ........................................................................... 11

                2.      The Honduran Government is Receptive to U.S. Judicial
                        Assistance in this Criminal Proceeding ................................... 12

                3.      The Application Does Not Attempt to Circumvent Honduran
                        Evidentiary Procedures ........................................................... 13

                4.      The Discovery Sought is Not Unduly Burdensome .................... 14

        E.      The Court Should Grant the Requested Discovery on an *Ex Parte* Basis ............ 15

V.      CONCLUSION .............................................................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bravo Express Corp. v. Total Petrochemicals & Ref. USA, Inc.,*
613 F. App'x 319 (5th Cir. 2015) ...................................................................................7, 8

*Ecuadorian Plaintiffs v. Chevron Corp.,*
619 F.3d 373 (5th Cir. 2010) ...............................................................................13

*Gushlak v. Gushlak,*
486 F. App'x 215 (2d Cir. 2012) ...........................................................................15

*In re Accent Delight Int'l Ltd.,*
869 F.3d 121 (2d Cir. 2017).................................................................................9

*In re Bayer AG,*
146 F.3d 188 (3d Cir. 1998)..................................................................................7

*In re Berlamont,*
No. 14-mc-00190 (JSR), 2014 U.S. Dist. LEXIS 111594
(S.D.N.Y. Aug. 4, 2014) ......................................................................................9

*In re Chevron Corp.,*
No. 4:10-mc-134, 2010 U.S. Dist. LEXIS 120479 (S.D. Tex. Apr. 5, 2010)....................13

*In re Edelman,*
295 F.3d 171 (2d Cir. 2002)..................................................................................7

*In re Eurasian Bank Joint Stock Co.,*
No. 3:15-mc-106-L-BN, 2015 U.S. Dist. LEXIS 142866
(N.D. Tex. Oct. 21, 2015) ..............................................................................13, 15

*In re Furstenberg Fin. SAS,*
No. 18-mc-44 (JGK), 2018 U.S. Dist. LEXIS 116391
(S.D.N.Y. July 12, 2018) ...............................................................................9, 10

*In re Godfrey,*
No. 3:08-MC-0107-K, 2009 U.S. Dist. LEXIS 127279
(N.D. Tex. Mar. 24, 2009) ..................................................................................15

*In re Gorsoan, Ltd.,* No. 13 MISC 397 (PGG), 2014 U.S. Dist. LEXIS 175613
(S.D.N.Y. Dec. 10, 2014)....................................................................................13

*In re Grupo Mex. Sab De CV,*
No. 3:14-MC-0073-G, 2015 U.S. Dist. LEXIS 177694
(N.D. Tex. Mar. 10, 2015) ..................................................................................15

*In re HydroDive Nig., Ltd.,*
No. 13-MC-0477, 2013 U.S. Dist. LEXIS 200238
(S.D. Tex. May 29, 2013) ...........................................................................9, 10, 13

-ii-

*In re iManagement Servs. Ltd.,*
   No. MISC 05-89 (FB), 2005 U.S. Dist. LEXIS 17025
   (E.D.N.Y. Aug. 16, 2005) ....................................................................................13

*In re Inversiones y Gasolinera Petroleos Valenzuela, S. de R.L.,*
   No. 08-20378-MC, 2011 WL 181311 (S.D. Fla. Jan. 19, 2011) ...................................9, 13

*In re Metallgesellschaft AG,*
   121 F.3d 77 (2d Cir. 1997)....................................................................................13

*In re Republic of Ecuador,*
   No. C-10-80255 MISC CRB (EMC), 2010 U.S. Dist. LEXIS 102158
   (N.D. Cal. Sept. 15, 2010) .........................................................................13, 14, 15

*In re RSM Prod. Corp.,*
   195 F. Supp. 3d 899 (S.D. Tex. 2016) ...................................................................14, 15

*In re Sarrio S.A.,*
   173 F.R.D. 190 (S.D. Tex. 1995)........................................................................7, 9, 13

*In re Solines,*
   No. 18-3680, 2018 U.S. Dist. LEXIS 82501 (E.D. La. Apr. 30, 2018)............................14

*In re Veiga,*
   746 F. Supp. 2d 8 (D.D.C. 2010) .........................................................................9, 10

*Intel Corp. v. Advanced Micro Devices, Inc.,*
   542 U.S. 241 (2004) ..................................................................................... *passim*

*Mees v. Buiter,*
   793 F.3d 291 (2d Cir. 2015)....................................................................................9

*Minatec Fin. S.a.r.L. v. SI Grp. Inc.,*
   No. 1:08-CV-269, 2008 U.S. Dist. LEXIS 63802
   (N.D.N.Y. Aug. 18, 2008) ...............................................................................13, 14

*Republic of Ecuador v. Connor,*
   708 F.3d 651 (5th Cir. 2013) ..................................................................................7

*Tex. Keystone, Inc. v. Prime Nat. Res., Inc.,*
   694 F.3d 548 (5th Cir. 2012) ..............................................................................7, 14

## STATUTES

28 U.S.C. § 1782.......................................................................................... *passim*

## MISCELLANEOUS

Global Witness 2016 Annual Report, https://www.globalwitness.org/documents/
   19085/Annual_report_2016_AW_lowres.pdf ...............................................................4

Inter-American Convention on Letters Rogatory, Jan. 30, 1995,
   1438 U.N.T.S. 283 .............................................................................................12

International Advisory Group of Experts (GAIPE), *Dam Violence: The Plan That Killed Berta Cáceres*, https://gaipe.net/wp-content/uploads/2017/10/GAIPE-Report-English.pdf..................................................3, 4, 5

International Labour Organization, Indigenous and Tribal Peoples Convention, 1989 (No. 169), ratified by Honduras in 1995.....................................................................3

## I.      INTRODUCTION

In March 2018, Roberto David Castillo Mejia ("Castillo") was indicted by the Honduran Office of the Public Prosecutor for ordering the murder of Berta Isabel Cáceres Flores ("Ms. Cáceres"). Ms. Cáceres was murdered on March 2, 2016, when hired gunmen broke down the door to her home and shot her multiple times in her bedroom. Ms. Cáceres's adult children, Laura Yolanda Zúniga Cáceres, Bertha Isabel Zúniga Cáceres, and Salvador Edgardo Zúniga Cáceres (together, "Applicants" or the "Cáceres Children"), now apply to this Court *ex parte* as authorized by 28 U.S.C. § 1782 ("Section 1782") for an order to aid them in obtaining justice as recognized victims in the pending Honduran criminal case against Castillo.

Applicants request that this Court grant them leave to obtain limited document discovery for use in the trial in Honduras against Castillo for Ms. Cáceres's murder. They seek bank records from Hancock Whitney Bank related to a $1.6 million real estate purchase Castillo made in the United States just a few months after successfully orchestrating Ms. Cáceres's assassination. Hancock Whitney Bank, which is headquartered in Gulfport, Mississippi, holds the mortgage to Castillo's property and is in possession of financial information related to the purchase. Evidence of the source of the funds used to purchase the property is expected to corroborate proof of Castillo's motive and connection to those who benefited directly from the murder, i.e., the owners of a dam construction project that was ground to a halt by Ms. Cáceres's efforts. The Cáceres Children, who are recognized as parties to the criminal proceedings in Honduras and are represented by private prosecutors there, intend to present evidence obtained from Hancock Whitney Bank—as is their right under Honduran law—to help secure Castillo's conviction.

As detailed below, the Cáceres Children's application under Section 1782 (the "Application") should be granted because it satisfies all three of the statute's threshold requirements and because all four of the discretionary factors identified by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.* favor granting the application.

Accordingly, Applicants respectfully request that the Court enter the order attached as Exhibit A, allowing Applicants to serve a subpoena in substantially the same form as that attached as Exhibit B.

## II.     FACTUAL BACKGROUND

### A.     Ms. Cáceres Successfully Campaigned against the DESA-led Agua Zarca Dam

In 2009, the Honduran Congress granted a concession to construct a hydroelectric project—the Agua Zarca Dam on the Gualcarque River in western Honduras—to a newly-formed hydroelectric company called Desarrollos Energéticos S.A. ("DESA"). Ex. 1[1] at 7, 8; Ex. 2 at 15. DESA was founded by two employees of Castillo, who served as his proxies, and held just $1,200 in equity. Ex. 1 at 8-9; Ex. 2 at 15. In addition to the large project concession, DESA secured operating permits, water rights, and a lucrative contract to sell power to the Honduran National Electricity Company ("ENEE"), at which Castillo held a managerial position. Ex. 1 at 8-11; Ex. 2 at 15. Notably—and partly due to Ms. Cáceres's efforts—Castillo has been indicted for fraud, forgery, abuse of authority, and other public official violations in connection with the deal between DESA and ENEE. Ex. 1.

Almost from the outset, Ms. Cáceres and the Council of Popular and Indigenous Organizations of Honduras ("COPINH," an indigenous rights group she co-founded) mounted a vigorous grassroots campaign against the Agua Zarca Dam, which if built, would cut off the supply of water, food, and medicine to hundreds of members of the local Lenca community who also considered the Gualcarque River their spiritual home. Ex. 3 at 24; Ex. 4 at 28. Moreover, the Agua Zarca Dam concession had been granted without free, prior, and informed consultation with the Lenca people in violation of international law. Ex. 4 at 28; *see*

---

[1] Exhibit numbers refer to the exhibits attached to the Declaration of Ralitza S. Dineva in Support of *Ex Parte* Application of Laura Zúniga Cáceres, Bertha Zúniga Cáceres, and Salvador Zúniga Cáceres for Discovery for Use in a Foreign Tribunal Pursuant to 28 U.S.C. § 1782.

International Labour Organization, Indigenous and Tribal Peoples Convention, 1989 (No. 169), ratified by Honduras in 1995.

Ms. Cáceres led the fight against the construction of the Agua Zarca Dam. She filed legal complaints, organized community meetings and peaceful protests, and even brought the case before the Inter-American Commission on Human Rights. Ex. 5 at 32. In July 2011, COPINH and Honduran President Porfirio Lobo Sosa signed an agreement, in which the government agreed not to authorize construction of dams in Lenca territories without free, prior, and informed consultation with the affected communities. International Advisory Group of Experts (GAIPE), *Dam Violence: The Plan That Killed Berta Cáceres* at 14, https://gaipe.net/wp-content/uploads/2017/10/GAIPE-Report-English.pdf (hereafter "GAIPE Report"). Around the same time, DESA received a massive infusion of funds from the Atala Zablah family—one of the most powerful families in Honduras (Ex. 2 at 16; Ex. 6 at 36)—and in November 2011, Castillo formalized his position at DESA, which he had been running unofficially since its founding, and became president of the company. Ex. 1 at 8-9.

In 2013, despite the 2011 agreement between COPINH and the Honduran President, an expansion of the Agua Zarca Dam was authorized. GAIPE Report at 14. Once again, Ms. Cáceres and COPINH vehemently opposed this action as a violation of the rights of the Lenca people and worked tirelessly to halt construction of the dam. The opposition included maintaining an over-a-year-long coordinated blockade to prevent DESA's access to the project site, while withstanding violent attacks and eviction attempts by security contractors hired by DESA. Ex. 4 at 29.

Ms. Cáceres's persistence paid off in late 2013, when DESA's construction partner—Chinese state-owned Sinohydro and the world's largest dam builder—withdrew from the project, citing community resistance and outrage over the killing of a community leader during

a peaceful protest. *Id.* at 30.[2]  Additionally, international financial institutions withdrew their support, further jeopardizing DESA's lucrative project and highlighting the effectiveness and threat posed by Ms. Cáceres's activism. Ex. 4 at 30.

**B.    Ms. Cáceres was Murdered in Order to Silence Her Opposition to the Agua Zarca Dam**

Ms. Cáceres's success in organizing the opposition against the Agua Zarca Dam made her a target of violence and intimidation.  She filed over thirty complaints related to threats she had received for her resistance to the project, leading the Inter-American Commission on Human Rights to order the Honduran government to provide protective measures for Ms. Cáceres.  Ex. 2 at 16.  However, this was not enough to save her life in "the deadliest country on the planet for environmental activists," where more than 120 such activists had been killed between 2010 and 2016, including Ms. Cáceres and two other COPINH members. Ex. 3 at 23; (citing Global Witness 2016 Annual Report at 20, https://www.globalwitness.org/documents/ 19085/Annual_report_2016_AW_lowres.pdf); Ex. 7 at 40.

On March 2, 2016, multiple armed men broke into Ms. Cáceres's home and murdered her in her bedroom. Ex. 8 at 50.  The assassination was the culmination of a carefully planned operation months in the making.  *Id.*  Security contractors and hired mercenaries had been tracking the movements of Ms. Cáceres and members of her organization.  *Id.* at 51; GAIPE Report at 17-18.  They had been maintaining constant contact via WhatsApp messages, SMS messages, and phone calls. Ex. 8 at 51; GAIPE Report at 17-18.  They had planned an earlier assassination attempt that was aborted at the last minute. Ex. 8 at 52.  Less than a month later, the hit men completed their mission—they burst into Ms. Cáceres's home, fatally shot her, and wounded another man who happened to be in the house at the time. *Id.* at 50.

---

[2] For her work in opposing the Agua Zarca Dam, in 2015 Ms. Cáceres was awarded the prestigious Goldman Prize Award, referred to as the "green Nobel"[2] and awarded to individuals "for sustained and significant efforts to protect and enhance the natural environment, often at great personal risk." Ex. 4.  By the time of her murder, Ms. Cáceres had become an internationally sought-after speaker and advocate for the rights of indigenous peoples. Ex. 3 at 22.

Castillo—a former military intelligence officer and president of DESA—was one of the masterminds behind the murder.  He ordered the assassination and coordinated its execution with Douglas Bustillo, DESA's former security chief and a former Honduran army lieutenant, whom Castillo tasked with assembling a team of hitmen.  *Id.* at 51-52.  Castillo also provided resources and logistical support to the assassins, who were paid to carry out the murder.  *Id.*  As the criminal indictment filed by the Honduran Public Prosecutor makes clear, Castillo put this plan in motion because of the significant losses incurred by DESA as a result of Ms. Cáceres's activism.  *Id.* at 50-51.

In May 2016, six men, including two DESA employees who had reported to Castillo, were arrested in connection with the murder of Berta Cáceres.  GAIPE Report at 6.  Castillo was not implicated in the murder at that time, and a few months later he purchased a 5,073 sq. ft. house valued at over $1.5 million in Houston, Texas.  Ex. 9; Ex. 10.  He financed part of the purchase through a mortgage held by Hancock Whitney Bank in the amount of $1,036,750 (Ex. 9 at 59, 73), thus paying *hundreds of thousands of dollars* as down payment.  (This Application is for a subpoena to that bank for records related to that transaction.)

By February 2017, two other individuals were implicated in Ms. Cáceres's murder. GAIPE Report at 6.  In 2018, all eight men were tried for her murder.  Ex. 6 at 36.  On November 29, 2018, the Honduran National Criminal Court convicted seven of those men.  *Id.*

On March 1, 2018, Castillo was indicted as "the intellectual author" of Ms. Cáceres's killing.  Ex. 8 at 49.  He is currently on trial in Honduras, which has been suspended pending an appeal.  Declaration of Victor Fernández in Support of *Ex Parte* Application of Laura Zúniga Cáceres, Bertha Zúniga Cáceres, and Salvador Zúniga Cáceres for Discovery for Use in a Foreign Tribunal Pursuant to 28 U.S.C. § 1782 ("Fernández Decl.") (Ex. 13) ¶ 9.  Castillo's trial will resume once the appeal is resolved, which may happen at any time.  *Id.*

### C.     The Cáceres Children Seek Justice for their Mother's Murder

In Honduras, victims of crime have the right to intervene in criminal proceedings and establish a private prosecution against the accused.  Article 16 of the Honduran Code of

Criminal Procedure explicitly allows a victim to "become a private plaintiff or complainant and to intervene as such" throughout the criminal process. Ex. 11 art. 16(a) (p. 143). A victim may be represented by an attorney who is referred to as a private prosecutor. Importantly, the private prosecutor may present evidence and arguments at pre-trial hearings and during trial, and may even cross-examine the defendant. *Id.* arts. 294, 301, 321, 323 (pp. 148-51). Additionally, a private prosecutor may, after providing notice, raise issues and proceedings separate and apart from those pursued by the Office of the Public Prosecutor. *Id.* art. 97 (p. 145).

Honduran law recognizes the Cáceres Children as victims of their mother's murder. *Id.* art. 17 (p. 147). They are determined to hold those responsible for Ms. Cáceres's death accountable and are unrelenting in their pursuit of justice. The Cáceres Children previously intervened in the 2018 trial of the eight men originally implicated in Ms. Cáceres's murder. Fernández Decl. ¶ 4. They have also retained attorneys to represent them as private prosecutors in Mr. Castillo's trial, who have already appeared in pre-trial proceedings on their behalf. *Id.* ¶¶ 3-5. The private prosecutors intend to present relevant evidence obtained as a result of this Application in the criminal proceedings in Honduras. *Id.* ¶ 8. They believe that records obtained from Hancock Whitney Bank related to the mortgage on the property will adduce evidence that Castillo received a large sum of money to orchestrate Ms. Cáceres's murder and that he had a strong financial motive to carry out the assassination. The private prosecutors further believe that this evidence may also help identify other, yet unknown, individuals who were involved in the killing. *Id.* ¶ 7.

## III.   LEGAL STANDARDS

Section 1782 authorizes a federal district court to order discovery of documents and testimony for use in a foreign proceeding from any person who resides or is found in the court's district:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person and may direct that the

-6-

testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782(a). The statute seeks to "make discovery of evidence for use in foreign litigation simple and fair," (*In re Edelman*, 295 F.3d 171, 173 (2d Cir. 2002)) and the court's discretion should be exercised in furtherance the statute's "twin aims of 1) providing equitable and efficient means to assist parties engaged in international litigation and, by so doing, 2) inviting foreign countries to provide similar assistance to our courts." *Id.* at 181; *see also Tex. Keystone, Inc. v. Prime Nat. Res., Inc.*, 694 F.3d 548, 549 (5th Cir. 2012).

Congress enacted Section 1782 to "facilitate the conduct of litigation in foreign tribunals, improve international cooperation in litigation, and put the United States into the leadership position among world nations in this respect." *In re Bayer AG*, 146 F.3d 188, 191-92 (3d Cir. 1998). The statute's legislative history also "indicates that Congress intended federal courts to provide ***broad assistance*** to foreign litigants who request permission to conduct discovery in the United States." *In re Sarrio S.A.*, 173 F.R.D. 190, 193 (S.D. Tex. 1995) (emphasis added). This "promote[s] international dispute resolution and comity." *Republic of Ecuador v. Connor*, 708 F.3d 651, 654 (5th Cir. 2013).

Section 1782 does not create a new discovery standard; it merely provides for a "threshold determination" regarding whether to allow foreign litigants to access discovery in federal courts that is consistent with federal rules. *Tex. Keystone*, 694 F.3d at 554. The statute sets forth three requirements: (1) the person or entity from whom the discovery is sought must be a resident of or be found in the district where the application is filed, (2) the discovery sought must be "for use in a proceeding in a foreign or international tribunal," and (3) the application must be made "by a foreign or international tribunal" or "any interested person." 28 U.S.C. § 1782(a); *Bravo Express Corp. v. Total Petrochemicals & Ref. USA, Inc.*, 613 F. App'x 319, 322 (5th Cir. 2015) (citing *Tex. Keystone*, 694 F.3d at 553).

Once Section 1782's statutory requirements are met, whether to grant the application is within the district court's discretion. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S.

241, 264 (2004). The Supreme Court has identified four discretionary factors to aid courts in determining whether to exercise their discretion in granting Section 1782 Applications: (1) whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach and thus accessible absent Section 1782 aid; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the subpoena contains unduly intrusive or burdensome requests. *Id.* at 264-65.

## IV.    ARGUMENT

The Court should grant this Application because it satisfies all of Section 1782's statutory requirements. *First*, the Application is filed in "the district in which a person resides," 28 U.S.C. § 1782(a), because Hancock Whitney Bank is headquartered in Gulfport, Mississippi. *Second*, the discovery is sought "for use in a proceeding in a foreign . . . tribunal," (*id.*), namely the murder trial against Castillo in the Honduran court. *Third*, Applicants, as victims of Castillo's crime and legally recognized as parties in the criminal prosecution under Honduran law, are "interested person[s]" in the foreign proceeding. *Id.* Moreover, all four of the discretionary *Intel* factors favor granting the application.

### A.    Hancock Whitney Bank Resides in This District

Hancock Whitney Bank "resides" and is "found" in the Southern District of Mississippi under 28 U.S.C. § 1782 because its headquarters is located in Gulfport, Mississippi, which is within this District. Dineva Decl. ¶ 16; *see Bravo Express*, 613 F. App'x at 322. Therefore, Hancock Whitney Bank is subject to this Court's authority under Section 1782.

### B.    The Discovery is Sought for Use in a Criminal Trial in Honduras

The requested discovery is sought for use in a pending foreign judicial proceeding, i.e., Castillo's murder trial in Honduras. Fernández Decl. ¶¶ 7-8. Under Section 1782, "a district court has broad discretion to grant a foreign litigant's request to conduct discovery in the

United States for use in foreign proceedings." *Sarrio*, 173 F.R.D. at 193.  To establish that the evidence sought is "for use" in a criminal proceeding, the applicant need only demonstrate "that he or she has the practical ability to inject the requested information into a foreign proceeding." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017) (stating the under Section 1782, "for use" means "that the requested discovery is 'something that will be employed with some advantage or serve some use in the proceeding'" (citation omitted)).  Courts have held that merely having the ability to present evidence to an official or magistrate overseeing an investigation satisfies this factor.  *See In re Inversiones y Gasolinera Petroleos Valenzuela, S. de R.L.*, No. 08-20378-MC, 2011 WL 181311, at *9-10 (S.D. Fla. Jan. 19, 2011) (finding the "for use" requirement was met where petitioners sought to use evidence in criminal investigation in Honduras); *In re Furstenberg Fin. SAS*, No. 18-mc-44 (JGK), 2018 U.S. Dist. LEXIS 116391, at *11-12 (S.D.N.Y. July 12, 2018) (citing *Accent Delight*, 869 F.3d at 132 (finding that "for use" requirement was met where the "[p]etitioners are parties to that proceeding who, while they have abandoned any claim there for monetary relief, retain the procedural right to submit the requested documents to the magistrate overseeing the investigation")), *appeal docketed*, No. 18-3158 (2d Cir. Oct. 22, 2018); *In re Berlamont*, No. 14-mc-00190 (JSR), 2014 U.S. Dist. LEXIS 111594, at *3 (S.D.N.Y. Aug. 4, 2014) ("A complaining witness's presentation of evidence to an investigating magistrate satisfies the 'for use' prong of § 1782."), *aff'd sub nom. In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings*, 773 F.3d 456 (2d Cir. 2014).

There is no requirement that the discovery be necessary to prevail in the underlying foreign proceeding.  *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015).  Section 1782 likewise does not require that the evidence sought be admissible.  *See In re HydroDive Nig., Ltd.*, No. 13-MC-0477, 2013 U.S. Dist. LEXIS 200238, at *7-8 (S.D. Tex. May 29, 2013) (citing *In re Veiga*, 746 F. Supp. 2d 8, 18-19 (D.D.C. 2010)).  The district court "should generally refrain from addressing admissibility" because the foreign tribunal is responsible for determining how evidence is used within that tribunal.  *Id*.  "Relevancy in this context is 'broadly construed and

encompasses any material that bears on, or that reasonably leads to other matters that could bear on, any issue that is or may be in the case.'" *Id.* (quoting *Veiga*, 746 F. Supp. 2d at 19).

Here, the discovery is sought for the specific purpose of presenting evidence in Castillo's murder trial in Honduras. Applicants, who are legally recognized parties in the trial, have robust participatory and procedural rights, including the right to present evidence through their private prosecutors. Ex. 11 arts. 16 (a), 294, 301, 321, 323 (pp. 143, 145, 148-51). The information sought is relevant because it bears on the financial motivations and means behind Castillo's involvement in Ms. Cáceres's murder. Fernández Decl. ¶ 7. Therefore, the Cáceres Children are able to demonstrate that the documents they seek are "for use" in a foreign proceeding.

### C.   The Cáceres Children are "Interested Persons" in the Honduran Proceedings

The Cáceres's Children are "interested persons" under Section 1782 because they are legally recognized parties in Castillo's murder trial and have significant participation rights in the Honduran proceedings. The Supreme Court has stated that "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782." *Intel*, 542 U.S. at 256. However, the term "any interested person" in the statute is broad and includes "any other person whether he be designated by foreign law or international convention or merely possess a reasonable interest in obtaining the [judicial] assistance." *Id.* at 257. The *Intel* court held that a private party that filed a complaint before a foreign commission and which had the right to submit evidence for the foreign commission's consideration and the ability to proceed to a court if the commission discontinued the investigation or dismissed the complaint had a "significant role" in the proceedings, and "therefore qualifie[d] as an 'interested person'" under Section 1782. *Id.* at 256-57; *see also Furstenberg*, 2018 U.S. Dist. LEXIS 116391, at *17 (finding that applicants who filed a Section 1782 application with an intent to file a criminal complaint that will trigger legal proceedings and an independent criminal investigation were interested persons).

Here, under Honduran law, the Cáceres Children are victims who have the right to intervene in the criminal process against Castillo as private complainants via their private prosecutors. Ex. 11 arts. 16, 17 (pp. 143-44). As such, they are litigants in the foreign proceedings and plainly qualify as "interested persons" under Section 1782.

Moreover, as the private party in *Intel*, Applicants have expansive participation rights, including the right to present arguments, submit evidence, and even cross-examine the accused via a private prosecutor. *Id.* arts. 294, 301, 321, 323 (pp. 148-51); *see Intel*, 542 U.S. at 256-57. The private prosecutor may even initiate proceedings and raise issues that the Office of the Public Prosecutor fails or declines to pursue. Ex. 11 art. 97 (p. 145). Thus, just as the private party in *Intel*, the Cáceres Children have a strong and legally cognizable interest in obtaining judicial assistance. Additionally, Applicants' interest in the Honduran proceedings is neither abstract nor hypothetical. The Cáceres Children have already taken advantage of their right to engage a private prosecutor and intervene in Castillo's murder trial. Fernández Decl. ¶¶ 3-5. They also previously exercised their right to participate in the trial of the eight men originally implicated in Ms. Cáceres's murder. Fernández Decl. ¶ 4.

**D.   The Court Should Exercise Its Discretion and Grant This Application**

The factors identified by the Supreme Court to guide the Court's discretion in analyzing requests under Section 1782 favor granting this application.

**1.   The discovery sought is outside of the jurisdictional reach of Honduran courts, and thus inaccessible absent assistance under Section 1782**

The first *Intel* factor—whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach and thus accessible absent Section 1782 aid—weighs in favor of granting discovery in this case. 542 U.S. at 264. As the Court explained in *Intel*, non-participants in the foreign proceeding are not subject to the foreign tribunal's reach:

> [W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . , the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad. A foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence. . . . In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach;

hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid.

*Id.*

The situation here is analogous to the one in *Intel*: Hancock Whitney Bank is not a participant in the underlying Honduran murder trial and is not expected to be a participant in those proceedings. Further, as a corporation incorporated and located in the United States, Hancock Whitney Bank is outside of the Honduran court's jurisdictional reach. Thus, the evidence in Hancock Whitney Bank's possession would likely be unobtainable by Applicants absent Section 1782 aid.

### 2. The Honduran Government is Receptive to U.S. Judicial Assistance in this Criminal Proceeding

The second *Intel* fact—the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance—also weighs in favor of granting the Application. *Id.* at 265. The Honduran government has demonstrated that it is receptive to receiving foreign discovery aid in connection with the criminal investigation and prosecution of Castillo. Specifically, on December 2, 2018, the Public Ministry of Honduras issued a request to United States authorities pursuant to the Inter-American Convention on Mutual Assistance in Criminal Matters to obtain SIM card information related to Castillo. Ex. 12 at 165-70. Moreover, Honduran courts and authorities are generally amenable to U.S. federal court assistance. Honduras has ratified the Inter-American Convention on Letters Rogatory, which sets out procedures for "[t]he taking of evidence and the obtaining of information abroad." *See* Inter-American Convention on Letters Rogatory, art. 2(b) Jan. 30, 1975, 1438 U.N.T.S. 283. In addition to Honduras's general receptivity, one of the private prosecutors in this matter has submitted a declaration stating his intent to present relevant evidence obtained as a result of this Application in the criminal proceedings against Castillo in Honduras. Fernández Decl. ¶ 8.

Furthermore, in the absence of authoritative proof or "clear directive" that a foreign tribunal would reject evidence obtained under Section 1782, this factor weighs in favor of

exercising discretion to grant a Section 1782 application. *Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 377 (5th Cir. 2010) (citation omitted).[3] The Fifth Circuit has determined that such proof would only be authoritative if it is "embodied in a forum country's judicial, executive or legislative declarations that specifically address the use of evidence gathered under foreign procedures," and absent such evidence, "a district court's ruling should be informed by Section 1782's overarching interest in 'providing equitable and efficacious procedures for the benefit of tribunals and litigants involved in litigation with international aspects.'" *Sarrio*, 173 F.R.D. at 196 (citation omitted); *see also Inversiones y Gasolinera Petroleos Valenzuela*, 2011 WL 181311, at *13 (absence of evidence that Honduran prosecutor would be either receptive or hostile to evidence favored granting Section 1782 application).

### 3. The Application Does Not Attempt to Circumvent Honduran Evidentiary Procedures

Similarly, the third *Intel* factor— whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States—weighs in favor of granting the application. 542 U.S. at 266. There is no requirement that evidence sought be discoverable in the foreign tribunal or that an applicant seek discovery in the foreign jurisdiction before requesting the assistance of a federal court. *See id.* at 259-66; *HydroDive*, 2013 U.S. Dist. LEXIS 200238, at *9-10 (citing *In re Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997)). However, the court may consider whether the Section 1782 request is an attempt to circumvent foreign restrictions or policies. *See Intel*, 542 U.S. at 259-66. In conducting this analysis, courts probe whether the applicants are seeking discovery in bad faith. *In re Chevron Corp.*, No. 4:10-mc-134, 2010 U.S. Dist. LEXIS 120479, at *3 (S.D. Tex. Apr. 5, 2010) (citing *Minatec Fin. S.a.r.L. v. SI Grp. Inc.*, No.

---

[3] *See also In re Eurasian Bank Joint Stock Co.*, No. 3:15-mc-106-L-BN, 2015 U.S. Dist. LEXIS 142866, at *7 (N.D. Tex. Oct. 21, 2015); *In re Gorsoan, Ltd.*, No. 13 MISC 397 (PGG), 2014 U.S. Dist. LEXIS 175613, at *19-23 (S.D.N.Y. Dec. 10, 2014); *In re Republic of Ecuador*, No. C-10-80255 MISC CRB (EMC), 2010 U.S. Dist. LEXIS 102158, at *14-16 (N.D. Cal. Sept. 15, 2010); *In re iManagement Servs. Ltd.*, No. MISC 05-89 (FB), 2005 U.S. Dist. LEXIS 17025, at *15-19 (E.D.N.Y. Aug. 16, 2005).

1:08-CV-269 (LEK/RFT), 2008 U.S. Dist. LEXIS 63802, at *25-26 (N.D.N.Y. Aug. 18, 2008) ("The primary issue for us [under the third *Intel* factor] is whether [applicant] is pursuing this discovery in bad faith.")).

Applicants are not aware of any restriction on obtaining the discovery requested in this Application. They merely seek to obtain additional probative information that could provide evidence of motive and support a murder conviction. This goal is in line with the statute's purpose of "provid[ing] efficient means of assistance to participants in international litigation in our federal courts." *Tex. Keystone*, 694 F.3d at 553-54 (citation omitted). Indeed, where the evidence sought cannot be obtained via discovery in the foreign tribunal—as is the case here where Hancock Whitney Bank is outside of the Honduran court's jurisdictional reach—it is clear that such an application is not an attempt to avoid a foreign rule or order. *See Republic of Ecuador*, 2010 U.S. Dist. LEXIS 102158, at *11-12.

### 4. The Discovery Sought is Not Unduly Burdensome

Finally, the fourth *Intel* factor—whether the subpoena contains unduly intrusive or burdensome discovery requests—also favors granting this application. 542 U.S. at 266. The Cáceres Children seeks only those records held by Hancock Whitney Bank that relate to the financing secured to purchase Castillo's Houston property. *See* Exhibit B, attached hereto. Such narrow and specific requests are not unduly burdensome. *See In re Solines*, No. 18-3680, 2018 U.S. Dist. LEXIS 82501, at *6 (E.D. La. Apr. 30, 2018) (finding a request for production of documents not unduly burdensome where the request listed only six specific and narrow requests). Even if the Court determines that the discovery sought in this case is excessive, it may limit its scope rather than preclude it entirely in situations where the other factors weigh in favor of granting the application, as is the case here. *See In re RSM Prod. Corp.*, 195 F. Supp. 3d 899 (S.D. Tex. 2016); *see also Intel*, 542 U.S. at 265 (requests in a § 1782 application "may be . . . trimmed" where they are overly broad).

**E.**     **The Court Should Grant the Requested Discovery on an *Ex Parte* Basis**

Finally, it is proper for the Court to consider this Application *ex parte*. *Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) (stating that it is "neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*"). Courts in this Circuit routinely grant *ex parte* applications for discovery under Section 1782. *See, e.g.*, *Eurasian Bank*, 2015 U.S. Dist. LEXIS 142866 (granting *ex parte* Section 1782 application); *In re Godfrey*, No. 3:08-MC-0107-K, 2009 U.S. Dist. LEXIS 127279 (N.D. Tex. Mar. 24, 2009) (same); *RSM*, 195 F. Supp. 3d 899 (same); *In re Grupo Mex. Sab De CV*, No. 3:14-MC-0073-G, 2015 U.S. Dist. LEXIS 177694 (N.D. Tex. Mar. 10, 2015) (same), *aff'd sub nom. Grupo Mex. Sab De DV v. SAS Asset Recovery, Ltd.*, 821 F.3d 573 (5th Cir. 2016). Indeed, courts have recognized that in the context of applications under Section 1782, "it is common for the process of presenting the request to a court and to obtain the order authorizing discovery to be conducted *ex parte*." *Republic of Ecuador*, 2010 U.S. Dist. LEXIS 102158, at *4-8. Proceeding *ex parte* on a Section 1782 applications is "typically justified by the fact that the parties will be given adequate notice of any discovery taken pursuant to the request and will then have the opportunity to move to quash the discovery or to participate in it." *Id.* at *7 (citation omitted).

## V.   CONCLUSION

The Cáceres Children are seeking narrowly-tailored discovery for use in the trial against Castillo for the murder of their mother.  This Application satisfies the statutory requirements of Section 1782, and the *Intel* factors weigh in favor of its granting.  As such, Applicants respectfully request leave to serve on Hancock Whitney Bank the subpoena attached as Exhibit B to this application.

Dated:  July 17, 2019                    Respectfully submitted,

By: _Amelia S. McGowan_____
     Amelia S. McGowan

MISSISSIPPI CENTER FOR JUSTICE
5 Old River Place, Suite 203 (39202)
P. O. Box 1023
Jackson, Mississippi 39215

OF COUNSEL:

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
Leo P. Cunningham
Ralitza S. Dineva
Sean Killeen
650 Page Mill Road
Palo Alto, California 94304-1050

INTERNATIONAL HUMAN RIGHTS LAW
CLINIC, UNIVERSITY OF CALIFORNIA
BERKELEY
Roxanna Altholz
489 Simon Hall,
Berkeley, California 94720

*Attorneys for Applicants*
*Laura Zúniga Cáceres, Bertha Zúniga*
*Cáceres, and Salvador Zúniga Cáceres*