**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

IN RE:  EX PARTE APPLICATION OF
LAURA ZUNIGA CACERES, BERTHA
ZUNIGA CACERES, AND SALVADOR                    **CASE NO. 1:19MC405-LG-RHW**
ZUNIGA CACERES FOR ASSISTANCE
BEFORE A FOREIGN TRIBUNAL


**RESPONSE IN OPPOSITION TO APPLICATION OF LAURA ZUNIGA CACERES,
BERTHA ZUNIGA CACERES, AND SALVADOR ZUNIGA CACERES FOR
DISCOVERY FOR USE IN A FOREIGN TRIBUNAL PURSUANT TO 28 U.S.C. § 1782**


**I.      Introduction**

There are several reasons why the Court should deny Applicants' Section 1782 request—
some procedural, some substantive.  But an overriding problem with the Application is that it is
almost certainly a bad faith fishing expedition.

As this response demonstrates, there is no legitimate reason to believe the Castillos'[1]
mortgage file at Hancock Bank contains evidence relevant to whether David Castillo
"masterminded" Ms. Cáceres' murder in Honduras.  By contrast, the file surely contains all kinds
of information about the Castillos' assets, business interests, financial holdings, bank accounts,
and other sensitive financial information, which the Applicants and the organization with which
they are aligned undoubtedly covet for reasons having nothing to do with the criminal case or the
reason set forth in the Application.

Section 1782 merely provides a procedural vehicle to grant federal courts discretion,
where appropriate, to facilitate international discovery.  For the reasons set forth in this response,
the Court should exercise its discretion to deny the Application.

---

[1] The term "Castillos" is used as shorthand in this response for David Castillo and his wife,
Tanya Romero-Baca.

II.     **Background**

    **A.  Tanya Romero-Baca and David Castillo**

Tanya Romero-Baca was born in Miami, Florida and is a United States citizen.

David Castillo was born in Honduras, yet received a prestigious scholarship to attend college at the United States Military Academy—West Point, from which he graduated with a B.S. in Electrical Engineering.  (Ex. 1, Romero-Baca Dec. ¶ 3).  Upon graduating from West Point, he worked for a few years for a private technology company in Maryland before returning to Honduras to fulfill his military commitment.  (*Id.* ¶ 4).

Ms. Romero-Baca and Mr. Castillo married about ten years ago.  They have three children.  (*Id.* ¶ 2).

    **B.  Mr. Castillo's Successful Career to Date in Honduras**

Upon returning to Honduras, Mr. Castillo served in multiple positions in the Honduran military as well as in the Honduran government.  Given his background in electrical engineering, and his personal interest in providing electricity to Honduras's rural areas, he served in several prominent roles helping to oversee and plan the country's power infrastructure. (*See* Ex. 3, AMSTERDAM & PARTNERS, LLP, *War on Development: Exposing the COPINH Disinformation Campaign Surrounding the Berta Cáceres Case in Honduras*, at 26-38 (hereafter, "AMSTERDAM REPORT")).

After leaving public service, Mr. Castillo entered the private sector and became involved in several Honduran entities and projects related to power generation and electrical infrastructure.  For example, he was a founder of Potencia y Energía de Mesoamerica ("PEMSA"), which developed a successful solar power facility in Nacaome, Honduras.  (Ex. 1, Romero-Baca Dec. ¶ 6).  He also became the President of Desarollos Energéticos S.A. ("DESA"), which obtained international financing and key governmental permits to develop a substantial hydro-electric facility, called Agua Zarca.  (Ex. 3, AMSTERDAM REPORT, at 40; Ex. 1, Romero-Baca Dec. ¶¶ 5, 7).

### C.  COPINH and Berta Cáceres

Berta Cáceres was a prominent environmental and human rights activist in Honduras. She also headed COPINH, a controversial environmental and human rights organization. Applicants portray COPINH – with which some or all of the Applicants are associated – as a grassroots indigenous-rights organization.  COPINH and its tactics, however, have been described far less charitably.  (*See* Ex. 3, AMSTERDAM REPORT, at 13-21, 48-51).  One of COPINH's and Ms. Cáceres' causes was to oppose DESA's Agua Zarca project.  (*Id.* at 44-51).

### D.  Ms. Cáceres Is Murdered and COPINH Immediately Blames DESA

As the Application notes, armed men broke into one of Ms. Cáceres' homes on March 2, 2016, and murdered her.  Nothing in this Application is meant to express insensitivity to the tragic fact that she was murdered, causing pain to her family and others who admired and cared about her.

Almost immediately after the murder, COPINH publicly advocated that DESA and Mr. Castillo must have had Ms. Cáceres killed due to her opposition to their Agua Zarca project.

### E.  The Threats to the Safety of the Castillo Family

When COPINH and its allies in the Honduran and international communities quickly came to accuse DESA and Mr. Castillo of Ms. Cáceres' murder, Honduras became increasingly unsafe for the young Castillo family.  Despite employing full-time security, the harassment and intimidation eventually became so serious that the Castillos came to fear for their lives and especially for their children.  (Ex. 1, Romero-Baca Dec. ¶¶ 9-10).  The Castillos agreed to relocate Ms. Romero-Baca and their children, who are all U.S. citizens, to Houston, where Ms. Romero-Baca has family.  (*Id.* ¶ 11).

### F.  The Houston Home Purchase

The Castillos found a home that they wished to purchase in Houston in approximately September 2016 and so they applied for a mortgage through a Houston branch of Hancock Bank. In November, they closed on the home, paying approximately $400,000 as a down-payment and financing the remaining $1,036,750 with Hancock through a mortgage.  After they moved into

the home, Mr. Castillo continued to work in Honduras during the week, and, when he was able, fly home on the weekends to be in Houston with his family.  (*Id.* ¶ 16).

**G.  Mr. Castillo Is Charged with Murder**

As part of its public relations and political effort to force an indictment of Mr. Castillo, COPINH helped procure a document known as the GAIPE Report, which is relied upon throughout the Application.  The GAIPE Report is hardly a neutral account; the Report originated with requests from COPINH and Ms. Cáceres' family and was funded by various donors and human rights organizations around the world.  It has been described as a "blatantly non-objective" analysis that "has served as COPINH's most important foundational propaganda instrument to recruit allies among the NGO community who have neglected to independently analyze the facts of the case."  (*See* Ex. 3, AMSTERDAM REPORT, at 7; Ex. 4, July 2, 2018, Greenspan Ltr. to Amsterdam, at 8-12 (hereafter "Greenspan Letter")).  But for present purposes, what is important is that the GAIPE Report supported COPINH's theory that DESA and Mr. Castillo masterminded the murder and was used as a political and public relations tool to pressure prosecutors to charge Mr. Castillo.  (Ex. 3, AMSTERDAM REPORT, at 8 (noting that the GAIPE Report "placed undue pressure upon the prosecutors . . . even in the face of a complete lack of evidence against . . . Castillo")).

Eventually, COPINH's political and public relations effort paid off when on March 2, 2018, the exact two-year anniversary of Ms. Cáceres' death, Mr. Castillo was indicted as the supposed "intellectual author" of her murder.  *See* www.bertacaceres.org, *President of DESA Arrested for Involvement in Assassination of Berta Cáceres* (available here) (last visited Aug. 19, 2019) ("COPINH reports to the national and international community that moments ago David Castillo, the President of the DESA corporation and the Agua Zarca hydroelectric project, was arrested thanks to all of the work and pressure created by the solidarity and work of organizations nationally and internationally."); Ex. 10, Translated Indictment).

Before being charged with Cáceres' murder, Castillo had never been charged with a crime or demonstrated any propensity for violence.[2]  (Ex. 1, Romero-Baca Dec. ¶¶ 18-19).

**H.  The Prosecution's Theory and the Status of the Proceedings Against Mr. Castillo**

The Indictment and other public statements by the prosecutors do not contend that Mr. Castillo was physically involved with the murder or that he was in any way compensated to organize or mastermind it.  The theory is that he initiated the murder to silence a vocal opponent to his Agua Zarca development.  The only actual evidence the Prosecution has produced against Mr. Castillo is a forensic report by a state-employed intelligence officer of cell phone calls and digital communications that appears to be seriously deficient.  (*See* Ex. 5, Ruben Edgar Chapa Cabrera, *The Opinion of the Defense of Mr. Roberto David Castillo Mejia* (Apr. 2, 2019) (translated to English)). In particular, the prosecution's report relies on

> conversations . . . assembled by mixing messages . . . and inserting them, even
> when they are from different whatsapp groups and conversations, creating in this
> way, a conversation that seems to be real; but it is the product of the intercalation
> of messages of different contexts for being or belonging to other conversations,
> obtained from extractions of the telephone device allegedly confiscated from [an
> alleged co-conspirator] . . . .

(*Id.* at 34; *see also id.* at 10-22).  Castillo's lawyers have filed a grievance against the prosecution's expert for falsifying evidence to justify the indictment.  (Ex. 6, Grievance).

Procedural challenges that came up at the first hearing in the matter are still working their way through the Honduran legal system.  There is no trial date set for Mr. Castillo and there is a ways to go before it is even determined that he will stand trial.

**I.  The Applicants' Right to Participate as Victim Representatives in Honduras**

Honduras appears to provide for relatively robust "victim rights," whereby representatives of a victim may be heard and participate in certain ways in the criminal

---

[2] The Applicants refer to another indictment of 16 people (including Castillo) related to the Agua Zarca project, that was handed down on the third anniversary of Ms. Cáceres' death, after Castillo was already incarcerated.  *See* Telesur, *16 Indicted for Fraud in Berta Cáceres Case in Honduras* (available here) (last visited Aug. 22, 2019). Applicants are not "victims" in that case, nor does the case have any relation to the Application.

proceedings.  (Ex. 7, Honduras Criminal Code, Art. 16).  But Applicants are, of course, not the prosecutors in the matter and that they have some participation rights does not mean they have the right to use judicial process to propound and compel discovery.  Indeed, Applicants conspicuously do not refer the Court to any provision of Honduran law that says victim representatives have discovery power.

Moreover, what role these representatives will be permitted to play in Mr. Castillo's trial is yet to be fully determined.  According to public reports, after they intervened in the related prosecution of several men who were later actually convicted of carrying out Cáceres' murder, the Court excluded the Applicants because they did not appear for a required hearing and because they had engaged in other conduct detrimental to the proceedings.  *See* Robert Amsterdam, *Press Release: COPINH's Objective is to Deprive Fair Trial Rights from Defendants in Berta Cáceres Trial* (Oct. 24, 2018) (available here) (last visited Aug. 21, 2018); (Ex. 9, EL HERALDO, *Berta Cáceres' Family Denounces Exclusion from Trial* (Oct. 22, 2018)).

**III.    The Application Is A Pretext to Obtain Unjustified Access to the Castillos' Finances**

Applicants do not seriously try to explain why they believe the Hancock Bank mortgage file includes evidence that Mr. Castillo was paid to coordinate Ms. Cáceres' murder.  The closest Applicants come to even articulating a theory is to ask the Court to infer that, because the Castillos had $400,000 for a home down-payment months after the murder, *someone*—whose identity and motive are left entirely unaddressed in the Application—*must* have paid Mr. Castillo to mastermind the murder.

Applicants' theory, of course, ignores that Mr. Castillo was a successful businessman who had worked in high-level jobs and on high-level projects for years.  (Ex. 1, Romero-Baca Dec. ¶¶ 4-6).  It also ignores the safety considerations that escalated after Ms. Cáceres' death and led the Castillos to purchase the home in Houston.  (*Id.* ¶¶ 8-11).  And the theory that someone paid Mr. Castillo a lot of money to have Ms. Cáceres murdered is altogether inconsistent with the prosecutor's theory that Mr. Castillo was "*the* intellectual author" of the murder.  (Ex. 10,

Translated Indictment, at 1 (emphasis added).)  Applicants are simply shifting their entire theory of guilt to try to justify their discovery.

The reason the Applicants' "relevance" theory is articulated so cryptically, has never been offered by the actual prosecutors (or even by COPINH to our knowledge), and is unaccompanied by any factual support, is because the theory is a transparent pretext.  If one is investigating Mr. Castillo's alleged connection to the murder, an *ex parte* demand for his Bank's underwriting file on a Texas home purchased eight months after the murder makes little sense.  But if one's objective is to obtain specifics regarding the Castillos' assets and where they are held, then the Applicants' request for the file makes perfect sense.

Applicants presently have no basis for demanding information about the Castillos' assets, let alone to obtain all their other financial information.  There is no civil judgment against them, or even any civil proceedings.  So Applicants have resorted to offering a pretextual and baseless theory that the request for the mortgage file is reasonably calculated to lead to evidence connecting Mr. Castillo to the murder.  This is an abuse of Section 1782.  *See In re Application of Gov't of Lao People's Democratic Republic v. For an Order Pursuant to the United Nations Convention Against Corruption*, 2016 WL 1389764, at *8 (D. N. Mariana Islands Apr. 7, 2016).

The Court has broad discretion in considering Section 1782 requests.  The Court need not be certain a request will lead to relevant evidence in order to grant it.  But the Court should deny any request "made in bad faith" or "for the purpose of harassment" "just as it can if discovery was sought in bad faith in domestic litigation."  *Green Dev. Corp. S.A. De C.V. v. Zamora*, 2016 WL 2745844, at *3 (S.D. Fla. May 10, 2016) (internal quotations omitted); *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 WL 183944, at *4 (N.D. Cal. Jan. 17, 2013) (denying Section 1782 request in the court's discretion even though minimum statutory requirements were facially satisfied).  Here, the Court can reasonably infer that this is an improper (or, at a minimum, premature) effort by Applicants to try to determine whether and where the Castillos have assets, which is not a valid premise for the discovery.  *See Gov't of Lao*,

2016 WL 1389764, at *8 (denying application because it had more to do with "seeking damaging information for [an unrelated proceeding] than it does with punishing criminal activity").

In addition, the Court should consider that there is no reasonable way to protect the Castillos from potential misuse of their financial information and the serious threat that such misuse may occur.  As surely the Applicants know, to secure financing for their home, the Castillos had to submit considerable financial and other personal information to Hancock Bank. (Ex. 1, Romero-Baca Dec. ¶ 14).  This information is sensitive and private, especially to persons with family and holdings in a country like Honduras.  The information predictably could be used in numerous ways to harass the Castillos, to try to tap into or tie up those assets, or to interfere with Mr. Castillo's business relationships.  Recall that the only way the Castillos even found out about the *ex parte* Application was because Applicants leaked the Application to a reporter.  (*Id.* ¶ 20).  And no restrictions the Court might place on Applicants' distribution or use of information obtained from the mortgage file would be effective and enforceable in Honduras. These concerns easily outweigh the seemingly non-existent probative value of the mortgage file to investigating the murder case.

## IV.   Applicants Are Likely Exceeding Their Rights Under Honduran Law

The Application appears to be the first formal "discovery" Applicants have taken to obtain information regarding Mr. Castillo or any alleged connection between his finances and the murder.  To our knowledge, they did not ask the Honduran Court to authorize this discovery.

The Application asserts that Applicants, as Castillo's alleged victims, have the power to participate in Castillo's prosecution.  That is accepted as true.  But that does not mean they have the authority to invoke discovery procedures.  Honduras's victim's rights statute gives victims six specific rights, none of which include the right to propound or seek discovery or conduct an investigation under the imprimatur of the court.  (Ex. 7, Honduras Criminal Code, Art. 16 (giving victims the right to (1) accuse or make a complaint against a defendant; (2) to be informed about the case, upon request; (3) to be heard, upon request; (4) to be involved in public hearings; (5) to object to an administrative dismissal; and (6) to exercise "other rights provided for in the laws").

There is a world of difference between being given an opportunity to voice your position or be informed about the case as an interested party versus having authority to invoke formal discovery procedures to conduct your own prosecutorial investigation.  *See, e.g.*, *Cooper v. Dist. Court*, 133 P.3d 692, 705 (Alaska Crim. App. 2006) (distinguishing between victim's right to notice, attend proceedings, and offer their view, on the one hand, and the "right to participate as independent parties to a criminal prosecution," on the other); *Lindsay R. v. Cohen*, 343 P.3d 435, 437 (Ariz. App. 2015) (although victim's lawyer may protect victim's constitutional rights, "such counsel cannot serve as a substitute for the prosecutor").  That the Honduran legislature did not grant victims an express right to conduct discovery or issue subpoenas among the specific rights and powers accorded victim representatives strongly suggests no such authority was contemplated.  *Cf. In re Condor Ins. Ltd.*, 601 F.3d 319, 324 (5th Cir. 2010) (adopting interpretation maxim *expressio unius est exclusio alterius* to reject argument that exception to statutory restriction was available despite legislature's decision to explicitly list exceptions and not include exception at issue).

Furthermore, Applicants' request appears inconsistent with Article 149 of the Honduran Criminal Code.  That Article, entitled "Request for Assistance to Foreign Courts," requires letters rogatory[3] and other requests to foreign tribunals to be processed either through Honduran diplomatic channels or approved by a judge.  (Ex. 2, Cantillano Aff.; *see also* Ex. 8, Honduras Criminal Code, Art. 149).  Applicants have not disclosed any evidence that they have obtained diplomatic authorization or sought letters rogatory or other permission from the judge presiding over Castillo's case.

In sum, Applicants are attempting the type of "end-run around foreign proof-gathering restrictions," for which Section 1782 cannot be used.  *In re Application for Discovery for Use in*

---

[3] *See* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "letters rogatory" as "[a] document issued by one court *to a foreign court*, requesting that the foreign court (1) take evidence from a specific person within the foreign jurisdiction or serve process on an individual or corporation within the foreign jurisdiction and (2) return the testimony or proof of service for use in a pending case") (emphasis added).

*Foreign Proceeding Pursuant to 28 U.S.C. § 1782*, 2019 WL 168828, at *11 (D.N.J. Jan. 10, 2019) (internal quotations omitted); *see also In re Cathode Ray Tube*, 2013 WL 183944, at *3 (criticizing applicant who improperly "side-stepped less-than-favorable discovery rules by resorting immediately to § 1782"). This concern is even more heightened given the restrictions the Honduran court may place on Applicants and their counsel's participation given the problems and their exclusion in the related proceedings.

## V. The Request Is Overbroad

"Recent cases suggest that courts should be more inclined to grant applications that seek either a single document or only those documents relating to a particular event." *In re Kreke Immobilien KG*, 2013 WL 5966916, at *7 (S.D.N.Y. Nov. 8, 2013). "When a party chooses to serve overly broad discovery," under Section 1782, "it runs the risk that the discovery will be denied outright without an opportunity to narrow it." *In re Application*, 2019 WL 168828, at *13 (internal quotations omitted).

Even if the mortgage file included records reflecting payment to Mr. Castillo for planning a murder (and it does not), Applicants have made no effort to target just such records. *See In re Kreke Immobilien KG*, 2013 WL 5966916, at *7. Applicants did not ask for documents showing the "source" of funds for the down-payment on the home.[4] Instead, they seek the Castillos' *entire* mortgage file, which includes extensive private financial and other sensitive information about Ms. Romero-Baca and Mr. Castillo that – even under Applicants' contrived theory – has no relevance to the Honduras prosecution. "It is one thing to seek U.S. judicial assistance in serving a subpoena; it is another to make a kitchen-sink discovery request, without having tried local discovery (which might at least have narrowed it), and delegate responsibility to the U.S. tribunal to sort it out." *In re Application*, 2019 WL 168828, at *14; *Amcast Indus. Corp. v. Detrex Corp.*, 138 F.R.D. 115, 121 (N.D. Ind. 1991) (rejecting discovery request for information

---

[4] To be clear, the cash the Castillos used to buy their home in Houston was from money Mr. Castillo earned, principally from his involvement with PEMSA. (Ex. 1, Romero-Baca Dec. ¶ 15).

that would not "bear any similarity to the subject matter of this case" because it "represents not merely a 'fishing expedition,' but . . . an effort to 'drain the pond and collect the fish from the bottom'") (internal quotations omitted).

## VI.   Conclusion

Ms. Romero-Baca is grateful the Court allowed her to be heard on the Application, despite the Applicants' insistence that it should be heard *ex parte*.  The Application fails to demonstrate the relevance of its request; appears to be a pretext to uncover the Castillos' sensitive and private financial information; and it appears that the request is inconsistent with or, at least, highly atypical under Honduran law.  The Court should exercise its discretion and deny the request.

RESPECTFULLY SUBMITTED, this the 23rd day of August, 2019.

> **Attorneys for Interested Party, Tanya Romero-Baca**
>
> WEBB SANDERS & WILLIAMS, P.L.L.C.
> 363 NORTH BROADWAY
> POST OFFICE BOX 496
> TUPELO, MISSISSIPPI 38802
> TELEPHONE: (662) 844-2137
> B. WAYNE WILLIAMS, MSB #9769
> wwilliams@webbsanders.com
> NORMA CARR RUFF, MSB #5721
> nruff@webbsanders.com
>
> **BY:**   **/s/ B. Wayne Williams**
>          **B. WAYNE WILLIAMS**
>
> LEWIS ROCA ROTHGERBER CHRISTIE LLP
> 201 East Washington Street, Suite 1200
> Phoenix, AZ  85004-2595
> Telephone:  602-262-5337
> Randy Papetti (AZ State Bar No. 014586)
> rpapetti@lrrc.com
> Jared Sutton (AZ State Bar No. 028887)
> jsutton@lrrc.com
> Jennifer Lee-Cota (AZ State Bar No. 033190)
> jlee-cota@lrrc.com

## <u>CERTIFICATE OF SERVICE</u>

    I, B. Wayne Williams, one of the attorneys for Tanya Romero-Baca, do hereby certify that

I have this date filed the above and foregoing ***Response in Opposition to Section 1782 Application***

using the Court's electronic filing system which in turn served a true and correct copy of the same

to counsel of record as follows:

Amelia S. McGowan, Esq.
Mississippi Center for Justice
P.O. Box 1023
Jackson, MS  39215
amcgowan@mscenterforjustice.org

Leo P. Cunningham, Esq.
Ralitza S. Dineva, Esq.
Sean P. Killeen, Esq.
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304-1050
lcunningham@wsgr.com
rdineva@wsgr.com
skilleen@wsgr.com

Roxanna Altholz, Esq.
INTERNATIONAL HUMAN RIGHTS LAW
CLINIC, UNIVERSITY OF CALIFORNIA
BERKELEY
489 Simon Hall,
Berkeley, California 94720
raltholz@law.berkeley.edu

    This the 23rd day of August 2019.


                            **/s/ B. Wayne Williams**

                            **B. WAYNE WILLIAMS**