# EXHIBIT 3



# WAR ON DEVELOPMENT

EXPOSING THE COPINH DISINFORMATION
CAMPAIGN SURROUNDING THE BERTA
CÁCERES CASE IN HONDURAS

AMSTERDAM & PARTNERS LLP

# AMSTERDAM & PARTNERS LLP
## LONDON | WASHINGTON DC

WAR ON DEVELOPMENT:
EXPOSING THE COPINH DISINFORMATION
CAMPAIGN SURROUNDING
THE BERTA CÁCERES CASE

TABLE OF CONTENTS

**INTRODUCTION** .................................................................................................................. 3

**I. A TRAVESTY OF DUE PROCESS** ................................................................................... 6

    A.   DUE PROCESS VIOLATIONS ........................................................................................ 6
    B.   SUPPRESSION OF EXCULPATORY EVIDENCE ........................................................... 7
    C.   DENIAL OF PRESUMPTION OF INNOCENCE ............................................................... 1
    D.   PROSECUTION BASED ON INCOMPLETE INVESTIGATION ........................................ 3
    E.   FALSIFICATION OF TESTIMONY .................................................................................. 3
    F.   IRREGULAR AND INCOMPLETE ACCESS TO CELL PHONE, OTHER DEVICES, AND ELECTRONIC DATA......... 4

**II. THE FALSE MYTHOLOGY OF THE GAIPE REPORT** ................................................ 7

    A.   FAILURE TO MEET LUND-LONDON GUIDELINES ..................................................... 9
    B.   UNSUPPORTED CLAIMS ............................................................................................. 9

**III. THE TRUE FACE OF COPINH** ..................................................................................... 10

    A.   EARLY HISTORY AND REBRANDING ....................................................................... 10
    B.   COPINH'S RADICAL MEANS AND RHETORIC ......................................................... 13
    C.   VICTIMS OF COPINH .............................................................................................. 16

**IV. NGOS: INCENTIVIZING CONFLICT IN HONDURAS** ................................................ 22

    A.   NGOS' ANTI-DEVELOPMENT STANCE ................................................................... 22

**V. HONDURAS NEEDS RENEWABLE ENERGY** ............................................................ 26

    A.   POLITICAL CONTEXT ............................................................................................... 26
    B.   ECONOMIC CONTEXT .............................................................................................. 27
    C.   PERVASIVE POVERTY AND INEQUALITY .................................................................. 28
    D.   ELECTRICITY GENERATION IN HONDURAS............................................................... 30

**VI. HISTORY OF THE AGUA ZARCA PROJECT** ............................................................ 39

    A.   LOCATION AND TITLE TO LAND .............................................................................. 39
    B.   FINANCING AND CONSTRUCTION FIRMS ................................................................. 40
    C.   REGULATORY APPROVALS........................................................................................ 40
    D.   INITIAL COMMUNITY CONSULTATIONS AND BENEFITS............................................ 42
    E.   COPINH'S EARLY OPPOSITION AND VIOLENCE...................................................... 44
    F.   AN ADDITIONAL CONCESSION: PROJECT RELOCATION ACROSS THE GUALCARQUE RIVER ................... 46
    G.   COPINH'S CONTINUED VIOLENT OPPOSITION........................................................ 48
    H.   COPINH HAS SPREAD DISINFORMATION ABOUT ILO 169 AND COMMUNITY CONSULTATION PROCESSES 51

**VII. CONCLUSION** .............................................................................................................. 55

## INTRODUCTION

*Further, testimony has been provided in the criminal proceedings to indicate that the first persons to arrive on the scene following the murder were not police officers or law enforcement authorities: they were members of COPINH. Indeed, investigators observed that the COPINH members had altered the crime scene before any photographs or evidence could be taken. The presence of others at the murder scene after the murder but before any steps were taken to secure the scene raises serious issues about the integrity of the crime scene. Where there is reason to question the integrity of the crime scene, there is reason to doubt the reliability of evidence seized from that crime scene.*

*– Brian Greenspan and Michelle Biddulph[1]*

In the late evening of March 2, 2016, the activist Berta Cáceres was murdered by unknown gunman in her home in La Esperanza, Honduras. Although the country suffers one of the highest murder rates in the world – 5,154 murders recorded in 2016 alone[2] – Cáceres' death was met with thunderous condemnation from a broad range of international non-governmental organizations (NGOs), making this one of the most visibly and widely discussed cases in the region.

As horrific and tragic as the underlying crime is, the present narrative regarding the Cáceres case and the presumed knowledge of the facts is not only deeply flawed, but also based largely on fabrications circulated by her former organization, the Council of Popular and Indigenous Organizations of Honduras (COPINH).

Before any investigation had even begun into the crime, COPINH had misled these organizations to join them in squarely placing the blame on Desarrollos Energéticos Sociedad Anónima (DESA), the Honduran corporation formed for the purpose of building the Agua Zarca hydroelectric project which Cáceres had opposed.

This original assumption – that Cáceres was killed because of her opposition to Agua Zarca – became a canonical feature of the international narrative. The formidable legacy of her memory, which grows larger each day, is inseparable from this unproven notion.  Rarely questioned, unburdened by any need for evidence, and against any logic, this narrative against DESA became a doctrinal feature of COPINH's public pressure campaign which swiftly destroyed the multi-million-dollar investment and placed nine individuals in pretrial detention (the latest of which was symbolically arrested exactly on the two-year anniversary of the murder).

This White Paper will detail how COPINH has carried out a fraud by misinforming the public and twisting the facts to fit their story, relying on hundreds of pages of evidence and transcripts of text messages obtained by independent expert witnesses. Rather than support COPINH's defamatory theory of the authorship of the crime, an entirely different picture emerges, showing an organization which manipulated foreign media and NGOs, a leader who had positive and collaborative relations with our client, and even signs of other potential third parties who have seemingly not been considered as subjects.

This White Paper will further explain how the actions of COPINH and other anti-development activists have served to damage the poorest people of Honduras, destroying jobs and opportunities, and further fueling migration pressures. In the two years since the murder of Cáceres, investment in renewable energy and other infrastructure projects has ground to a halt, and with it, economic development has stalled in Intibucá and far beyond in Honduras. The Agua Zarca project would have brought much-needed opportunities to the area, which is why it received

overwhelming public support. The project included around 250-300 direct jobs and 1,200 indirect jobs, in addition to other crucial infrastructure.  Now, with the project all but destroyed, there are at least five other hydro projects which have been halted by these activist groups, freezing some $260 million dollars in investments and more than 30,000 direct and indirect jobs.[3]

Long before March 2, 2016, COPINH had begun spreading additional false information about DESA, including vague claims about alleged violations of indigenous rights in their consultation process, endangering "traditional ways of life," and claims of unspecified harm to the environment. In many cases, the reasonable calls for accountability in the wake of the murder morphed into a broader anti-development message, one that has been passively accepted by the global NGO community with an astonishing lack of independent verification.

In such a fragile environment for rule of law, this kind of politically charged case featuring unprecedented international pressure has placed a fatal strain on due process. When Amsterdam & Partners LLP was retained to represent DESA earlier this year, our first step was to appoint an independent expert to carefully verify facts, evaluate the State's process, and examine the conclusions of a report by the Grupo Asesor Internacional de Personas Expertas (GAIPE), a group appointed by COPINH and the victim's family.

Brian Greenspan, one of Canada's most highly respected criminal law experts, visited Honduras earlier this year to investigate, and his findings – presented in full later in this White Paper – present profound concerns regarding the failures to meet standards in the process and the reckless bias exhibited by GAIPE.  The Greenspan Report details how the NGOs' key findings on this case lack sources, rely on speculative inferences, incomplete evidence, mischaracterization of evidence, and an overarching lack of objectivity.

Spurred by the global NGO community, this failure of objectivity has distorted the broader debate in Honduras, creating an unhealthy and unnecessary split between the perception of indigenous rights (as defined by one extremist group) and the rights of other Hondurans to achieve economic development.

If these international parties had bothered to do their own investigation of the facts, to visit these communities in the Departments of Intibucá and Santa Bárbara, they may have been surprised to find a much more complex picture, one where a clear majority of local residents had favored the project, and where COPINH is not remotely viewed as a representative of their interests.

Agua Zarca, a planned run-of-river hydroelectric project of moderate capacity on the Gualcarque River, was one of a few dozen hydroelectric projects approved by national legislation in 2010. DESA lawfully obtained all necessary regulatory and legislative approvals and engaged with the local communities within the area of influence of the project. The project was subjected to rigorous due diligence, both internally and by outside experts appointed by the international financial institutions supporting the project. DESA made a robust commitment to their social responsibility policies, with local employment, plans for new roads, access to electricity, clean water, education, and assistance with agricultural development.

Surrounding communities, including all indigenous communities were initially all supportive. As the project progressed, however, COPINH activists began spreading misinformation to sow discord against the project. They alleged, among other things, that DESA would privatize the Gualcarque River's water and that the company had failed to consult the communities under the Indigenous and Tribal Peoples Convention of 1989—allegations troubled both

factually and legally. Nevertheless, by 2013, their efforts paid off as some residents of La Tejera, one of the affected Lenca communities, came to oppose the project (all other communities remained in favor).

COPINH, to put it mildly, is not what they seem. COPINH has made a name for itself through confrontational, often violent means and anti-American rhetoric. This White Paper includes testimony from numerous victims of the group's actions. COPINH's opposition to Agua Zarca, in particular, appears to be motivated by the group's selective anti-development and anti-hydroelectricity agenda, not the merits of the project or the actual will of the local communities. Claims regarding environmental sustainability are uninformed and flimsy at best, while the regular broadcasting of false information about the project often undermined civil dialogue.[4]

As such, the confrontations grew in intensity.  In 2013, COPINH set up road blocks to the project site, vandalized DESA vehicles and equipment, cut poles to power lines, and destroyed a bridge crossing the Gualcarque River. Tensions escalated as COPINH supporters entered the construction camp with machetes on July 15, 2013. That day a COPINH supporter was killed by military personnel, and a COPINH supporter shot and killed a fourteen-year-old member of the community.

In an effort to reduce tensions, DESA consulted again with local communities and made the decision to move the project, despite the loss of investment, choosing a new location that was outside the community of La Tejera altogether. COPINH was still not placated, and they began harassing and threatening neighboring communities who supported the project. Indeed, in 2016 the group even bussed in activists from another Honduran department as La Tejera itself began to distance itself from the group's militant opposition. Nevertheless, the accommodation was successful in the eyes of the company and its international partners, and work finally was proceeding positively and peacefully, uninterrupted for fifteen months, with strong support from the local communities.

The tragic murder of Cáceres could not have been a worse outcome for the project, leading to its indefinite suspension, the preemptive detention of two executives, and the calumny of an outraged public.

None of the facts or context stated above diminishes the severity of the crime of March 2, 2016 or the need for a thorough and truly independent process to deliver justice and accountability. However, many of the impassioned assessments by activist third parties – who are often misinformed with bias – contribute to an environment of highly politicized pressure and interference that is destructive to due process.

In publishing this White Paper, we invite the reader to rigorously examine our evidence and facts. We welcome the opening of a debate over whose rights are served and whose rights are ignored by the currently blind conduct of global NGOs in Honduras. Based on what we have discovered thus far, both the Agua Zarca project and the murder of Berta Cáceres demand a sober, fact-based second look, not only to preserve and strengthen the rule of law in Honduras, but to expand international understanding of the root conditions in this area of the country that preceded the dispute.

---

[4] *See* the discussion at section IV-A, *infra*, on Ngo's Anti-Development Stance and the observations on the lack of proof of the

## I. A TRAVESTY OF DUE PROCESS

> *"I understand this family's pain and their demand for justice, but there can be no justice based on an injustice when I'm being unjustly implicated."*
> *– Sergio Rodríguez, statement to Judge.*[5]

Following the murder of Berta Cáceres Flores and the attempted murder of Gustavo Cáceres, between May 2, 2016 and March 3, 2018 the Public Ministry arrested and charged nine individuals with involvement in the crime. Among the defendants are two DESA executives: Sergio Ramón Rodríguez Orellana, who served as the company's Manager of Social, and Environmental, and Communications Affairs, and Roberto David Castillo Mejía, the company president whose arrest took place suspiciously on the second anniversary of the murder. Both were accused of being intellectual authors of the crime.

Both individuals are widely respected law-abiding professionals who performed their duties at DESA with integrity and transparency. Neither Rodríguez, a trained biologist, nor Castillo, a graduate of the elite West Point academy in the United States, had ever been accused of a crime previously, and neither had a known history of violence of any sort.

Following the arrests, DESA issued statements comprehensively rejecting any claim of involvement in the heinous crime. On May 2, 2016, the company issued a statement declaring its shock at the arrest of Rodríguez, emphasizing their commitment to cooperating with authorities to bring the true culprits to accountability.[6] Following the March 3, 2018 arrest of Castillo, DESA issued a statement denouncing the arrest as the result of "international pressure and smear campaigns from various NGOs towards the company."[7]

"For DESA, this event represents yet another reason to continue fighting to end injustice in the country," the statement read. "Today once again the truth is being ignored in Honduras, which is why DESA will work tirelessly to see that justice is served against those responsible, avoiding the blaming of innocent and honest people like Mr. [Roberto] David Castillo."[8]

In such an overwhelmingly poisonous environment, a fair trial would be very difficult in any jurisdiction. But in Honduras, where dependence on US foreign aid casts a formidable shadow over the proceedings, this unprecedented pressure from COPINH and international NGOs has prompted a series of due process failings and suspicious irregularities in this case dating back to the original arrests of the accused.

A.  Due Process Violations

From the beginning of these cases, the prosecution has exhibited irregular, discriminatory treatment of the accused, while inhibiting the legal team's ability to have equal procedural rights and prepare a proper defense. On at

---

[5] Petition to IACHR, Statement of Sergio Ramón Rodríguez Orellana, Inter.-Am. Comm. H.R., Petition No. 0000037371, page 4; *citing* Declaration and Interrogatory of Sergio Ramón Rodríguez Orellana, Appendix 2, page 735, of Initial Hearing (translation ours).
[6] *Pronunciamiento*, HIDROELÉCTRICA AGUA ZARCA (May 2, 2016), https://hidroelectricaaguazarca.hn/assets/documentos/Pronunciamiento%20PHAZ.pdf.

least two separate occasions, the prosecution has repeatedly refused to share the investigatory case file with the defense. The defense team originally submitted a request to view the evidence on November 23, 2017.[9] On January 9, 2018, a court granted the order, requiring the prosecution to comply. The court's decision had found that the prosecution has had ample time and that not sharing the information is putting the defense at a disadvantage, which is against Honduran internal law and its treaty obligations.[10] Nevertheless, the prosecution ignored the court order and has not shared the investigatory file.

Again, on March 16, 2018, Sergio Rodríguez's lawyers requested disclosure of this investigative file, specifically seeking further information about whether or not the police had bothered to pursue alternative lines of inquiry into the murder, as well as whatever information indicated that Mr. Rodríguez had ever been associated with a threat made against Berta Cáceres[11] – a disputed point which had been repeatedly circulated in the media by COPINH with no evidence. Again, prosecutors continued to deny the defendant his rights.

The failure to share the investigative file during this period of time leading up to the trial of Sergio Rodríguez represents an egregious violation of due process and the defendants' right to a fair trial. If the evidence being hidden is inculpatory, defense counsel requires immediate access to evaluate its strength and validity and to prepare a response. If the evidence is exculpatory, this would raise important doubts as to the defendant's guilt and the prosecution would have a duty to disclose it to the defense.

As Brian Greenspan writes in his report, "All of these documents are essential in defending a person accused of murder, and without them, a person's ability to make full answer and defence is irreparably impaired. How can a person defend a charge of murder when he has limited disclosure regarding why the state believes he is guilty of murder? How can a person present evidence of possible third-party suspects if no information has been provided regarding who those suspects may be? And how can a person adequately challenge the conclusions of so-called expert witnesses without any information about that person's qualifications as an expert?"[12]

B.  Suppression of Exculpatory Evidence

Due to the extraordinary prejudicial pressure from COPINH demanding that the government specifically punish not those guilty but instead their opponents for the murder of Cáceres, from the beginning of this process it has been clear that prosecutors have only had one target in mind: DESA. With this tenuous theory, the state proceeded to attempt to shape their findings to support such a predetermined outcome instead of investigating all lines of inquiry into who may have been responsible for the crime.

There is no indication that the police bothered to closely examine Berta Cáceres' lifestyle and routines in order to determine who had threatened her in the past, and who she considered to be a threat at the time of the murder. There were numerous other companies, organizations, and individuals who were subjected to COPINH's protests and activities which are and have been completely unrelated to DESA, in addition to a long list of bitter grievances between different communities in this area of the country.

---

[9] *See* Sergio Rodríguez's Defense Attorneys, Request to Access the File, Exp. 3-88-2017 (November 23, 2017) (only available in Spanish).

[10] *See* Judicial Power of Honduras. First Chamber. Ruling of the Sentencing Court with National Territorial Jurisdiction in

Indeed, as COPINH itself had reported, a member of the National Direction of Criminal Investigation (DNIC) told Berta Cáceres on February 25, 2016 that "they were not responsible if something happened to her".[13]

In light of the fact that Sergio Rodríguez and Roberto David Castillo have been falsely accused of this crime based on no evidence, Amsterdam & Partners LLP appointed a team of private investigators in an attempt to discover what the police had overlooked.  Our findings were nothing less than shocking, as investigators were able to obtain several leaked recordings of phone calls and a witness interview conducted by the police allegedly in April 2016, in which a certain named mayor is identified as issuing direct death threats against Berta Cáceres, which would imply that this individual would in normal circumstances be a prime suspect of the investigation.

Nevertheless, this evidence of someone else with no relations whatsoever to DESA making specific death threats against Cáceres was buried by the police, ignored by prosecutors, and hidden from public knowledge in favor of COPINH's campaign of selective persecution against innocent parties. The prosecution has not explained what happened with this line of inquiry and why it has not disclosed this evidence to the defense, thus hiding potentially exculpatory evidence from the accused and violating their rights as protected by Honduran and international law. It has also prosecuted policemen who appear to have tried to push forward alternative lines of investigation, in what may be a stifling of actual truth seeking within the Public Prosecutor's Office. We also have received information that indicates the prosecution had draft indictments against other individuals and several other alternative theories but that it chose to pursue a theory of intellectual authorship of Sergio Rodríguez Orellana and Roberto David Castillo. It appears that was the course of least resistance. The Prosecutor's Office authored a PowerPoint presentation that shows that the culprit could have been a band of persons from Concepción el Sur in the department of Santa Bárbara which wanted Ms. Cáceres dead. With regards to this second plan the prosecution had detailed recordings and statements of witnesses on who would have done this, given the orders, and why.

On August 21, 2018 the Expert Witness for the Public Prosecutor's Office signed a Final Expert Witness Report.[14] But the prosecution did not provide it to the defense until September. In the interim several expert witnesses for the defense who had traveled from the United States went on August 30, 2018 to the Offices of the Prosecution to conduct extraction of mobile phones and other devices. Those experts were not told that document existed. The prosecution withheld this information until after those defense experts had left even though the Public Prosecutor's Office knew the information contained in that Final Report was directly relevant to the work the defense expert witnesses would be performing both in knowing what devices the prosecution had and which it would be using it against Rodríguez and how the prosecution interpreted the information contained in those devices.

This is a 471-page document dated August 21, 2018 but which was released to the defense on September 6, 2018, sixteen days later, even though Sergio Rodríguez's trial was unofficially scheduled to start on September 10, 2018. The prosecution waited to release it to the defense until Thursday, September 6, 2018, with the trial unofficially scheduled to start that Monday, September 10, 2018, thus giving the defense only three days to analyze it. Yet on September 10, 2017, the trial date was officially set to September 17, 2018, which meant the defense would only have ten days to analyze the report. Yet on September 17, 2018 the private accusers would file a series of legal challenges that would again delay the trial's commencement.

---

This report by the prosecution shows there were no electronic communications between Rodríguez and Cáceres and that the only accused with which Rodríguez ever had any electronic contacts were Bustillo, who was an ex-employee of DESA (dismissed in early 2015) and Castillo, company president.

The August 21 Final Report emphasizes that Rodríguez had communications with contacts whose names appeared in the devices of other accused. Thus, the prosecution's expert is effectively -and absurdly- arguing that having a common acquaintance with a third party, or even just having that third party as a contact in one's mobile address book, necessarily means that because both may have known that third party, both must have communicated amongst themselves even if there is no evidence of communication.

Messages reviewed by Amsterdam & Partners LLP, which were obtained by expert witnesses who extracted information from devices as part of the process in the criminal trials of both Sergio Rodríguez and Roberto David Castillo, show that the prosecution omitted from its Final Report an earlier part of the conversation between Bustillo and Berta where Bustillo appears to maintain intimate relations with Berta and tells her that he knew her partner at the time was a jealous man.[15]

Berta Cáceres frequently communicated with and met Roberto David Castillo in person and was not afraid of him. On the contrary, their relationship was friendly, cordial and both repeatedly stated they respected each other. As the messages quoted in the Annex show, Berta acknowledged that David had helped her financially.[16]

Castillo wished her a good trip when she went to Italy and Cáceres replied she would bring him a bottle of grappa: an Italian brandy.[17] Cáceres also insistently asked Castillo to go to an activity where there would be persons of great importance to her[18], Cáceres told Castillo that she had been told he was a good person. They congratulated themselves on multiple times including Christmas and New Year's greetings[19]. Cáceres also acknowledged she told Castillo much information, and invited Castillo to drink tequila[20], coordinated having breakfast with him[21] and before a trip to Havana, Cuba she told Castillo she would have liked to take him with her to go to Havana's *malecón*[22] and indeed after arriving in Cuba she wrote to him when she found a wi-fi hotspot[23].

Cáceres also offered Castillo a place where he would sleep well[24], and was concerned about his health when Castillo was ill with dengue fever, telling him she would have liked to help him and take care of him[25] and recommending specific herbal remedies[26]. She also happily informed Castillo when two women close to her were awarded visas[27] and would frequently ask when she would be able to see him or talk to him[28]. Also, there are many messages about the car Castillo helped Cáceres get[29]; and when Castillo asked her for the vehicle's license plate

---

[15] See Annex I, message 16 et seq.
[16] *See* Annex II, message 49 *et seq.*
[17] *Id.*, message 58 *et seq.*
[18] *Id.*, message 95 *et seq.*
[19] *Id.*, messages 142-165; 1192-1200.
[20] *Id.*, message 189.
[21] *Id.*, messages 197, 651.
[22] *Id.*, messages 243-244.
[23] *Id.*, messages 248-250.
[24] *Id.*, message 304.
[25] *Id.*, messages 324-328.

information to help her with a payment, she readily gave him the information even before asking why he wanted it[30]. Later, Castillo tells her that the documents for her were ready and the business where she could pick them up, to which she replies she will refund him and apologizes for any inconveniences.[31]

It is also clear from the messages that Cáceres wrote to Castillo from the ceremony where she was being awarded the Goldman Prize, just before the ceremony started and told him she would have liked him to be there.[32] She gave him her temporary US mobile number[33] and also asked him for advice on car rental in Houston, Texas and asked if they would be able to communicate by WhatsApp while he traveled[34]. Castillo also told Cáceres that he wanted persons, likely referring to persons near the Agua Zarca project, to have a bridge[35] and about this Cáceres answered that of course they could talk. Castillo also stressed to Cáceres that he was always open to talking with her[36]; and that besides considering her a valued friend he was hopeful that someday they would be able to find a middle ground in which both would get a favorable outcome[37].

Most importantly it is clear that Castillo helped Cáceres at a time of need when Cáceres' mother required treatment for a medical condition. Castillo got her an appointment with a specialist and we can see how Cáceres would ask him for the details of when and where the appointment would be and with which physician and how afterwards she would keep Castillo informed of her mother's medical progress. Cáceres even consulted with Castillo on the details of how to pay for the treatment as a medical secretary would not accept advanced payment.[38]

Messages between Berta and this other partner, which the prosecution has completely ignored in its reports, show that they had a contentious sexual relationship in which the partner exhibited clear sexist and controlling attitudes towards Berta, in constantly insulting her, calling her derogatory names, to which Berta did not agree, and in using her as a source of money which he would borrow and not return.[39]

The messages read like a textbook example of an abusive relationship and show that even with respect to this one individual, one could imagine the clear existence of other motives for the crime, either because of money he owed Berta or the COPINH which he did not intend to repay or simply because Berta was trying to leave the relationship and as an abusive man he would have found that show of strength from Berta threatening to his profoundly twisted concept of manhood. Berta accused this person of being with her only because he wanted the Goldman Prize money, of beating her and abusing her, giving at least one concrete example of a beating. [40]

Among these messages, one can also clearly observe fraudulent tactics used by COPINH to deceive international media and NGOs – a pattern of behavior believed to continue today. Within their a WhatsApp conversation from October 16, 2015 they made plans to bring by bus outsiders to meet the UN Rapporteur on the Rights of Indigenous Peoples, specifically from the departments of Lempira and La Paz, with the purpose of fooling the Rapporteur into thinking that those protesters were locals that were opposing the Agua Zarca project.[41]

---

[30] *Id*., messages 1003-1014.
[31] *Id*., messages 1029-1135.
[32] *Id*., messages 586-587.
[33] *Id*., messages 596-602.
[34] *Id*., messages 625-629.
[35] *Id*., message 1025.
[36] *Id*., messages 1026.
[37] *Id*., messages 993.
[38] *Id*.. messages 1043-1104.

Similarly, the prosecution heavily edited a conversation that Berta had with a person who in the chat identified himself as a Swiss Journalist by the name Yanik on March 2, 2018 hours before Berta's murder. The part of the conversation that the prosecution omitted shows the journalist's interest on researching a report into mining activities and that hours before her death Berta spoke of threats that had originated because of those mining activities and that Berta spoke of areas of Honduras, like Copán, far away from Agua Zarca which is not a mining project. Yet the prosecution included in its report only 15 of 42 messages in the chat. Shortly after her death Yanik wrote an article in French in a Swiss newspaper about his conversation with Cáceres shortly before her death.[42] That article confirms the possibility that Berta was scared for her life because of threats that she believed were coming due to her mining activism, not her activism against Agua Zarca - a hydroelectric, not mining project-, a fact that has been omitted by the prosecution and private accusers in the criminal trials against Sergio Rodríguez and Roberto David Castillo and by the COPINH in their conveniently cast version of what happened.[43]

Messages dated Nov. 3rd 2014, between Berta and a person identified in the extracted messages as a solicitor ("fiscal") at the Office of the Solicitor for Ethnicities ("Fiscalía de las Etnias"), make it clear that the COPINH was helping that government office get financing from the European Union.[44]

It is also interesting to note that messages between Cáceres and Tomás Gómez Membreño on May 12 and 13, 2015, indicate that the Office of the Solicitor for Ethnicities used its resources to help the COPINH move demonstrators to protest sites.[45]

Other relevant messages are those between Cáceres and a person which per the information extracted from devices is identified as a prosecutor at the Office of the Solicitor for Ethnicities on May 13, 2018. These messages show that COPINH and the Office of the Solicitor for Ethnicities were in close coordination regarding their mutual financing. The COPINH would help the *Fiscalía* get money from European Union donors, while the Fiscalía itself would directly aid the COPINH in transportation for its protests.[46]

Messages between Tomás Gómez and Berta Cáceres are also illustrative of how the COPINH planned to move supporters from outside the area to the Agua Zarca project site area to make a show of force when Billy Kyte of Global Witness arrived at the area.[47]

---

[42] Yanik Sansonnens, [Resignation or death], La résignation ou la mort, (March 11, 2016) *available at* https://drupal.lecourrier.ch/portail/16169 (last visited October 10, 2018).

[43] See Annex IV conversation between Yanik and Berta Caceres according to the expert witness appointed by Attorney General's Office *c.f.*
Annex V, conversation between Yanik and Berta found by company who extracted the data directly from Berta´s device.

[44] See Annex VI, chat messages between as a solicitor ("fiscal") at the Office of the Solicitor for Ethnicities ("Fiscalía de las Etnias") and Berta Caceres on May 11th and 13th. 2015. messages 73-99.

It is also important to note that Berta and Tomás exchanged messages where they spoke with fear about common acquaintances. Berta had found out that a payment was being negotiated so that those individuals would not report to the authorities who had committed a murder. This situation made Berta, Tomás and Aureliano worry about their own safety. Through the conversation and at the end Berta repeatedly asked Tomás to delete all messages about this topic.[48]

According to information provided by the Prosecution in a report on messages sent to a chat regarding security for the project, Rodríguez informed group members that they should take action to make sure nothing happened to a COPINH member who had personal problems and for whom Berta wanted cautionary measures. Rodríguez knew that if something happened to that person the COPINH would blame the company.[49]

C.  Denial of Presumption of Innocence

When both Rodríguez and, later, Castillo were arrested, their photos were widely shared on social media by the prosecution, which then allowed COPINH to immediately integrate into their media campaigns, presenting the two DESA executives as guilty before any hearing could be held.

Rodríguez has now spent almost two and a half years in pretrial detention without bail, which represents a violation of basic human rights for which he is seeking redress before the Inter-American Commission on Human Rights (IACHR). He is being held in military barracks and has at times been in a mixed population with convicted inmates, his jail conditions are significantly worse and more dangerous than a normal facility for those awaiting trial. Without explanation, he has been denied many common privileges, such as access to paper and pencil, adequate time to meet with counsel, or even food and other items brought by relatives.

Incredibly, even in the face of the state of vulnerability to which Sergio Rodríguez has been subjected to because of the prosecution's concealments which have impeded the equality in procedural resources enshrined in Honduran criminal procedure, and an effective exercise of Rodríguez's right to defense and the presumption of innocence, on November 5, 2018 the Sentencing Court, in a convenient interpretation of the calculation of the limit imposed by the Law of two years for preventive detention, extended Mr. Rodriguez's stay in preventive detention. The court did this even though Rodríguez would still have been subject to the trial's result and verdict even from outside of jail.

---

[48] *See* appendix VII, chat messages between Tomas and Berta on August 25th, 2015, messages 1872-1898.
[49] *See* appendix VIII, chat messages, group conversation, included in a file titled "Coordinación PHAZ" originating from the prosecution, messages 30 and 31 (on file with Amsterdam & Partners LLP).

Rodríguez has clearly and repeatedly been treated as guilty by the state, violating his right to the presumption of innocence beginning with the weakness of the state's evidence. In few other countries could someone be jailed on a murder trial based on a single phone call, the contents of which are unknown, and a single text message, the contents of which are totally unrelated to the event. Castillo is believed to be held on even more spurious evidence. As Greenspan writes in his report, "The state appears to be attempting to incriminate Sergio Rodríguez without an evidentiary foundation to do so. This presumes his guilt and violates the presumption of innocence."[50]

What is more curious is that this pernicious treatment of Rodríguez is taking place despite his exemplary cooperation with investigators. Out of the first four individuals accused of the murder of Ms. Cáceres, Rodríguez was the only one to volunteer to make a statement before the Judge and submit to cross-examination by prosecutors – a decision he made as he has nothing to hide. Sergio's statement categorically denies involvement, and indicates how the prosecutors used him as a prop to draw a non-existent connection between the murder of Cáceres and the company:

> "*I have no connection with the murder of Bertha Cáceres, I never issued any threats against her either directly, or by phone, or by any other means. You have my telephone number. You can see that I never had any communication with her. I understand the anger of her family because I know what it's like in that situation; my father was murdered 23 years ago. I never knew who killed him and I never knew if anyone was in jail. I understand this family's pain and their demand for justice, but there can be no justice based on an injustice when I'm being unjustly implicated. I've been summoned by the Attorney General's Office and have appeared and provided full cooperation, and I'm being implicated because I'm the executive who was the face of the company in corporate communiqués, and I'm being implicated in this event based on that call I made. I believe, based on my attitude, since I would have appeared had I been called to give evidence, that I have demonstrated having no responsibility for this. Moreover, I could have fled on the day they came with the arrest warrant, but I presented myself to deny this and to put myself at the disposal of the authorities. I believe I've been victim of a character assassination. Even this morning they took me down to the street to parade me before the media. They brought my codefendants in directly but they took me down to the street to expose me, to make me the link and say that it was the company.*"[51]

---

[50] *See* Greenspan Report, *supra* note 1.

[51] Petition to IACHR, Statement of Sergio Ramón Rodríguez Orellana, *supra* note 5, pages 4-5; *citing* Declaration and Interrogatory of Sergio Ramón Rodríguez Orellana, *supra* note 5, Appendix 2, folio 735.

D.  Prosecution Based on Incomplete Investigation

On the morning of the opening day of the trial against Sergio Rodríguez on September 17, 2018, the prosecution made the extraordinary and outrageous move of swearing in new witnesses, which is an open admission to the court that the investigation is ongoing.

Speaking in an interview with Voice of Honduras, Rodríguez's lawyer Celeste Cerrato explained why the defense is so deeply concerned by this aberration from normal procedure:

> *"Thank you Lucía, this morning we have been convened to commence the hearing for the oral and public trial, as you have been able to see we have since early in the morning been here as we were also convened for the swearing in of an expert witness and this is a situation that truly worries us because then we are about to start arguing the case and yet investigative acts are still being conducted[.] [This is] something, well, unprecedented because our procedural norms are designed so that once the investigations have concluded the Public Prosecutor can file the prosecutorial request and sustain it based on those investigations. However, the investigations have not yet ended, and the participation of the defense has at all times been denied even though the case was already in judicial stages. This has forced us to request the [intervention of] expert witnesses, and thus this morning one of our expert witnesses has been sworn in. Yet we are called for debate and that indicates that the evidence [phase] is not yet over and in that sense this hearing which is of such importance should not start as the hearing is when a decision regarding innocence or guilt of the persons who are being processed [the accused] is reached."[52]*

E.  Falsification of Testimony

The state's case against Sergio Rodríguez also depends on witness statements from members of COPINH that are riddled with verifiably false claims. During the fact-finding hearing, Lilian Esperanza López Benítez, a COPINH member, claimed under oath that Rodríguez issued threats against Ms. Cáceres during a demonstration in San Francisco de Ojuera in November 2015. However, this is a completely false claim, as Rodríguez was not present in the area during this demonstration – a fact confirmed in the witness statement by Claudia Lorena Erazo and by telephone and credit card information that places Rodríguez in Tegucigalpa.

López also falsely claimed that Sergio again issued a threat against Cáceres on February 20, 2016 – which makes no sense as issuing threats in the presence of police would have resulted

---

[52] Celeste Cerrato, interview with Voice of Honduras, Sept. 17, 2018.

in arrest or rebuke, and further she wasn't present at the time that Rodríguez spoke with Cáceres on that day. In fact, much of this demonstration was captured on video, which appears to depict only aggressive conduct on behalf of the COPINH demonstrators, while the DESA representatives remained calm and respectful. According to Rodríguez's IACHR petition, the exchange between him and Cáceres on that day was completely innocuous, as "he saluted and congratulated her for having won the Goldman prize, to which she responded by inviting him to COPINH to see how she had invested the prize money she had been given; he never threatened her in any way, quite aside from the fact that the Police, members of the public and COPINH were present at that moment."[53]   Further, the witness statement of of José Manuel Penabad Pages contradicts López's claim, and declares that Sergio's behavior was friendly and that he did not hear Sergio threaten Ms. Cáceres.[54]

Additionally, López falsely claims that Rodríguez threatened Cáceres by phone and text message. This false accusation was rebutted in Expert Brenda Barahona's original report for the Public Prosecutor's Office on the telephone analysis, which shows that there are no calls or messages between Ms. Cáceres and Sergio Rodríguez.[55] In addition, when the Expert is asked based on the analysis what connections there were between Sergio and Ms. Cáceres, she answers that there are no calls and the Expert's report states that there are no calls or messages.

López further claims that at the time, reports had been made to the authorities of these alleged threats by Rodríguez toward Cáceres. However, neither the prosecutors nor the private accusers have submitted this documentation as evidence because they simply do not exist.

F.  Irregular and Incomplete Access to Cell Phone, Other Devices, and Electronic Data

As much of the state's accusations against Rodríguez and Castillo depend on vague theories of imagined connections to the killers of Berta Cáceres, the data from cell phones, other devices of all parties, and information gathered from cellular providers Tigo and Claro, represents the most important potential exculpatory evidence to prove their innocence – and yet access to the devices by the expert witnesses appointed by the defense has been repeatedly hampered, rushed, and in some cases, prevented.

---

[53] Petition to IACHR, Statement of Sergio Ramón Rodríguez Orellana, *supra* note 5, page 4; *citing* Declaration and Interrogatory of Sergio Ramón Rodríguez Orellana, *supra* note 5, Appendix 2, folio 733.
[54] Declaration and Interrogatory of José Manuel Penabad Pages (witness proposed by Sergio Rodríguez's defense attorneys), folios 787-790 of the Initial Hearing *cited in* Petición a la CIDH, Petition to IACHR, Statement of Sergio Ramón Rodríguez Orellana, *supra* note 5, page 5
[55]  Brenda Barahona, Preliminary Report File ANALISIS-VIVINV-DNII-No. 0004-2016 (March 9, 2018).

On August 29, 2018, the court decided to allow access to the private accusers (the victim's family and a protected witness to devices seized at the DESA offices, despite the prosecution declaring it had no interest in using those devices as evidence against Rodríguez. The lack of opposition from the prosecution before the court on this question represents a massive disadvantage for the defense, as now their expert witnesses were given an impossibly short time frame to analyze a huge amount of data. At the time the court required that a report be submitted by September 17, 2018, when in fact a proper forensic analysis of this data would take at least two months.

Furthermore, it is suspected that by handing over non-relevant DESA devices to the private accusers, the state could be inviting an opportunity for COPINH to misconstrue, misinterpret, and make false claims regarding perfectly lawful operational communications at the company. Given the group's past pattern of spreading disinformation about the company in their media campaigns, there seems to be little doubt that this egregious breach of privacy will further add to the negative public perception of the company created by COPINH.

In addition to the highly irregular handling of this sensitive information, throughout the data extraction process, the prosecutors have played a highly interventionist role curtailing the duties of the expert witnesses to examine the evidence. For example, the defense was denied access to a laptop recovered from the scene of the crime, ostensibly because the experts had been sworn in to examine "a white laptop," and not a "black laptop." Thus the private accusers described something the defense had never seen, did not describe it correctly (or so it seems), there was no previous indication that this was an error, and then the defense is required to magically know a superficial attribute that has not been indicated (the color of the laptop) with regards to an object whose analysis was authorized by the Court.

This denial of access to examine data is especially troubling given that the prosecutor's expert witness had been sworn in to extract information from that same laptop, meaning that the accusers will have access to this information, but the defense team for Rodríguez will not. This is an obvious case of obstruction of justice.

However, this wasn't the only time that the expert witnesses for the defense were denied access. The police recovered five flash drives from Cáceres' home – however when the experts arrived to perform the extraction, four of the flash drives had "gone missing," while the prosecution claimed that the individual in charge of that evidence was unavailable, resulting in denial of access to the data. Another iPhone which had been analyzed by the prosecutors was denied to the expert witnesses of the defense. One peculiar intervention by the prosecutors took place when the defense at the urging of one of its expert witnesses expressed concern that some of the UFDR files may be incomplete or corrupted, and to verify they asked the state's expert

Brenda Barahona to share another copy. However, this attempt to verify the accuracy of the data was blocked by the prosecutor, denying the defense expert witness the opportunity to ensure they had obtained the complete files.

There are also issues regarding the chain of custody of the phones and devices. In the Rodríguez case the prosecution just gave the defense information on CDs or other media which in turn had copies of what may have been extracted from the phones or other sources. Some of the information provided had already been processed with the Cellebrite software, and the data was disorganized and incoherent, making it impossible to make clear interpretations of potentially very important information. The expert witness for the defense was never provided with an inventory of the information of phone extractions or with a document which indicated the relationship between each phone extraction and who owned each device. Furthermore, it is entirely unclear how this data ended up on the specific media provided to the defense, often with no documented chain of custody as court documents attest. For example, an official court document signed by the court's secretary general, dated February 9, 2018 on the matter of what was given to the defense states a lack of chain of custody for several items, **including two mobile phones that belonged to Berta Cáceres**:

> "- **5)** a CD case made of paperboard, on its front part it can be read Maxell DVD+R, data, video, musica, donnes, video, musique, size 4.7 GB go, 120 min/up to/max 16x, color purple and white with a handwritten text that reads as follows (Berta Caceres case extraction of Sony Experia phone device), part 4, inside there is a DVD with digital information (sheet 2300 according to subparagraph a), provided by expert witness Brenda Barahona (without chain of custody).- **6)** a CD case made of paperboard, on its front part it can be read Maxell CD+R, data, music, video 700mb, 80 min/up to/max 48x, color blue and white, with a handwritten text that reads as follows (Berta Caceres case extraction of phone device Blu brand, mobile phone brand Blu, containing a CD-R with digitalized information (sheet 2301 subparagraph b) provided by expert witness Brenda Barahona (without chain of custody).- **7)** a CD case made of paperboard, on its front part it can be read Maxell CD+R, data, music, video 700 mb, 80 min/up to/max 48x, color blue and white, with a handwritten text that reads as follows (regarding number 9827-0708) and it contains a CD-R with digitalized information, (sheet 2301 subparagraph c), provided by expert witness Brenda Barahona (without chain of custody); and also the digital information provided by [phone] companies **Tigo and Claro** so that he [the expert witness for the defense] can carry out the expert analysis he has been tasked with in case **TS/JN-3-88-2017**, criminal process against. . . **3) SERGIO RAMON RODRIGUEZ ORELLANA** . . ."[56]

---

[56] Tribunal de Sentencia con Competencia Territorial Nacional en Materia Penal, Sala Primera; Constancia (Feb. 9, 2018), TSJN-3-88-2017 (underlining added; our translation).

This highly irregular, incomplete, and rushed data extraction process, in addition to the sharing of non-relevant data with the private accusers, raises serious concerns regarding the fairness of the trial.


## II. THE FALSE MYTHOLOGY OF THE GAIPE REPORT

> *"The Honduran state has failed Sergio Rodríguez and [Roberto] David Castillo Mejía.*
> *(...)*
> *Due process and the presumption of innocence are more than mere principles:*
> *they are fundamental human rights."*
> *– Brian Greenspan and Michelle Biddulph*[57]

In the months following the murder of Berta Cáceres, the victim's family and COPINH moved to appoint the International Advisory Group of Experts (GAIPE) to carry out a private investigation into the crime. The group, led by Dan Saxon, Roxanna Altholz, Miguel Ángel Urbina, Jorge Molano and Liliana Uribe-Tirado, made four visits to Honduras, interviewed sources handpicked by COPINH, and were given partial, selective access to the state's evidence from the criminal investigation – most infamously a selection of unflattering text messages.

Their report, "Dam Violence: The Plan that Killed Berta Cáceres,"[58] was published in November 2017 and made strong accusatory pronouncements regarding DESA executives and their alleged ties to the crime, despite openly lacking full access to the evidence. This document would later go on to become a cornerstone of the international media narrative on the case and would even be submitted as evidence in several of the cases against the accused.

The GAIPE report however is blatantly non-objective, and has served as COPINH's most important foundational propaganda instrument to recruit allies among the NGO community who have neglected to independently analyze the facts of the case. When Amsterdam & Partners LLP was retained by DESA in May 2018, one of our first actions was to retain Brian Greenspan, one of Canada's most highly respected criminal law experts, to independently review the claims contained in the GAIPE report. His findings, published in July 2018, invalidate numerous claims made by GAIPE, and cast doubt regarding the report's adherence to international standards for fact-finding investigations.

---

[57] Greenspan Report, *supra* note 1, page 15.
[58] GAIPE, Dam Violence, The Plan that Killed Berta Cáceres (November 2017) [hereinafter GAIPE Report], https://justassociates.org/sites/justassociates.org/files/exec_summ_dam_violencia_en_final.pdf.

The GAIPE Report's statements accusing DESA of improper dealings with security forces are wrong. We refer for example to this paragraph from that document:

> This report demonstrates that partners, executives, managers, and employees of Desarrollos Energéticos Sociedad Anónima (DESA), private security companies working for DESA, and public officials and state security agencies implemented different strategies to violate the right to free, prior, and informed consultations of the Lenca indigenous people. The objective of those strategies was to control, neutralize, and eliminate any opposition. These actions included: the manipulation of communities to rupture their social cohesion, smear campaigns, infiltrations, surveillance, threats, contract killing, sabotage of COPINH's communication equipment, cooptation of justice officials and security forces, and strengthening of structures parallel to state security forces.[59]

The organization that captured a government entity was COPINH through its relationship with the Office of the Solicitor for Ethnicities which under a mantle of illegality directly supported COPINH in its campaign against DESA, including supporting the transportation of persons that had nothing to do with the area surrounding the project to make it look to international actors as if COPINH did have the support of residents of the area close to the Agua Zarca project. (*See supra*, section I-B on messages between Berta Cáceres and a person at the Office of the Solicitor for Ethnicities, and text of messages included in Annex.)

Later on, the GAIPE report states that:

> Relationships of executives and partners with highest-ranking government officials sustained an alliance between DESA and security forces, which enabled not only coordination but also subordination of security force agents in operations to control and repress community and COPINH members, including Berta Isabel Cáceres Flores.[60]

We ask the reader to conscientiously absorb the discussion in Section I of this document regarding the *Travesty of Due Process*, about among others, failures by the Prosecution to disclose information to the defense in the criminal cases against Sergio Rodríguez and Roberto David Castillo.

Affirmations in the GAIPE Report about a supposed conspiracy between DESA and the State to cover up the murder are only irresponsible speculations. That report has in fact worked against the pursuit of truth and justice as it has placed undue pressure upon the prosecutors to convict even in the face of a complete lack of evidence against Rodríguez and Castillo.

---

[59] *Id*. at 2.
[60] *Id*. at 16.

A.  Failure to Meet Lund-London Guidelines

According to the Greenspan Report, the GAIPE Report shows repeated failures to comply with the International Human Rights Fact-Finding Guidelines (otherwise known as the Lund-London Guidelines) which were established by the International Bar Association's Human Rights Institute and the Raoul Wallenberg Institute in 2009.

The Lund-London Guidelines state that when conducting a fact-finding mission, the delegation should "make use of all data collection techniques available", and, where it relies upon information gathered by a third party, it should "take all reasonable measures to verify the objectivity of that information gathering process in order to rely on the evidence collected," and when verification is not possible, the report should note it as such, among other provisions.

The main problem here is that GAIPE appears to completely disregard the incomplete access they had to information. While the authors acknowledge that they had access to only a "fraction" of the digital evidence gathered in the investigation,[61] and while they identified irregularities and shortcomings in the investigation, it nevertheless concluded that it had identified criminal conduct and the "possible" intellectual authors of the murder of Berta Cáceres – and those conclusions in turn have resulted pressure on prosecutors to take actions that are not supported by evidence.

Greenspan writes: "The GAIPE Report suffers from numerous flaws: it makes assertions of fact without citing a supporting source; the sources that it does cite often do not support the factual assertions it makes; it draws speculative inferences from the evidence and fails to explore alternate inferences; it makes factual conclusions based on evidence that it concedes is inadequate; and it lacks objectivity in its analysis of the facts."[62]

B.  Unsupported Claims

The Greenspan Report identifies numerous areas in which the GAIPE authors make factual claims based on no cited sources, conclusions based on speculative inferences, and conclusions based on incomplete evidence.

Greenspan notes that GAIPE's most provocative allegations about DESA's employees have no factual support at all.  In terms of their main claims, the GAIPE authors fail to cite anything that "actually substantiates these allegations," and instead base their conclusions on

---

[61] *Id.* page 2.
[62] Greenspan Report, *supra* note 1, page 8.

9

"text messages that are completely unrelated to the contents of these allegations."[63] Greenspan concludes that the GAIPE report "appears to be written in order to justify charges against DESA executives, not to dispassionately and objectively determine the truth.  Any attempt to portray it as an independent fact-finding report is, unfortunately, mistaken and tragically misleading."[64]

## III. The True Face of COPINH

> *"When COPINH came to this sector of Río Blanco, Intibucá for the protests of the dam,*
> *they didn't come to the protests of the dam peacefully, they came attacking,*
> *you can say, the families of [the village of] El Barrial, Río Blanco, Intibucá."*
> *– Aquilino Madrid Muñoz, Aldea El Barrial, Río Blanco Intibucá*[65]

COPINH has successfully presented a certain positive image of itself to the international community as an indigenous rights organization engaged in both environmental and human rights activism. However, this overly simplistic portrayal overlooks a much more controversial reality of their tactics and conduct in the local communities in which they operate, where for many years their violent disputes over land and resources have been deeply controversial.

### A.  Early History and Rebranding

Beginning in the early 1990s, Honduras, largely during the Carlos Roberto Reina government (1994-1998), implemented a series of reforms with respect to the country's indigenous population.[66] This included the official recognition of Honduras as a multi-ethnic nation,[67] the 1995 ratification of the Convention concerning Indigenous and Tribal Peoples in Independent Countries of 1989[68] (**ILO 169** or **the Convention**), collective land titling, and the introduction of bilingual education for indigenous groups.[69] As has been noted, "the region-wide adoption of ILO 169 can be understood as part of the norms-cascade whereby elected democratic

---

[63] Greenspan Report, *supra* note 1, page 9.

[64] Greenspan Report, *supra* note 1, page 12.

[65] Interview by Aquilino Madrid Muñoz, Aldea El Barrial, Río Blanco, Intibucá (translation ours).

[66] Mark Anderson, *When Afro Becomes (like) Indigenous: Garifuna and Afro-Indigenous Politics in Honduras*, J. Latin A. & Caribbean Anthropology 384, 395, June 28, 2008.

[67] *Id.*; *see also* Constitución de la República de Honduras, art. 173 (obligating the state to preserve and stimulate native cultures such as folklore, popular art, and handicrafts).

[68] *See* ILO, Ratifications for Honduras, http://www.ilo.org/dyn/normlex/en/f?p=NORMLEXPUB:11200:0::NO::P11200_COUNTRY_ID:102675 (last visited May 30, 2018).

[69] Secretaria Técnica Pedagógica Dirección General de Programas Especiales, Programa Nacional de Educación Para las Etnias Autóctonas Afro-Antillanas de Honduras (1994), http://www.oas.org/udse/seminario_mx/honduras.doc; *see also* Decreto 93-97, 22 June 1997.

governments ratified international human rights instruments as a means of staking their global democratic credentials, following extended periods of military and authoritarian rule."[70]

In Honduras in particular, however, the reforms passed by the Reina administration were sparked in large part by an emergence and empowerment of groups representing indigenous peoples in Honduras. The Advising Council for the Development of Autochthonous Ethnic Groups (**CADHEA**) was founded in 1987 and acted as "a bridge between the ethnic organizations and the government." [71] Then, in 1992, then National Confederation of Autochthonous Peoples of Honduras (**CONPAH**)[72] supplanted CAHDEA as the dominant umbrella organization for major ethnic federations.[73]

Cáceres and her husband at the time, Salvador Zúniga, founded the Civil Council for Popular Organizations of Intibucá[74] in 1993 as an organization to coordinate the activities of various "popular"—not necessarily indigenous—organizations in the Intibucá area.[75] According to COPINH's own website, the organization's founding grew out of "the decline of the revolutionary struggles in the Central American region," including the "the incorporation of guerilla forces into legal electoral parties," as well as the "the opening of local economies to transnational capital investment in strategic areas, taking advantage of the neoliberal privatization of state and natural resources."[76] Early in COPINH's history, on May 1, 1993, the organization led what it describes as "a workers' march without precedent in the history of the city of La Esperanza" in protest of high living costs and "calling for the defense of the forest and culture, and for the repair of the streets and the city's sewage system."[77] The following year, COPINH led a series of marches from various Lenca communities to Tegicugalpa to push for

---

[70] MARIA V. CABRERA ORMAZA, THE REQUIREMENT OF CONSULTATION WITH INDIGENOUS PEOPLES IN THE ILO 73 (2018).

[71] ORGANIZACIÓN NACIONAL INDÍGENA LENCA DE HONDURAS, PERFIL DE LOS PUEBLOS INDÍGENAS Y NEGROS DE HONDURAS 9 (2002) (translation ours), http://documents.worldbank.org/curated/pt/533071468035409632/pdf/656720WP00PUBL0y0negros0de0 honduras.pdf (translation ours).

[72] The group was founded as the National Coordinator for Autochthonous Peoples (Coordinadora Nacional de Pueblos Autóctonos), and in 1993 changed its name to the Confederation of Autochthonous Peoples of Honduras (Confederación de Pueblos Autóctonos de Honduras).

[73] Anderson, *supra* note 66, at 394.

[74] For simplicity referred to as COPINH throughout, even when referring to the group prior to its renaming.

[75] MARVIN BARAHONA & RAMÓN RIVAS, ROMPIENDO EL ESPEJO: VISIONES SOBRE LOS PUEBLOS INDÍGENAS Y NEGROS EN HONDURAS 101 (1998).

[76] Roverto Barra, *Civic Council of Popular and Indigenous Organizations of Honduras: 25 Years of Struggle and Revolution* (Mar. 22, 2018), COPINH, http://copinhenglish.blogspot.com/2018/03/civic-council-of-popular-and-indigenous.html.

[77] QUE ES COPINH, https://copinh.org/2008/12/que-es-copinh/ (last visited May 31, 2018) (translation ours).

constitutional recognition and protection of indigenous peoples under Honduran law.[78] Some 3,000 to 5,000 people participated in the march, which became known as the "Pilgrimage for Life, Justice and Liberty" and sparked what has been described as "Lenca mania" in the capital.[79]

By then, it had "bec[o]me clear [to COPINH] that Lenca community demands, framed as such, generated more excitement among community members, COPIN/H member organizations, and outside organizations belonging to the COPIN/H organizations' solidarity networks, than did purely class-based claims. In short, identity politics was gaining traction where national-popular articulations were failing."[80] Thus, in February 1995, the organization dedicated itself to the representation of "indigenous" peoples, amending COPINH's name to the Civil Council for Popular *and Indigenous* Organizations of Honduras.[81] To be sure, this name change was not necessarily due to the ethnic makeup of COPINH's leadership[82] or a change to COPINH's ongoing, self-professed struggle to oppose "the North American empire"[83] as represented by its "Gringo ambassador[s]."[84] Rather, the rebranding arose from COPINH's quest for relevance.[85]

COPINH's motivations aside, "at least 14 organizations claim[] to represent the Lenca and . . . COPINH, as a national NGO, could not claim to be exclusively speaking for them."[86] Even when COPINH is present in a community through what the organization calls its own *consejo indígena lenca* (Lenca indigenous council), this should not be confused with a political governing body, just as it "does not preclude the presence within the village of people who decline to participate or who actively oppose COPINH's politics."[87] Moreover, COPINH, according to indigenous groups, is an NGO and "not a grassroots membership organization with

---

[78] *Id.*

[79] DANIEL GRAHAM, GHOSTS AND WARRIORS: CULTURAL-POLITICAL DYNAMICS OF INDIGENOUS RESOURCE STRUGGLES IN WESTERN HONDURAS 74 (2009).

[80] *Id.* at 70.

[81] *See id.* at 70-84; 83 (emphasis added).

[82] GRAHAM, *supra* note 169, at 70-71 ("Salvador, who has continued to be a driving force for COPIN/H since its founding, told me in an interview that he viewed his own self-identification as *indígena* as a long and continuing process.")

[83] Roverto Barra, *supra* note 76.

[84] COPINH, ANTE LA LLEGADA DE BARACK OBAMA A CENTROAMÉRICA, NOS MANIFESTAMOS PARA CONDENAR EL INTERVENCIONISMO Y EL GOLPISMO, https://copinh.org/?s=imperio+norteamericano (last visited June 11, 2018).

[85] *See* GRAHAM, *supra* note 169, at 70-71 ("Whereas old-style, national-popular politics did not seem to stir people, the civil actions that emphasized Lencas' otherness, underscored their historic marginalization, and attended directly to community-level priorities, were striking a chord in indigenous communities and (so long as the demands remained modest) met with the favor of many middle-class ladinos as well.").

[86] JULIAN BURGER ET AL., INDEPENDENT FACT FINDING MISSION, *supra* note 4 at 25.

[87] GRAHAM, *supra* note 169, at 465-68.

broad-based community representation and support."[88] When COPINH joined CONPAH in 1994, the original group representing the Lenca, the National Indigenous Lenca Organization of Honduras (**ONILH**), which was founded in 1980,[89] left CONPAH to "work independently with the government and multilateral institutions," such as the World Bank.[90] This development "expressed fissions among ethnic organizations that would become more visible by the end of the [1990s]."[91]

### B.  COPINH's Radical Means and Rhetoric

In an apparent effort to distinguish itself, COPINH employed increasingly radical actions. On October 12, 1997, 100 to 200 COPINH activists gathered at Parque Colón, where the Mayor of Tegucigalpa and delegations from Italy and Spain were gathering at a statue of Columbus donated by Italy eighty years prior.[92] COPINH activists proceeded to spray paint slogans before "us[ing] syringes to draw small quantities of their own blood, which they spattered on the base of the monument" before toppling the statue.[93] COPINH claimed that the statue fell unexpectedly when one of its members mounted the statue in an attempt to smear paint on Columbus's face, but photos taken at the time show a Lenca man tying rope around the statue.[94] Cáceres recalled in an interview years later that they had been "testing" how easily the statue would fall.[95] Whatever the particular circumstances, COPINH activists proceeded to "beat the decapitated statue as they might a felled piñata" while the TV cameras rolled.[96]

COPINH was denounced roundly in Honduras for its actions, and "politicians and the media began questioning the authenticity of COPIN/H's members' Lenca identity," especially that of co-founder Zúniga, who along with COPINH's leadership was accused of opportunism.[97] President Reina, a "staunch defender of indigenous causes,"[98] called the COPINH leaders "sick

---

[88] *See* Gerencia Ambiental Internacional, Follow-Up Social Due Diligence: Agua Zarca Hydroelectric Project 26 (Feb. 4, 2014) [hereinafter GAI 2014 Report] (on file with Amsterdam & Partners LLP).

[89] Organización Nacional Indígena Lenca de Honduras, Perfil de los Pueblos Indígenas y Negros de Honduras 8 (2002), http://documents.worldbank.org/curated/pt/533071468035409632/pdf/656720WP00PUBL0y0negros0de0honduras.pdf.

[90] Anderson, *supra* note 66, at 396.

[91] *Id.*

[92] *Id.* at 313.

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.* at 314.

[97] *Id.* at 315.

[98] Thelma Mejia, *Clay Leaders Matter More Than Our Problems*, Inter Press Service (Nov. 13, 1997), http://www.ipsnews.net/1997/11/honduras-indigenous-clay-leaders-matter-more-than-our-problems/.

people who acted in order to make themselves famous,"[99] and refused to engage in direct negotiations with COPINH, arguing that their demands and tactics "went beyond what is rational."[100] COPINH is thus "an organization that has attracted more than its share of controversy—not just in official camps but also from a variety of conscientious social critics who have looked askance at COPIN/H's particular brand of militancy."[101]

While COPINH's actions have long garnered criticism, COPINH's rhetoric—claiming, for instance, "that the U.S. ambassadors in Honduras are pro-consuls of the empire,"[102] and comparing COPINH's plight to the biblical martyrdom of Jesus, Daniel, and Peter ("They crucified him upside-down, the poor bastard . . .")[103]—appears to be no less radical. As one scholar explains:

> At least as controversial as its bristly modus operandi has been the mixed idiom of Latin American populism-cum-indigenous identity politics through which COPIN/H has articulated its demands. COPIN/H members' unapologetic insistence—echoing the utopian slogan of the World Social Forum—that "another world is possible," and their public praise for leftist leaders such as Fidel Castro in Cuba and Hugo Chávez in Venezuela, have been especially worrisome to those who have long championed indigenous peoples' rights in Latin America. In terms both of its rhetoric and its mixed membership, COPIN/H bears signs of what anthropologist Charles Hale has called "popular–indigenous" organizations. In circulating programmatic statements that hail non-indigenous avatars of pan-American liberalism or invoke mythic, indigenous culture-heroes, COPIN/H's leadership has sometimes downplayed the continuities in indigenous peoples' experiences of domination under Iberian rule and, later, under the internal colonialism imposed on them by ladino elites.[104]

Unsurprisingly, "Overall the sense from most actors (indigenous and non-indigenous) appears to be that COPINH is a political organization that promotes violence against those who

---

[99] GRAHAM, *supra* note 169, at 317.

[100] Thelma Mejia, Thelma Mejia, *supra* nota 98 (traducción nuestra).

[101] GRAHAM, *supra* note 169, at 4-5.

[102] COPINH, BEFORE THE ARRIVAL OF BARACK OBAMA IN CENTRAL AMERICA, WE DEMONSTRATE TO CONDEMN INTERVENTIONISM AND COUPS, https://copinh.org/?s=imperio+norteamericano (last visited June 11, 2018).

[103] GRAHAM, *supra* note 169, at 506.

[104] GRAHAM, *supra* note 169, at 4-5.

do not actively support its ends."[105] Moreover, COPINH's "confrontational political tactics and its strident criticism of northern (especially U.S.) imperialism" are well known in Honduras.[106] Yet this, it seems, has been no obstacle to COPINH's noted ties with international human rights and environmental NGOs—from Cultural Survival to Amnesty International and International Rivers Network.[107] Nor has it jeopardized COPINH's resonance in Washington, D.C.,[108] or its continued association with Honduras's opposition movement (*e.g.*, Frente Nacional Revolucionario Popular) and the country's social democratic political party, Partido Libertad y Refundación (**LIBRE**), led by Zelaya's wife.[109]

While cultivating political alliances and relationships with international NGOs, however, COPINH was less vigilant in faithfully advocating for the interests of the communities in which it was active. In particular, COPINH's "[l]a Esperanza-based, labor-left and middle-class organizers who comprised the core of COPIN/H's early leadership were pushing an environmental agenda that derived more from their own conservationist and anti-capitalist sensibilities than from the expressed priorities of their indigenous rank-and-file members."[110] COPINH's infrequent visits to communities it claimed to be active only exacerbated the problem and reportedly resulted in frequent complaints by these communities.[111]

This dynamic follows a familiar pattern in Central America, where leftist groups have a documented history of professing solidarity with indigenous peoples in order to conform indigenous needs and interests to a leftist political agenda.[112] COPINH's intentional lack of

---

[105] Monkey Forest Social Performance Consulting, Quarterly Monitoring Report 25 (Jan. 2015) [hereinafter Monkey Forest Jan. 2015 Report] (on file with Amsterdam & Partners LLP).

[105] *See* GAI 2014 Report, *supra* note 88, at 5, 9.

[106] GRAHAM, *supra* note note 169, at 4-5.

[107] *See* GAI 2014 Report, *supra* note 88, at 26.

[108] As recently as November 2017, Senator Patrick Leahy referred to COPINH on the Senate floor as a "civil society organization that peacefully advocate[s] for equitable economic development and access to justice," asserting that the "organization and the community of Rio Blanco were threatened repeatedly as they engaged in peaceful protests to protect  the river and their way of life from the construction of the Agua Zarca hydroelectric dam by DESA." 163 Cong. Rec. 183, S7152 (daily ed. Nov. 9, 2017) (statement of Sen. Patrick Leahy); *see also* Letter from Sixty Lawmakers to Treasury Secretary Jacob Lew and to State Department Secretary John Kerry (Mar. 16, 2016), *available at* https://hankjohnson.house.gov/media-center/press-releases/reps-johnson-ellison-call-independent-murder-investigation-human-rights.

[109] GAI 2014 Report, *supra* note 88, at 26.

[110] *See* GRAHAM, *supra* note 169, at 122.

[111] *See generally id.* at 465-68.

[112] *See generally* Charles R. Hale, *Between Che Guevara and the Pachamama: Mestizos, Indians, and Identity Politics in the Anti-Quincentenary Campaign*, 14 CRITIQUE OF ANTHROPOLOGY 9 (1994); *see also* KAY B. WARREN, INDIGENOUS MOVEMENTS AND THEIR CRITICS: PAN-MAYA ACTIVISM IN GUATEMALA (2001).

governance and funding transparency only adds to questions about the organization's activism in indigenous communities. For example, an American researcher who wrote his dissertation on COPINH had "to steer clear of the subject of COPIN/H's funding sources" as a condition of engaging with the organization.[113] Similarly, the organization's website contains no information on its funding or governance structure.[114] What little is known about COPINH's funding—*i.e.*, that the organization received millions of lempiras in grants for indigenous land purchases and other purposes from the conservative Lobo administration[115]—only casts additional doubt on the organization's integrity.

### C. Victims of COPINH

Through intimidation, theft, vandalism and violence, COPINH has a shameful record of transgressions against the rural population for whom they claim to advocate. This conduct, though very well hidden behind a carefully stage-managed media image, is nothing short of scandalous, and unequivocally contradicts any claims by COPINH to protection or promotion of Honduras's rural indigenous advocacy.

To investigate the reality on the ground, Amsterdam & Partners LLP sent a field research team to collect interviews with members of the community close to the project area. In these twelve interviews, captured on video testimony, a common theme was immediately apparent - far from being a representative force for popular rights, COPINH is infamously known among locals as a feared and well-funded special interest group - one which pursues violent methods, including murder, to achieve its ends.

The first community-member to offer an interview recounted truly harrowing tales. Aquilino sat with our interviewer and described several personal and second-hand accounts of extortion, threats and violence perpetrated by various COPINH operatives in his community. The middle-aged laborer carried with him a laminated poster that featured a photograph of a little boy, 14 years old. Mr. Muñoz informed us the sad story of what happened during a violent COPINH protest against the Agua Zarca project in April 2013, as they "came mainly causing deaths, violent crimes, as you can see this kid [referring to photograph], my son, they killed him. He was innocently working on our property where my dad had him milking [cows], so the man that killed him entered our private property, that's where they killed my son, Cristian Anael Madrid Muñoz."

---

[113] GRAHAM, *supra* note 169, at 30-31.

[114] *Cf.* COPINH, https://copinh.org/ (last visited June 11, 2018).

[115] *See* GAI 2014 Report, *supra* note 88, at 26; *see also Lobo Suscribe "Histórico" Acuerdo con el COPINH,* PROSECO DIGITAL (Aug. 3, 2011), http://www.proceso.hn/component/k2/item/49136.html (claiming that Lobo and COPINH signed an agreement worth at least 16 million lempiras—two million for purchasing land for indigenous people; 4.2 million for a bond for agrarian debts; and 4.5 million for the payment of salaries owed to teachers who work for that sector).

Over the course of these interviews, the murder of this man's son at the hands of COPINH members proved not an irregular occurrence.

After the murder of Aquilino's son, the laborer's family hardly expected compensation of any kind. The COPINH however, "received some money" from the death of Aquilino's son, and then bought weapons, according to Santiago Gómez García, another Río Blanco resident Santiago explains that international NGOs and other organizations will listen to the word of COPINH over the word of true Lenca communities, thus emboldening COPINH's power and further muffling the voices of the Honduran indigenous. Even in situations as brutal as the murder of a child, not all sides are given their equal attention. Gómez García, of La Tejera, also explained in detail how armed COPINH members use intimidation and violence, including destruction of property, to steal and occupy lands from those who do not support that organization. Their intimidatory power is of such intensity that local authorities do not prosecute COPINH members for their misdeeds even though locals have filed complaints.

And when COPINH is aware of their unchallenged control over the dialogue, the organization is given greater latitude in which to operate as they please. Ms. Vicenta Domínguez Vásquez is the surviving sister of yet another Río Blanco community member murdered by COPINH as punishment for not supporting the COPINH. To this day, justice has yet to be delivered, and instead her mother, father, sister and two incarcerated brothers have been formally and falsely blamed by the COPINH for his death. The audacious disregard for the suffering of Ms. Vicenta Domínguez Vásquez and her family has led her to conclude that, "Yes, they [COPINH] are Lencas, we are the same Lencas, and so, if you don't support them, they try to make your life impossible... They go around doing harm, because, because according to them they do good for the community and all, but no, they aren't doing good, they are doing harm, because what they did to my brother, they killed him and there is no justice for them. So, they are not doing good. They are not doing good." Vicenta's conclusions were shared by her sister, María Enriquez Domínguez Vásquez, who described patterns of COPINH's disregard for private property rights and its perpetuation of chronic violence. Like her sister, María concluded that, "they say they do what they want because for them [COPINH] there is no law... that they can kill us and there is no law for them, they can do what they want to do and there is no law for them, because they say the institution of the COPINH is supporting them. There is no law for them [COPINH]." The sisters' account reveals a consequence of the COPINH's aggression that goes beyond the deeply unfortunate death of their brother. In the years since the murder of the Vásquez sisters' brother, COPINH has made repeated efforts to ostracize, humiliate and incriminate the surviving family, of which the two sisters care for.

Benigno Domínguez was yet another victim of the COPINH's violence and aggression toward the supposed "disloyal" Río Blanco residents who did not abide by the organization's unsubstantiated 'pro-Lenca agenda'. As a former employee of DESA, Mr. Domínguez was already a target of COPINH's when he refused to participate in a road-blockade meant to obstruct the transport of food, supplies and laborers to the Agua Zarca campsite. As a result, Mr. Domínguez graduated from target to traitor in the eyes of the COPINH, and within two months after the blockade demonstration, Mr. Domínguez found himself fleeing his home in the middle of the night to avoid the rage and retribution of the local COPINH agents:

"…because I didn't support them, then about two months after they did the blockade, they came with machetes to destroy my house, and they sentenced me to death in my house. They were firing weapons, so at midnight I ran away with all my family. We left without clothes and we fled to a village ... to the small village of El Barrial, where we stayed with my wife's family until the morning…. They sentenced me, they told me: 'We are going to kill you because you are supporting the company DESA and you are not supporting us, that's why we'll kill you.' So that's why we ran away that night. We went out through a side door, because thank God - God does everything - look, they had my house surrounded..."

Virgilio Pineda Madrid had not only accepted the arrival of DESA in Río Blanco, he celebrated it. Virgilio felt that this company would bring much needed development, electricity, community support and employment, but he soon learned that these benefits would be denied to him by COPINH once they began protesting and demonstrating in the community. But, in anticipation of a growing local economy and DESA's guaranteed buyout of his property, Virgilio sold his land to DESA early on and immediately became a target of COPINH, much like Benigno had become. They claimed that the sale of his land to DESA was an act of betrayal against his community, an act they believed warranted their aggression. Virgilio describes how their anger, "made a war against us," and they "have invaded a property of mine where I have grazing cattle, they've taken it upon themselves to cut wires and take out my cattle to the community of Tejera," and brandished and discharged "machetes and guns" against other 'traitors'. He even explains COPINH's attempts to lure him from his home by sending him, "a letter to go and negotiate with them but what they want is to have conflict with me to see if I harm one of them so they can declare themselves martyrs."

The organization has spent years publicizing their 'altruistic' campaigns for the indigenous populations in Honduras, but the opinions of the Río Blanco community members exhibit a different evaluation of COPINH's work. Similarly, Juan Gutiérrez, a resident of Chorrera Áspera, Opalaca, explained how they and Valle de Ángeles are isolated after the COPINH burned a bridge the communities used and how now the communities cannot bring to market their coffee, beans and corn by car, as since they have no bridge, they are forced to move those crops across the river using cargo animals. The COPINH did this in retaliation for those two communities not having supported them against DESA. DESA had built a road that benefitted the communities. But the road leads to the bridge and the bridge is no longer there. To cross the river on foot they are now forced to use a difficult hanging bridge and now it is much harder to get laborers to the fields so much of the crops are lost and farmers make less money. In sum, he feels that the COPINH is a negative force damaging his community and he's not alone.

José Natividad Gutiérrez Díaz articulates what he perceives to be discrimination and exploitation of indigenous Honduran populations, saying "What we've been seeing is discrimination, they [COPINH] have made an organization with part of our people and discriminating against us, who are indigenous too. We live in the same area." He added that

"They [the COPINH] are trying to take information abroad to the international communities to be able to get support in the name of these [local] families but we do not know what support, what money is assigned and that they get which do not get to our communities. They say that they find help for our communities, but we can't see that, and this is the injustice and we should

18

be in the media clearing these lies. Since 2013 they have said... that ours is a militarized zone, that we are slaves under Honduran law and that the military has taken our lands, and this is a lie."

But the exploitation of these indigenous groups takes several forms, whether that includes taking pictures of "those who are barefoot," and "blackmailing them," or simply blaming the violence, extortion and other local maladies on DESA. José recounted how in 2013 the COPINH, following instructions of its leaders destroyed a drinking water project in the community of Valle de Angeles, how they threaten the inhabitants into supporting them and damage the lands and destroy crops of those who refuse to support that organization. In José's view:

"They pretend to be Lenca indigenous peoples but [what they are doing is] looking to improve their economic situation for themselves to survive, and enroll their children in good universities while our children are facing raindrops inside the classrooms when it rains, they [the children of COPINH members] are studying at the best private universities."

And it's for these reasons that, according to José, "This community hasn't submitted to them, this community of Valle de Angeles has never supported COPINH. Why? Because if [Valle de Angeles] started supporting them, I think we would see more poverty, we would become even poorer. Why? Because what they want is to have humiliated people, to have leaders that can fight for them in order to win prizes and money at hand that supports their living differently."

Another resident of Opalaca, José Héctor García Mejía, corroborates his neighbor's claims of discrimination and exploitation. José Héctor, explained that COPINH arrived in Río Blanco and started to organize and to claim that as an organization they were the real title holders to land that in truth belonged to the municipality. They also started saying that those who did not join the COPINH would be excluded from land ownership as is evidence by the land deeds. Like several other rural Hondurans in Agua Zarca's impact zone, José Héctor recognized the incredible potential for development and an invaluably beneficial partnership between his community and DESA, explaining that "with DESA we always had good relations because we support development and through DESA and the Agua Zarca project we saw the development of our communities." But, COPINH members "were or are almost always armed," with weapons and differing agendas. José remembers how "they [COPINH] separated us, they discriminated against us and then it was in my community that because of their pressure, to which we did not submit, they destroyed our [drinking] water project" and strove to commandeer the public discourse regarding DESA and the Agua Zarca Project. COPINH leaders would frequently broadcast propaganda and threats  in local radio broadcasts, threatening the communities with violence if they did not comply with the COPINH agenda and emphasizing they had firearms and other weapons. He added that regarding COPINH protests in the area the majority of attendees are not locals as the COPINH pays people to attend their demonstrations and provides them with alcohol. José also spoke of how he knows of several people who have had to migrate to the US and Spain because of this troubling situation in his community, including persons who travel with minors. COPINH had only brought his community "destruction, pain and death".

19

Mr. Juan Bautista Madrid Muñoz attempted to offer a holistic perspective of the relationship between COPINH and Río Blanco. In his illustrations, Juan Bautista detailed, through several separate examples, the relative obscurity from which COPINH emerged in Río Blanco, explaining "so to our community COPINH came in 2013, before that nobody knew Copinh in the sector of Río Blanco, Intibucá. We had heard of COPINH in other places but never in Río Blanco". But it's been COPINH's violent and abusive treatment of the residents that left a lasting impression on Juan Bautista and, according to him, the rest of the community. His own experience included the extra-judicial seizure of his land by COPINH, but that was not all. Exposing his skin, Juan Bautista pointed to six scars, each a result of a .38 caliber bullet fired at him, in his own home, by agents of COPINH. He knows people and has relatives who have migrate because of the insecurity the COPINH has created. For Juan Bautista the situation in his community due to COPINH actions is like what happens when *maras* and gangs are present in other parts of the country. He was also concerned about international organizations not supervising how the money they give to COPINH is used, as it is not benefitting the communities it is supposed to help. Indeed after Ms. Cáceres won the Goldman prize the COPINH had more weapons that were used to intimidate the locals.

But Norma Lidia Díaz Estrada's story presents one of the more telling accounts of COPINH under the direction of Berta Cáceres. A social worker, Norma made many trips to communities within the Agua Zarca project's impact zone, and in turn interacted with COPINH on several of these occasions. Unfortunately, Norma's relationship with the organization was not as cordial as her position may have commanded with any other civil society organization. Instead, Norma tells of a several exchanges with Berta Cáceres, "when we went to meetings on many occasions she [Berta Cáceres] personally  would tell me with her microphone 'either you stop socializing this project or you'll wind up dead,'" how "there are many witnesses to the attacks I was subjected to within meetings, attacks where I was hit... and sometimes the person she [Berta Cáceres] had for the press would tell me 'leave, because here they might kill you'", she was once attacked and told of how "on one occasion I went to the community of La Unión to do some work. When I was returning, they were waiting me with machetes, and attacked me. They injured me [and] here I still have scars. Here I have [more] scars, [inflicted] with machetes." On a different occasion, "They came, surrounded us with machetes; [and] attacked even the army. I had to have army protection. When the army came in their cars, [they] would go up the hills and with slings and rocks they would attack. They hit army officers, and once when I was with a sub-lieutenant they hit him with stones."

Aquilino Madrid's words deconstruct the grievances of the interviewed Lenca Hondurans, and the problems with COPINH that led to these unfortunate murders, crimes and destruction of a peaceful community. Aquilino offers his concession, that "these organizations [like COPINH] are not bad, what's bad are those leaders that administer them," because in his experience, COPINH came to communities "in opposition against the project which wasbenefitting the community." Aquilino pointed to the importance of civil-society organizations, but emphasized the long-absent integrity of COPINH.

After our team met these persons their ordeal has continued. Juan Bautista Madrid filed a statement to the Honduran National Police following an incident on November 1, 2018 where COPINH members issued death threats against him and several persons close to him. As a result

one of them who has a heart condition fell ill and was taken to the hospital due to the stress inflicted by those persons identified in the statement. Those COPINH members have repeatedly entered the private properties of the neighbors of El Barrial and state, to the rightful landowners who have proper land titles, that they are the landowners. The COPINH members argue they have ancestral land titles. The statement also describes how those members of COPINH boast of not being afraid of the police as they say that the national police protects them and even lends them their car. The statement ends by complaining of unanswered requests of action to the Intibucá prosecution having been filed since 2013 with many deaths having occurred because of this situation.

## IV. NGOs: Incentivizing Conflict in Honduras

Following the murder of Berta Cáceres, understandably a wide range of NGOs made statements of concern. Demands for accountability and justice were made, while many organizations were eager to point out the rampant shortcomings in Honduras's protection of civil-society activists, including environmental and human-rights advocates.

Gradually, however, the narrative from many international NGOs transitioned from advocacy to antagonism. Taking their talking points directly from COPINH, MADJ, and other related parties, global NGOs went beyond calling for accountability to make direct accusations against DESA executives, seemingly pressuring the authorities to take further actions whether or not there was evidence to support these claims. We were soon seeing the ridiculous situation of international human rights groups and diplomatic missions celebrating the unlawful pretrial detention of innocent persons, while ignoring any need to mention the requirements for a fair trial.

In the same breath, these same NGOs also broadly condemned hydroelectric projects in Honduras, with of course particular ire focused on the Agua Zarca project.

### A. NGOs' Anti-Development Stance

NGOs as well as IOs asserted that the Agua Zarca "dam['s]" location was "considered sacred by the [indigenous] Lenca people," that "[l]ocals were adamantly against the project"[116] or that "[m]ost of the members of the Río Blanco communities voiced their rejection of the project [in 2011],"[117] and that protesters had been "peaceful" in their opposition to the project.[118]

---

[116] Nick Vacchio, *Honduras' War on Indigenous Communities*, PROSPECT J. INT'L AFF. (June 15, 2017), https://prospectjournal.org/2017/06/15/profiteering-from-death-honduras-war-on-indigenous-communities/.

[117] U.N. Human Rights Council, Report of the Special Rapporteur on the Rights of Indigenous People on Her Visit to Honduras, ¶ 9 Annex, U.N. Doc. A/HRC/33/42/Add.2; 33rd Sess. (July 21, 2016); *see also* THE GOLDMAN ENVIRONMENTAL PRIZE, *Berta Cáceres 2015 Goldman Prize Recipient South and Central America*, https://www.goldmanprize.org/recipient/berta-caceres/ (last visited July 6, 2018) (claiming, inexplicably, that "[i]in 2006, community members from Rio Blanco came to COPINH asking for help," and having "witnessed an influx of machinery and construction equipment coming into their town" even though the Agua Zarca project's earliest beginnings date to 2009).

[118] Nick Vacchio, *Honduras' War on Indigenous Communities*, PROSPECT J. INT'L AFF. (June 15. 2017), https://prospectjournal.org/2017/06/15/profiteering-from-death-honduras-war-on-indigenous-communities/; *see also* Report of the Special Rapporteur on the Rights of Indigenous People on Her Visit

Another report reiterated that "the project threatens to desiccate the river . . . and therewith the communal farm lands,"[119] while yet another one accused the project's developer of "the manipulation of communities to rupture their social cohesion."[120] Soon apparent consensus emerged that the affected indigenous communities "had not been consulted,"[121] or at least that "[t]he purchase of energy and the concession on "Lenca territory were granted to DESA without free, prior, and informed consultation with the Lenca community, as required under ILO Convention 169, which was incorporated into Honduran law in 1995."[122] International media outlets regurgitated these findings,[123] as did U.S. elected officials who stated, *inter alia*, that the project "clearly cannot coexist with the indigenous people of Río Blanco who see it as a threat to their safety and way of life."[124]

The reports also provided ample advice to the government of Honduras, domestic and foreign parties involved in the project, and others. For example, one NGO opined, "International investors should immediately divest from the project and the Honduran government should cancel the project's concession given . . . the failure to consult all affected indigenous communities before the approval of projects."[125] Going further, the same NGO recommended that "*[a]ll* companies and investors should refrain from doing business in the . . . hydroelectric . . . industry[y] until the rights of local communities are protected."[126] Another NGO alleged "willful negligence by [international] financial institutions,"[127] further explaining that "[t]he lack

---

to Honduras, *supra* note 117, ¶ 7 Annex (claiming that "the lands were part of the ancestral territory of Lenca communities").

[119] JOHAN FRIJNS, *Agua Zarca Hydro Project*, BankTrack (May 18, 2018),
https://www.banktrack.org/project/agua_zarca_dam/pdf.

[120] GRUPO ASESOR INTERNACIONAL DE PERSONAS EXPERTAS, DAM VIOLENCE: THE PLAN THAT KILLED BERTA CÁCERES 2 (2017), *available at* https://www.gaipe.net/wp-content/uploads/2017/10/Exec-Summ-Dam-Violencia-EN-FINAL.pdf.

[121] Report of the Special Rapporteur on the Rights of Indigenous People on Her Visit to Honduras, *supra* note 117, ¶¶ 46-47; *see also* UNITED NATIONS HUMAN RIGHTS OFFICE OF THE HIGH COMMISSIONER, UN RIGHTS EXPERT RAISES ALARM,
http://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=16743&LangID=E (last visited May 30, 2018) (claiming that the project had been "approved without previous consultation with them").

[122] DAM VIOLENCE: THE PLAN THAT KILLED BERTA CÁCERES, *supra* note 120, at 13.

[123] *See, e.g.*, Alexandra Endres, *Wer ließ die Umweltschützerin Berta Cáceres töten?*, DIE ZEIT (Dec. 7, 2016), https://www.zeit.de/wirtschaft/2016-11/honduras-berta-caceres-mord-voith-hydro-siemens-menschenrechte-verantwortung.

[124] 163 Cong. Rec. 183, S7152 (daily ed. Nov. 9, 2017) (statement of Sen. Patrick Leahy); *see also* Letter from Sixty Lawmakers to Treasury Secretary Jacob Lew and to State Department Secretary John Kerry (Mar. 16, 2016), *available at* https://hankjohnson.house.gov/media-center/press-releases/reps-johnson-ellison-call-independent-murder-investigation-human-rights.

[125] GLOBAL WITNESS, HONDURAS: THE DEADLIEST PLACE TO DEFEND THE PLANET 15 (2017), *available at* https://www.globalwitness.org/documents/18804/English_Honduras_full_report_single_v6.pdf.

[126] *Id.* at 39 (emphasis added).

[127] DAM VIOLENCE: THE PLAN THAT KILLED BERTA CÁCERES, *supra* note 120, at 2.

of due diligence in providing loans and other types of financing to companies ha[s] led to the use of financial resources to increase the levels of violence, destroy the social fabric of communities, and intensify the systematic attacks on human rights defenders."[128]

Interestingly an Independent Fact-Finding Mission commissioned by FMO found that:

> *"During meetings of the Mission with the communities, members of La Tejera and COPINH used the words 'sacred' and 'cosmology' as part of a general discourse of the Lenca People's attachment to and responsibility for the environment and Mother Earth. When pressed for more detailed information regarding the sacredness of the river, there was none forthcoming. This is not to minimize or negate the strong attachment people expressed to the river and the earth generally, and it may be that culturally it is not appropriate for such matters to be discussed in an open forum.*
>
> *The Mission also asked the meeting at Valle de Angeles about the cultural and spiritual values of the river. These communities also identify with a Lenca ancestry. The information provided by various individuals was that they had no stories or other cultural information passed down to them by older generations, which supported an assertion that the river was sacred. As with many colonized indigenous communities it may be that beyond the notion of water as being an essential element for supporting life and livelihoods, specific stories, ceremonies and collective memories of Lenca cultural and spiritual values have been lost.*
>
> *In the meeting with DINAFROH, the assertion of the sacredness of the Gualcarque River was also raised. The observation made was that there was insufficient information to confirm the assertion*
>
> *. . .*
>
> *[T]he perception of the representatives of the other communities in the area of influence of the Project was that the consultation process was adequate, undertaken through their community decision-making bodies and formalized in the formal registers of the community and municipality. They spoke of the benefits of the Project, specifically jobs, additional income flowing into the local economy and the various social projects to provide drinking water, electricity, improved roads and small economic activities."*[129]

Regrettably, the NGOs' position suffers from at least two flaws. First, the NGOs fail to reconcile their opposition to this hydroelectric project with their equally fierce condemnation of

---

[128] *Id.* at 8.
[129] JULIAN BURGER ET AL., INDEPENDENT FACT FINDING MISSION, *supra* note 4 at 16, 20.

energy alternatives.[130] Second, their position also suffers from a fundamental disregard for the most basic of needs among Honduras's indigenous communities: "needs for water, light, irrigation, road construction" that, where not met, render these communities essentially stateless.[131]

As Bolivian Vice President Álvaro García Linera observed in the context of his country's struggle for rural development, for NGO employees who "travel by plane... and have electricity, drinking water, freedom of movement, and television at hand," economic development may be more expendable than for "the peasant who produces food, for the indigenous who needs to purchase work tools, for the merchant and transport provider, for the common resident" whose travel distance is shortened by a new road.[132] Thus, NGOs come to "frequently misrepresent (unintentionally or otherwise) the feelings of the poor."[133] While the NGOs' relationships with communities "is, in effect, a form of representative democracy," it lacks "the degree of accountability that comes with election. If the NGOs are also responsible for disseminating information about the proposed project, their ability to manipulate increases further."[134]

Equally troubling and divorced from the socioeconomic reality in rural Honduras, the NGOs' recommendations appear to envision a black-and-white development approach in which indigenous communities may only benefit from development assistance once near perfect systems of governance are in place that safeguard indigenous rights in accordance with Western standards. This high bar may be achievable in some developed countries but is almost certainly elusive in exactly those countries where development assistance, in the form of hydroelectric power, is needed most—"countries [that] still do not have access to electricity, clean drinking water, basic flood protection and reliable irrigation," and where "storage and diversion dams [thus] have to be built."[135] The NGO's position also ignores the real possibility that indigenous rights and interests with respect to Agua Zarca may be in conflict with one another.[136] As Jim

---

[130] *See, e.g.*, OXFAM WWF BRIEFING NOTE, TIME FOR A FAIR DEAL ON SHIPPING Emissions (Sept. 8, 2011), https://www.oxfam.org/sites/www.oxfam.org/files/bn-out-of-the-bunker-050911-en.pdf (describing one of Honduras's main sources of energy as so "cheap and so dirty that the particulate matter spewed into the atmosphere may cause 60,000 deaths a year").

[131] ÁLVARO GARCÍA LINERA, EL OENEGISMO, ENFERMEDAD INFANTIL DEL DERECHISMO 153 (2011) (responding to a public statement by a group of intellectuals and political figures critical of the Evo Morales government's public investment projects and development policies).

[132] *Id.*

[133] Nicholas A. Fromherz, *From Consultation to Consent: Community Approval as a Prerequisite to Environmentally Significant Projects*, 116 W. VA. L. REV. 109, 146 (2013).

[134] *Id.*

[135] Dipak Gyawali, *Epilogue*, *in* THE NEPAL-INDIA WATER RESOURCES RELATIONSHIP: CHALLENGES, 295, 300 (Dwarika N. Dhunkel & Santa B. Pun eds., 2009).

[136] John Beverley, *El Ultraizquierdismo: Enfermedad Infantil de la Academia*, 1 ALTER NATIVAS (2013), *available at* https://alternativas.osu.edu/assets/files/essays%201/johnbeverley.pdf (explaining that "[e]ven

Yong Kim, president of the World Bank, stated with respect to Agua Zarca and the general challenge of involuntary resettlement in the development of infrastructure in developing countries generally: "[Y]ou cannot do the kind of work we are trying to do and not have some of these incidents happen. We just have to be honest when it happens, admit it, and then try to fix it as best we can."[137]

## V. HONDURAS NEEDS RENEWABLE ENERGY

### A. Political Context

Categorized as "partly free" by Freedom House in 2017, Honduras is a multiparty democracy whose "power has mostly been concentrated in the hands of the Liberal Party (PL) and the National Party (NP)."[138] The country's military also holds significant power as the government continues to rely on the armed forces to fight crime.[139] Honduras's murder rate, despite recent declines, still ranks among the highest in the world[140] with 43.6 murders per 100,000 inhabitants in 2017.[141] Crimes are heavily underreported, and even when reported, most are never investigated.[142]

In June 2009, the military ousted President Manuel Zelaya, a PL member, in a coup d'état after Zelaya had called for a non-binding referendum on convening an assembly with powers to rewrite Honduras's constitution.[143] Reportedly, the coup was motivated by Zelaya's reported ties with Venezuela's Hugo Chávez as well as fears that Zelaya would remain in office indefinitely by repealing the constitution's presidential term limit.[144] Following the military coup, Ricardo

---

if the autonomy of indigenous territories is established as an inviolable right, even against the reasons for a "development" that would lead to better living conditions for all the popular classes, there could be—and indeed there are—conflicts between different indigenous groups...").

[137] *Fact Sheet: Honduras and Indigenous People*, THE WORLD BANK (May 11, 2016), http://www.worldbank.org/en/topic/indigenouspeoples/brief/honduras-and-indigenous-people.

[138] FREEDOM HOUSE, FREEDOM IN THE WORLD 2017: HONDURAS (2017), *available at* https://freedomhouse.org/report/freedom-world/2017/honduras.

[139] *Id.*

[140] *Id.*

[141] THE WORLD BANK, HONDURAS, http://www.worldbank.org/en/country/honduras/overview (last visited May 29, 2018).

[142] FREEDOM HOUSE, FREEDOM IN THE WORLD 2017: HONDURAS (2017), *available at* https://freedomhouse.org/report/freedom-world/2017/honduras.

[143] AGUA ZARCA HYDROELECTRIC PROJECT: INDEPENDENT FACT FINDING MISSION, *supra* note 86, at 8;; *see also* David Landau, *Honduras: Term Limits Drama 2.0*, CONSTITUTION NET (May 27, 2015), http://www.constitutionnet.org/news/honduras-term-limits-drama-20-how-supreme-court-declared-constitution-unconstitutional.

[144] *See* Richard Gott, *Honduras: Back to the Bad Old Days?*, THE GUARDIAN (June 29, 2009), https://www.theguardian.com/commentisfree/2009/jun/29/honduras-coup-hugo-chavez.

Micheletti, the president of the National Congress and like Zelaya a PL member, took over as president with 124 of 128 votes.[145] The Organization of American States called this sequence of events an "unconstitutional alteration of the democratic order,"[146] and the international community broadly condemned Zelaya's ouster.[147] Elections were called for the following year.[148] Four years later, in 2014, Juan Orlando Hernández, an NP member, took office.[149]

After a major corruption scandal involving the Honduran Institute of Social Security, the Hernández government entered into an agreement with the Organization of American States (**OAS**) to create the Mission to Support the Fight against Corruption and Impunity in Honduras (**MACCIH**)[150] with a mandate to "improv[e] the quality of services delivered by the justice system of Honduras . . . through active cooperation, technical advice, supervision and oversight of the state institutions."[151]

The Honduran Supreme Court, in a widely criticized decision,[152] struck down presidential term limits in 2015,[153] and Hernández was reelected to a second term in November 2017.[154]

B.  Economic Context

Historically, the Honduran economy has been dependent on exports of bananas and coffee, but more recently the country has diversified its exports to include apparel and

---

[145] *Id.*

[146] *See* Doug Cassel, *Honduras: Coup d'Etat in Constitutional Clothing?*, AM. SOC. INT'L L. (Oct. 15, 2009), https://www.asil.org/insights/volume/13/issue/9/honduras-coup-d%E2%80%99etat-constitutional-clothing-revision#_edn1.

[147] *Id.*

[148] *See* AGUA ZARCA HYDROELECTRIC PROJECT: INDEPENDENT FACT FINDING MISSION, *supra* note 143, at 8.

[149] *See id.*

[150] FREEDOM HOUSE, FREEDOM IN THE WORLD 2017: HONDURAS (2017), *available at* https://freedomhouse.org/report/freedom-world/2017/honduras.

[151] OAS FACTS SHEET: WHAT IS MACCIH? (2016), *available at* http://www.oas.org/en/media_center/press_release.asp?sCodigo=S-001/16.

[152] David Landau, *Honduras: Term Limits Drama 2.0*, CONSTITUTION NET (May 27, 2015), http://www.constitutionnet.org/news/honduras-term-limits-drama-20-how-supreme-court-declared-constitution-unconstitutional (describing the decision as "emblematic of continued elite manipulation of the Honduran constitution for narrow interests, and thus of the failure of constitutionalism to act as an effective constraint on political power or as a generator of positive change").

[153] FREEDOM HOUSE, FREEDOM IN THE WORLD 2017: HONDURAS (2017), *available at* https://freedomhouse.org/report/freedom-world/2017/honduras.

[154] *Honduras: President Juan Orlando Hernandez Declared Election Winner*, DEUTSCHE WELLE (Dec. 18, 2017), http://www.dw.com/en/honduras-president-juan-orlando-hernandez-declared-election-winner/a-41836671.

automobile parts.[155] Nonetheless, Honduras's "economy remains heavily dependent on U.S. trade and remittances."[156] The United States is Honduras's main trading and economic partner with U.S. exports to Honduras amounting to USD 5.9 billion in 2014 alone, and U.S. direct investment in Honduras amounting to approximately USD 900 million that same year.[157] Thus, about 15% of Honduras's inbound foreign direct investment comes from the United States— driven in part by the U.S.-Central America-Dominican Republic Free Trade Agreement, which came into force in 2006 and which has helped foster foreign direct investment.[158]

Since the global financial crisis, Honduras has experienced a moderate recovery with 4.1% economic growth in 2017,[159] and 4.2% projected growth in 2018.[160] Despite this growth in recent years, the country remains vulnerable to external forces: "Its agricultural sector, for example, lost nearly one-third of its revenue over the past two decades, in part due to the declining prices of the country's export crops, especially banana and coffee."[161]

C. Pervasive Poverty and Inequality

Honduras is the second poorest country in Central America[162] with 60.9% of its population living in poverty,[163] and has the highest level of economic inequality in all of Latin America[164] and the sixth highest worldwide.[165] As of 2016, Honduras's GDP per capita

---

[155] *See* HERITAGE FOUNDATION 2018 INDEX OF ECONOMIC FREEDOM, https://www.heritage.org/index/country/honduras (last visited May 20, 2018).

[156] CENTRAL INTELLIGENCE AGENCY, WORLD FACTBOOK: HONDURAS, https://www.cia.gov/Library/publications/the-world-factbook/geos/ho.html (last visited May 29, 2018).

[157] U.S. DEPARTMENT OF STATE, BUREAU OF ECONOMIC AND BUSINESS AFFAIRS, 2015 INVESTMENT CLIMATE STATEMENT: HONDURAS (2015), *available at* https://www.state.gov/e/eb/rls/othr/ics/2015/241587.htm.

[158] CENTRAL INTELLIGENCE AGENCY, WORLD FACTBOOK: HONDURAS, https://www.cia.gov/Library/publications/the-world-factbook/geos/ho.html (last visited May 29, 2018).

[159] THE WORLD BANK, HONDURAS, http://www.worldbank.org/en/country/honduras/overview (last visited May 29, 2018).

[160] Reuters Staff, *Honduras Sees Economic Growth of up to 4.2% in 2018*, CNBC (Mar. 8, 2018), https://www.cnbc.com/2018/03/08/reuters-america-honduras-sees-economic-growth-of-up-to-4-point-2-pct-in-2018.html.

[161] THE WORLD BANK, HONDURAS, http://www.worldbank.org/en/country/honduras/overview (last visited May 29, 2018).

[162] CENTRAL INTELLIGENCE AGENCY, WORLD FACTBOOK: HONDURAS, https://www.cia.gov/Library/publications/the-world-factbook/geos/ho.html (last visited May 29, 2018).

[163] THE WORLD BANK, HONDURAS, http://www.worldbank.org/en/country/honduras/overview (last visited May 29, 2018).

[164] *Id.*

[165] The Editors, *Why Honduras Remain Latin America's Most Unequal Country*, WORLD POL. R. (Jan. 6, 2017), https://www.worldpoliticsreview.com/trend-lines/20856/why-honduras-remains-latin-america-s-most-unequal-country.

amounted to a mere USD 2,361, whereas Latin America's average GDP per capita was over USD 8,342.[166]

While these statistics bespeak the fact that Honduras's wealth stratification is extreme even within Latin America, the country's indigenous population—some nine percent of the overall population according to a 2013 census[167]—experiences even more dire conditions according to all major indicators. For example, indigenous communities receive under six years of schooling compared to a national average of seven and a half years.[168] "In many rural communities, especially indigenous ones, there still are no schools at all. Where there are schools, the only teachers are often . . . community members with just sixth grade educations themselves."[169] According to the World Bank, rural teacher absenteeism is exceedingly high, causing school closures of close to thirty days per school year.[170] The average monthly income among the indigenous is nearly two thirds below the national average, and 88.7% of indigenous children live in poverty.[171]

What is more, 38% of indigenous children—and 55% of the country's largest indigenous group, the Lenca—suffer from chronic malnutrition compared to 30% nationally.[172] Indigenous children are also affected by high rates of respiratory infections, diarrhea, malaria, dengue fever, and tuberculosis, to name (but) a few.[173] Mortality among indigenous children under twelve months of age is 43.5 per 1,000 live births versus a national average of 35.1, and mortality among indigenous children under five years of age is 62.9 per 1,000 compared to a national average of 49.7.[174] Lenca travel as far as El Salvador to access health care.[175] Life expectancy is as low as 38 among indigenous women and 43 among men vis-à-vis 65 and 70 nationally.[176]

---

[166] The World Bank, *GDP Per Capita* (2016), https://data.worldbank.org/indicator/NY.GDP.PCAP.CD?end=2016&locations=ZJ-HN-SV-NI-GT&start=2016&view=bar.
[167] *See* MINORITY RIGHTS INTERNATIONAL: HONDURAS, http://minorityrights.org/country/honduras/ (last visited July 6, 2018).
[168] *See* Report of the Special Rapporteur on the Rights of Indigenous People on Her Visit to Honduras, *supra* note 117, ¶ 66.
[169] *See* GRAHAM, *supra* note 169..
[170] *Id.*
[171] *See* Report of the Special Rapporteur on the Rights of Indigenous People on Her Visit to Honduras, *supra* note 117, ¶ 61.
[172] *Id.* ¶¶ 72, 74.
[173] *Id.*
[174] *Id.*
[175] *Id.*
[176] *Id.*

Minorities also remain dramatically underrepresented in Honduras's congress.[177] Adding to these challenges, indigenous lands have long been subject to encroachment and appropriation by the non-indigenous population from surrounding areas.[178] For example, as Freedom House notes, "The clearing of land for clandestine airstrips used in the drug trade has increased pressure on indigenous groups in remote areas of the country."[179] With respect to Lenca in particular, their loss of their ancestral language, lack of separate political decision-making bodies, and high degree of assimilation into non-indigenous culture has elevated their struggle for the recognition of their ancestral lands.[180]

The divide between the haves and have nots in Honduras, however, is not simply one of indigenous versus non-indigenous; it is also one of urban versus rural. For instance, in rural areas, approximately 20% of Hondurans live in extreme poverty, *i.e.*, on less than USD 1.90 per day.[181] The rural-urban divide is particularly pronounced in terms of access to clean water[182] and electricity: "Access to basic infrastructure services in the rural areas is severely limited . . . . [as] only 38 percent of [the] rural population has access to electricity, compared to 95 percent in urban areas."[183] According to the World Bank, "Th[is] situation constrains the potential for economic and social development and compounds the problems of isolation and poverty of the rural population."[184]

D. Electricity Generation in Honduras

Honduras has long suffered from a lack of infrastructure development and persistent energy shortages despite hydroelectric potential that could render the country energy independent.

---

[177] *Id.*

[178] *Id.* ¶ 7 Annex.

[179] FREEDOM HOUSE, FREEDOM IN THE WORLD 2017: HONDURAS (2017), *available at* https://freedomhouse.org/report/freedom-world/2017/honduras.

[180] *See* GAI 2014 Report, *supra* note 88; *see generally* GRAHAM, *supra* note 169, at 139-40 (discussing the significance of nature to Lenca identity and spirituality).

[181] THE WORLD BANK, HONDURAS, http://www.worldbank.org/en/country/honduras/overview (last visited May 29, 2018).

[182] *See* Haley Rogers, *What Is the Water Quality in Honduras Like?*, THE BORGEN PROJECT (Nov. 12, 2017), https://borgenproject.org/water-quality-in-honduras/.

[183] THE WORLD BANK, HONDURAS - RURAL ELECTRIFICATION PROJECT 1 (2005), *available at* http://documents.worldbank.org/curated/en/807361468033700930/Honduras-Rural-Electrification-Project.

[184] *Id.*

As late as 1965, the country had a mere twenty-four miles of paved roads and a corresponding "absence of any meaningful energy infrastructure."[185] In 1957 reforms under the military junta, the Honduran government created the National Energy Utility (**ENEE**) with the aim of providing energy across the country.[186] By 1970, ENEE's domestic energy market share had grown to 60-70% and continued to grow thereafter.[187] At the same time, Honduras recognized its lack of domestic fossil-fuel reserves and the prohibitive cost of importing energy from abroad.[188] Thus, the country capitalized on the potential of hydroelectricity with the assistance of the World Bank and other growing international financial organizations that injected funds into ENEE.[189]

During this period, the World Bank "built one hydroelectric project after another,"[190] and by 1970 hydroelectricity accounted for over half of the country's energy-production capacity.[191] This culminated in the country's largest hydroelectric project: Hidroélectrica Francisco Morazán, commonly referred to as "El Cajón," which was commissioned in 1985 with a capacity of 300 MW.[192] To this day, El Cajón remains the most important dam in the country and one of the tallest in the world,[193] towering at 234 meters.[194]

El Cajón had been built on the back of high energy demand growth.[195] Yet, by 1985, Honduras's total energy capacity of 550 MW compared to a mere 200 MW in demand.[196] Compounding the financial consequences of this supply-demand mismatch, ENEE's electricity charges for consumers were extremely low: the average charge for all residential customers covered only 60% of the actual supply cost, while charges for residential customers consuming

---

[185] Lester Hunt et al., THE POLICY OF POWER AND THE POWER OF POLICY: ENERGY POLICY IN HONDURAS 6 (1998), *available at* https://www.surrey.ac.uk/sites/default/files/SEED%2096.pdf.
[186] HISTORIA DE LA ENEE, http://www.enee.hn/Portal_transparencia/2015/estructura%20organica/funciones%202015.pdf (last visited May 30, 2018).
[187] Hunt, *supra* note 185, at 6.
[188] *Id.*
[189] THE WORLD BANK, ENERGY SECTOR MANAGEMENT ASSISTANCE PROGRAM, HONDURAS: POWER SECTOR ISSUES AND OPTIONS 116 (2010), *available at* http://documents.worldbank.org/curated/en/357601468031595888/pdf/722960WP0P10140l0Issues0and0 Options.pdf.
[190] *Id.*
[191] Hunt, *supra* note 185, at 6.
[192] HONDURAS: POWER SECTOR ISSUES AND OPTIONS, *supra* note 189, at 116.
[193] David Zapata, *El Cajón, Una Represa y un Destino Turístico Que Maravilla a Los Hondureños*, LA PRENSA (Oct. 4, 2016), http://www.laprensa.hn/honduras/1000938-410/el-cajon-una-represa-y-un-destino-tur%C3%ADstico-que-maravilla-a-los.
[194] ROBERT JANSEN, ADVANCED DAM ENGINEERING FOR DESIGN, CONSTRUCTION, AND REHABILITATION 4 (2012).
[195] HONDURAS: POWER SECTOR ISSUES AND OPTIONS, *supra* note 189, at 116.
[196] *Id.* at 25.

less than 300 kWh per month—up to 84 percent of all residential clients—covered only 39% of operational costs.[197] This led ENEE to incur heavy losses, which, in turn, contributed to the country's 1989 default with multilateral institutions.[198]

Making matters worse, from 1993 to 1994, severe droughts curtailed El Cajón's output.[199] Paired with insufficient generation-reserve capacity and deteriorating infrastructure, Honduras experienced an energy crisis[200] with massive blackouts leading to economic turmoil.[201] These blackouts took a toll on industry generally but proved particularly painful for small businesses without back-up generators.[202] Supermarkets, for instance, were forced to reduce their inventory to prevent spoiling perishable foods.[203]

The energy crisis of the early 1990s, with assistance from the World Bank and Inter-American Development Bank (**IADB**),[204] resulted in major reforms. In November 1994, congress passed the Framework Law for the Electric Sub-Sector[205] to spur investment in private energy-production projects.[206] But the legislation lacked proper incentives, leading to fossil-fuel based energy projects.[207] Whereas these projects could be brought online in twelve months or less,[208] they proved costly to the government due to high market risks.[209] Moreover, they required expensive fuel imports and polluted the environment.[210]

---

[197] *Id.* at 34.

[198] *Id.* at XVII.

[199] *See* WORLD BANK PUBLIC-PRIVATE INFRASTRUCTURE ADVISORY FACILITY, PRIVATE SOLUTIONS FOR INFRASTRUCTURE IN HONDURAS 102 (2003).

[200] HONDURAS: POWER SECTOR ISSUES AND OPTIONS, *supra* note 189, at XV.

[201] TIM SQUIRES, THE IMPACT OF ACCESS TO ELECTRICITY ON EDUCATION: EVIDENCE FROM HONDURAS 4 (2015), *available at* https://economics.ucr.edu/seminars_colloquia/2014-15/applied_economics/Squires_JMP_Electricity.pdf.

[202] Hunt, *supra* note 185, at 18.

[203] *Id.*

[204] *Id.* at 16.

[205] *See* Ley No. 158/94, 4 Nov. 1994, Ley Marco del Sub-Sector Eléctrico [Framework Law for the Electric Sub-Sector], FAOLEX (Hond.).

[206] THE INSTITUTE OF ELECTRICAL AND ELECTRONICS ENGINEERS, INC., MARCO LEGAL DEL SUB-SECTOR ELÉCTRICO, PART III (2014), http://www.andi.hn/wp-content/uploads/2014/11/1_marcolegal-3_sn.pdf.

[207] INT'L RENEWABLE ENERGY AGENCY, EMPRESA NACIONAL DE ENERGÍA ELÉCTRICA (2017), *available at* https://www.irena.org/-/media/Files/IRENA/Agency/Events/2017/Aug/Regional-workshop-Central-America/Honduras_Miguel-Garcia.pdf?la=en&hash=CAC581CF445661C66EFE06FBF1F6591086F6E99C.

[208] *Honduras' Big New Oil-Fired Plant*, POWER (Mar. 15, 2009), http://www.powermag.com/honduras-big-new-oil-fired-plant/.

[209] HONDURAS: POWER SECTOR ISSUES AND OPTIONS, *supra* note 189, at XVII.

[210] *Id.*

Specifically, Honduras's thermal power plants, *i.e.*, plants where heat is turned into electricity, are powered by either Bunker C (also known as No. 6 fuel oil),[211] diesel fuel (also known as No. 2 fuel oil),[212] or coal.[213] While each of these fossil fuels is a high pollutant,[214] Bunker C is especially noteworthy for its adverse environmental impact that, compared to other fuels, has a lot more impurities (like sulfur and heavy metals), all of which contribute to ash and deposit formation as well as combustion emissions.[215] The Guardian describes bunker fuel as the "world's dirtiest diesel fuel—a toxic, tar-like sludge that usually contains 3,500 times more sulphur than the diesel used for cars."[216] Bunker C is the literal "bottom of the barrel."[217]

Nonetheless, this "dense, viscous oil produced by blending heavy residual oils with a lighter oil"[218] is frequently used by large ships such as tankers or cruise ships, as well as in small industrial power plants. The use of such fuel by ships alone has been projected to cause some 570,000 deaths between 2020 and 2025.[219] This, in turn, recently led the UN International

---

[211] THE AMERICAN PETROLEUM INSTITUTE, PETROLEUM HPV TESTING GROUP, HEAVY FUEL OILS CATEGORY ANALYSIS AND HAZARD CHARACTERIZATION 9 (2012), *available at* http://www.petroleumhpv.org/~/media/PetroleumHPV/Documents/2012_12_10_December_7_2012_Heavy%20Fuel%20Oil%20CAD_Final_std.pdf.

[212] U.S. Energy Information Administration, https://www.eia.gov/dnav/pet/TblDefs/pet_cons_821use_tbldef2.asp (last visited June 11, 2018).

[213] Karla Aguilar, *Electricity Projects & Regulation in Honduras 2017*, BLP (Oct. 13, 2017), http://www.blplegal.com/electricity-2017-latin-lawyer/; *see generally* Energía, Perfil Sector Energía en Honduras (2016), *available at* https://www.direcon.gob.cl/wp-content/uploads/2017/03/Honduras_06_perfil_sectorial_energia.pdf (providing a full summary of Decreto 70/07).

[214] *See, e.g.*, Jay Apt, *The Other Reason to Shift Away From Coal: Air Pollution That Kills Thousands Every Year*, SCIENTIFIC AMERICAN (June 7, 2017), *available at* https://www.scientificamerican.com/article/the-other-reason-to-shift-away-from-coal-air-pollution-that-kills-thousands-every-year/; *see also* UNION OF CONCERNED SCIENTISTS, DIESEL ENGINES AND PUBLIC HEALTH, https://www.ucsusa.org/clean-vehicles/vehicles-air-pollution-and-human-health/diesel-engines#.Wx8GNzNKjOR (last visited June 11, 2018).

[215] *See* BELL PERFORMANCE, POWER GENERATION AND BUNKER C FUEL, https://www.bellperformance.com/bell-performs-blog/Power-Generation-and-Bunker-C-fuel-oil (last visited June 11, 2018).

[216] Jeremy Plester, *Dirty Diesel: Why Ships Are the Worst Offenders*, THE GUARDIAN (May 18, 2017), https://www.theguardian.com/uk-news/2017/may/18/dirty-diesel-ships-worst-offenders-pollutionwatch.

[217] Rick Shankman, *The Environmental Horrors of Bunker Fuel: Climate Action MIT Style*, MIT CLIMATEX (Aug. 2017), https://climatex.mit.edu/environmental-horrors-bunker-fuel-climate-action-mit-style.

[218] NOAA OFFICE OF RESPONSE AND RESTORATION, NO. 6 FUEL OIL (BUNKER C) SPILLS, https://response.restoration.noaa.gov/oil-and-chemical-spills/oil-spills/resources/no-6-fuel-oil-spills.html (last visited June 11, 2018).

[219] Josh Spero, *Shipping Chief Says $50bn Cost of Green Fuel Rules Risk Bankruptcy*, FIN. TIMES (June 10, 2018), https://www.ft.com/content/86201656-6994-11e8-8cf3-0c230fa67aec (citing IMO, SULPHUR 2020 – CUTTING SULPHUR OXIDE EMISSIONS (2016), http://www.imo.org/en/MediaCentre/HotTopics/Pages/Sulphur-2020.aspx).

Maritime Organization reduce the cap on bunker sulfur content from 3.5 to 0.5 percent.[220] In New York City, where only one percent of buildings still burn #4 and #6 fuel oil, this accounts for 86% of the total airborne soot pollution produced by all buildings in the city.[221] Not surprisingly, in the United States and elsewhere, Bunker C is no longer common in power generation.[222]

Trying to turn a corner, when Carlos Robert Flores took office in 1998, his government declared the ¨development and generation of energy with new and renewable sources" essential to the public interest.[223] New legislation offered incentives to renewable energy projects,[224] empowering ENEE to enter into multi-decade power-purchase agreements at fixed prices with private energy producers and prioritizing renewable energy projects in the granting of project approvals.[225]

In spite of these reforms and potential for energy self-sufficiency based on hydroelectric generation,[226] Honduras was still building dirty, heavy fuel (Bunker C and diesel) power plants in 2005. That year, Luz y Fuerza de San Lorenzo S.A. (**Lufussa**), one of Honduras' major energy companies, opened the 276 MW Pavana III heavy fuel power plant—the third such plant operated by Lufussa,[227] and, at a $190 million price tag, the largest private investment in the history of Honduras.[228] A mere two years later, the World Bank warned of another "emerging energy crisis"—projecting an electricity deficit from 170 MW to 380 MW between 2007 and

---

[220] *Id.*

[221] Rick Shankman, *The Environmental Horrors of Bunker Fuel: Climate Action MIT Style*, MIT CLIMATEX (Aug. 2017), https://climatex.mit.edu/environmental-horrors-bunker-fuel-climate-action-mit-style.

[222] *See* BELL PERFORMANCE, POWER GENERATION AND BUNKER C FUEL, https://www.bellperformance.com/bell-performs-blog/Power-Generation-and-Bunker-C-fuel-oil (last visited June 11, 2018).

[223] Ramón Espinasa et al., *Dossier Energético: Honduras*, INTER-AMERICAN DEVELOPMENT BANK, Jan. 2017, at 40.

[224] *See* Decreto No. 85/98, 27 Apr. 1998, Decreto Desarrollo y Generación de Energía por Fuentes Nuevas y Renovables [Development and Generation of Energy by New and Renewable Sources], FAOLEX (Hond.); *see also* Decreto No. 267-98, 25 Nov. 1998, Decreto Ejecución de Proyectos de Generación de Enegía Eléctrica [Decree on Renewable Energy Generation], LA GACETA, 5 Dec. 1998 (Hond.).

[225] *See* Espinasa, *supra* note 223, at 41.

[226] Wilfredo Flores et al., *Sustainable Energy Policy in Honduras: Diagnosis and Challenges*, 39 ENERGY POL'Y 551 (2011).

[227] Lufussa, Our Projects, http://lufussa.com/en/our-projects/ (last visited June 11, 2018).

[228] *Id.*; *see also Honduras' Big New Oil-Fired Plant*, POWER (Mar. 15, 2009), http://www.powermag.com/honduras-big-new-oil-fired-plant/.

2010.[229] But similar to the 1990s, only the leasing of expensive-to-operate and environmentally dirty skid-mounted diesel generators offered a realistic short-term reprieve.[230]

In October 2007, during Zelaya's tenure, congress passed the Law for the Promotion of Electric Power Generation with Renewable Resources,[231] aimed at facilitating private renewable power generation by means of: (1) investment protections and incentives, such as preferential income tax treatment, import duty policies, and ENEE Power Purchase Agreements; and (2) streamlining the permit application, environmental review, and construction processes.[232] The law built upon the 1998 legislation promoting renewable energy, and sparked the proliferation of privately-owned renewable generation, especially hydroelectric projects.[233]

Yet, despite these legislative initiatives that suggested Zelaya's support of renewable energy and energy independence, by 2008 fossil fuels supplied 62% of Honduras's power generation as total imports of oil jumped from USD 1.303 billion in 2007 to USD 1.945 billion the following year.[234] Most alarming, by 2010, 42.2% of Honduras's national energy mix and 86% of residential consumers' energy consumption came from fuelwood.[235] During this period, ENEE was also losing an estimated $300 million per year (three percent of GDP), and was spending $194 million per year on subsidizing gasoline and diesel fuel (another two percent of GDP).[236]

Facing this energy crisis, Zelaya "all[ied] himself with the Venezuelan government of then President Hugo Chavez."[237] On January 28, 2008, Zelaya signed an agreement with

---

[229] HONDURAS: POWER SECTOR ISSUES AND OPTIONS, *supra* note 189, at XXII.

[230] *Id.*

[231] *See* Decreto No. 70/07, 29 June 2007, Ley de Promoción a la Generación de Energía Eléctrica con Recursos Renovables [Law for the Promotion of Electric Power Generation With Renewable Resources], LA GACETA, 2 Oct. 2007 (Hond.).

[232] Karla Aguilar, *Electricity Projects & Regulation in Honduras 2017*, BLP (Oct. 13, 2017), http://www.blplegal.com/electricity-2017-latin-lawyer/; *see generally* Energía, Perfil Sector Energía en Honduras (2016), *available at* https://www.direcon.gob.cl/wp-content/uploads/2017/03/Honduras_06_perfil_sectorial_energia.pdf (providing a full summary of Decreto 70/07).

[233] *See* Espinasa, *supra* note 223, at 41.

[234] *Compare id.*, *with* WIKILEAKS U.S. EMBASSY CABLE (Jan. 28, 2008), https://wikileaks.org/plusd/cables/08TEGUCIGALPA86_a.html (claiming that bunker oil was the source of 70% of Honduras's power generation).

[235] *Id.* at 551.

[236] *See* WIKILEAKS U.S. EMBASSY CABLE (Jan. 28, 2008), https://wikileaks.org/plusd/cables/08TEGUCIGALPA86_a.html.

[237] David Landau, *Honduras: Term Limits Drama 2.0*, CONSTITUTION NET (May 27, 2015), http://www.constitutionnet.org/news/honduras-term-limits-drama-20-how-supreme-court-declared-constitution-unconstitutional.

Venezuela[238] to join PetroCaribe, Venezuela's energy assistance program,[239] which has been criticized as a "mechanism set up by Hugo Chávez for lavishing oil subsidies on Latin American and Caribbean countries in exchange for political subservience."[240]

As part of the scheme, Venezuela offered favorable terms.[241] The thirteen countries that participated in PetroCaribe "depended deeply on the oil to finance social spending and infrastructure, and rewarded Caracas with diplomatic support on the international stage."[242] According the U.S. Embassy in Honduras, such diplomatic support extended to personal pressure from Hugo Chávez on the Zelaya administration "to either remove the Revolutionary Armed Forces of Colombia (FARC) from any terrorist lists or publicly acknowledge it as not being a terrorist organization."[243] According to U.S. embassy cables, Honduras, at the behest of Venezuela, also joined the Bolivarian Alternative for the Americas (ALBA), an ambitious Venezuela and Cuba-led alternative to the defunct Free Trade Area of the Americas.[244]

Venezuela sold to Honduras 3.3 million barrels of oil priced at USD 218.4 million between June 2008 and April 2009.[245] As a result, Honduras received some USD 94.2 million in long-term PetroCaribe financing.[246] Reportedly, Zelaya aimed to use PetroCaribe and ALBA for his own political ends, and to delay a reckoning regarding Honduras' unsustainable energy policies. The Embassy noted Zelaya's "unwillingness to take needed steps to rationalize the

---

[238] WIKILEAKS U.S. EMBASSY CABLE (Jan. 28, 2008),
https://wikileaks.org/plusd/cables/08TEGUCIGALPA86_a.html.
[239] *Single Point of Failure Venezuela's Financing Programme Leaves Many Caribbean Countries Vulnerable*, THE ECONOMIST (Oct. 4, 2014), https://www.economist.com/the-americas/2014/10/04/single-point-of-failure.
[240] Alvaro Vargas Llosa, *Honduras's Coup Is President Zelaya's Fault*, THE WASHINGTON POST (July, 1, 2009), http://www.washingtonpost.com/wp-dyn/content/article/2009/07/01/AR2009070103210.html?noredirect=on.
[241] *See generally* Otaviano Canuto, *Oil Prices and the Future of Petrocaribe*, THE HUFFINGTON POST (Sept. 28, 2015), https://www.huffingtonpost.com/otaviano-canuto/oil-prices-and-the-future_b_8209010.html.
[242] Ezequiel Minaya, *An Ailing Venezuela Trims Oil Diplomacy*, WALL ST. J. (Dec. 5, 2014), https://www.wsj.com/articles/an-ailing-venezuela-trims-oil-diplomacy-1417824828.
[243] WIKILEAKS U.S. EMBASSY CABLE (Jan. 28, 2008),
https://wikileaks.org/plusd/cables/08TEGUCIGALPA89_a.html.
[244] ENCYCLOPEDIA BRITANNICA, BOLIVARIAN ALLIANCE FOR THE PEOPLES OF OUR AMERICA,
https://www.britannica.com/topic/Bolivarian-Alliance-for-the-Peoples-of-Our-America; *but see* STRATFORD WORLDVIEW, HONDURAS: WALKING AWAY FROM ALBA (Jan 14, 2010),
https://worldview.stratfor.com/article/honduras-walking-away-alba (stating that in January 2010, under the interim government of Ricardo Micheletti, Honduras withdrew from ALBA).
[245] WIKILEAKS U.S. EMBASSY CABLE (July 7, 2009),
https://wikileaks.org/plusd/cables/09TEGUCIGALPA542_a.html.
[246] *Id.*

energy sector, or desire to assign political blame for those steps to others," and "an effort to secure enough cash to skate through the final two years of his Presidency."[247]

Following Zelaya's eventual ouster from office, in 2009, congress passed the General Water Law, regulating "the use, development and general forms of employment of water resources,"[248] and setting out the conditions under which the Ministry of the Environment (SERNA from 2000-2015, but now called **MI AMBIENTE**) may grant so-called "water contracts" to private hydroelectric plants.[249] "By 2014, the National Congress [through legislation] had approved more than eighty such contracts between ENEE and private producers for almost 2000 MW of new clean energy . . ."[250] Two years later, Honduras once again produced over half (51%) of its electricity through renewable means[251]—up from a mere 6% in 2007.[252] Of the 51%, hydroelectric power accounted for 47.6% of renewable energy production, and privately-owned energy production made up 32% of total renewable production.[253] Carlos Pineda Fasquelle, MI AMBIENTE undersecretary, remarked that "[w]ith the generation of clean energy, we are achieving energy sovereignty that cannot be measured in money."[254]

Nonetheless, to this day, Honduras still faces major challenges in ensuring access to affordable and clean electricity. In 2016, the country remained reliant on fossil fuels for 49% of its electricity production.[255] Moreover, "ENEE has [continually] failed to properly manage Honduras'[s] chronic electricity shortages, make timely investments in infrastructure, especially in the outdated power grid, and address technical losses and theft accounting for almost 30 percent of power generation, twice the power industry standard for a developing country and the highest rate in Central America."[256] Reportedly, many business continue to opt to install on-site power generators to supplement or substitute ENEE's high-cost, low-reliability electricity supply.[257] In 2016, 35.6% of rural areas and 18.7% of urban areas in Honduras still did not have

---

[247] WIKILEAKS U.S. EMBASSY CABLE (Jan. 28, 2008),
https://wikileaks.org/plusd/cables/08TEGUCIGALPA86_a.html.
[248] *See* Decreto No. 181/09. 30 Sept. 2009. Ley General de Aguas [General Water Law], La Gaceta, 14 Dec. 2009 (Hond.).
[249] *See* LATIN LAWYER, ELECTRICITY PROJECTS & REGULATION: HONDURAS,
https://latinlawyer.com/jurisdiction/1004593/honduras (last visited May 30, 2018).
[250] 2015 INVESTMENT CLIMATE STATEMENT: HONDURAS, *supra* note 157.
[251] *See El 51% de la Energía Usada en Honduras es de Fuentes Renovables*, LA PRENSA (Feb. 28, 2016), http://www.laprensa.hn/honduras/934416-410/el-51-de-la-energ%C3%ADa-usada-en-honduras-es-de-fuentes-renovable.
[252] *Id.*
[253] *Id.*
[254] *Id.*
[255] *Id.*
[256] 2015 INVESTMENT CLIMATE STATEMENT: HONDURAS, *supra* note 157.
[257] *Id.*

access to ENEE's electricity distribution networks.[258] This included many communities in the departments of Santa Bárbara and Intibucá, where the Agua Zarca project was to be located.

Interestingly on August 24, 2001 Berta Caceres' mother, as major of the Municipality of la Esperanza, and the General Manager of a for profit corporation signed an agreement to activate, in a parcel of land known as La Posona in the city of La Esperanza, a dam and foundations of an abandoned machine room to build there a hydroelectric project through a concession contract lasting twenty-five years from the date of the start of construction. That is, seventeen years ago this contract recognized succinctly the benefits to La Esperanza and Honduras in general of hydroelectric energy. The document lists the benefits the company guaranteed for the city of La Esperanza, Intibucá, which were:

> *"a) Creation of jobs in the short and long run; b) Creation of indirect jobs for local industry; c) Education and training in technical areas, increasing thus the qualified labor pool in the city and in nearby villages; d) acquisition in the city of a permanent infrastructure to be used directly for electricity; e) All the energy produced directly reduces the importation of fuels currently necessary for the production of electrical power, helping the national and local economy of the city; f) Reforestation of the banks of the Intibucá river basin and its tributaries; g) Develop in the zone of the dam of "La Pozona" a tourism area; h) Extending the power transmission lines thus allowing several inhabitants to receive commercial energy from ENEE; i) Repair and upkeep of existing access roads, as well as the construction of new roads (those necessary for the execution of the project) improving communication between several villages; j) Diminish energy rationing that [currently] affects the city; h) Generate taxes for the municipality."*

---

[258] INT'L RENEWABLE ENERGY AGENCY, EMPRESA NACIONAL DE ENERGÍA ELÉCTRICA (2016), *available at* https://www.irena.org/-/media/Files/IRENA/Agency/Events/2017/Aug/Regional-workshop-Central-America/Honduras_Miguel-Garcia.pdf?la=en&hash=CAC581CF445661C66EFE06FBF1F6591086F6E99C.

## VI. HISTORY OF THE AGUA ZARCA PROJECT

### A.  Location and Title to Land

One of forty hydroelectric projects approved by legislation in 2010,[259] the Agua Zarca project was to consist of a five meter by ninety-three meter dam, a reservoir of 3.4 hectares in size, a two-kilometer tunnel, and a power station housing three turbines.[260] The project was to be located on the Gualcarque River, some nine kilometers southeast of San Francisco de Ojuera.[261] The general project area is jurisdictionally convoluted and requires a brief introduction. The Gualcarque River crosses from the Department of Intibucá into the Department of Santa Bárbara before culminating in the River Ulúa. While the entire project was located physically in the territory of the Department of Santa Bárbara, the project site—as originally conceived on the right side of the river—is actually part of the Department of Intibucá due to the so-called Río Blanco land claim that dates to the nineteenth century and covers approximately 4.5 square kilometers but whose exact boundaries remain undefined,[262] resulting in confusion.[263] The relevant land to the right of the Gualcarque River, *i.e.*, the Río Blanco land title, has a considerable population of people identifying as indigenous Lenca.[264] On the other hand, the left side of the river—not part of the Río Blanco land claim but the Chupuquira claim instead—does not have any sizable indigenous population.[265]

As early as 2011, DESA purchased some 36 hectares of land in twenty separate property transactions on both sides of the Gualcarque River.[266] The private sellers themselves had acquired the land in the year of 2000,[267] and none of them were related to the mayors of Intibucá or San Francisco de Ojuera, located on the left side of the river.[268] Similarly, none of the plots had previously belonged to any residents of the community of La Tejera,[269] and none of the Río

---

[259] Report of the Special Rapporteur on the Rights of Indigenous People on Her Visit to Honduras, *supra* note 117, ¶ 46.

[260] *Id.* at 11.

[261] FMO FREQUENTLY ASKED QUESTIONS ON THE AGUA ZARCA PROJECT, https://www.fmo.nl/l/library/download/urn:uuid:3068ae40-c31a-40cc-8819-4a263254f60e/faq+agua+zarca+project+fmo.pdf (last visited May 30, 2018).

[262] *See* GAI 2014 Report, *supra* note 88, at 4-5, 12.

[263] *Id.* at 12, 20 (noting that the official government map places the original project area north of the Río Blanco title).

[264] *See id.* at 4.

[265] *Id.*

[266] *See id.* at 13.

[267] *See id.* at 13-15.

[268] *See id.* at 14.

[269] *See id.* at 15.

Blanco purchases appear to have involved communal Lenca land according to an EU-sponsored survey conducted in the late 1990s.[270]

### B.  Financing and Construction Firms

DESA was incorporated in May 2009 with a nominal 25,000 Lempiras in seed capital[271] (approximately USD 1,000) and with the specific corporate purpose of developing, owning, and operating the Agua Zarca project.[272] The total project cost was of approximately USD 64 million,[273] DESA obtained financing from its shareholders as well as a number of Honduran and other Central American Banks. In addition, established foreign and transnational development organizations contributed capital. The Central American Bank for Economic Integration committed USD 2.4 million toward the project in 2012.[274] Dutch development bank FMO acted as the project's primary lender, agreeing in February 2014 to lend USD 15 million.[275] The Finish development bank, Finnfund, agreed to serve as a secondary lender with a maximum USD 5 million capital commitment.[276]

Before DESA could commence development of the project, however, Honduran law imposed a series of regulatory requirements.

### C.  Regulatory Approvals

On October 7, 2009, DESA asked SERNA for permission to conduct a project feasibility study,[277] the results of which DESA submitted to SERNA on December 15, 2009, as part of its

---

[270] *See id.* at 15, 20.

[271] OXFAM, HECHOS Y CIRCUNSTANCIAS ALREDEDOR DEL ASESINATO DE BERTA CÁCERES FLORES 6 (2017), *available at*
https://www.oxfam.org/sites/www.oxfam.org/files/file_attachments/hechos_y_circunstancias_alrededor_del_asesinato_de_berta_caceres_0.pdf.

[272] AGUA ZARCA HYDROELECTRIC PROJECT: INDEPENDENT FACT FINDING MISSION, *supra* note 143, at 11.

[273] JOHAN FRIJNS, *Agua Zarca Hydro Project*, BankTrack (May 18, 2018),
https://www.banktrack.org/project/agua_zarca_dam/pdf.

[274] JOHAN FRIJNS, *Agua Zarca Hydro Project*, BankTrack (May 18, 2018),
https://www.banktrack.org/project/agua_zarca_dam/pdf.

[275] FINNFUND FREQUENTLY ASKED QUESTIONS ON THE AGUA ZARCA PROJECT,
https://www.finnfund.fi/ajankohtaista/uutiset17/en_GB/aqua_zarca_finnfund/ (last visited May 30, 2018).

[276] FINNFUND FREQUENTLY ASKED QUESTIONS ON THE AGUA ZARCA PROJECT,
https://www.finnfund.fi/ajankohtaista/uutiset17/en_GB/aqua_zarca_finnfund/ (last visited May 30, 2018).

[277] *See* Se Solicita Permiso Para Realizar Estudio de Factibilidad Para la Construcción de una Planta Hidroeléctrica Denominada Agua Zarca, 7 Oct. 2009.

application for a permit to operate the hydroelectric power plant.[278] SERNA subsequently granted the operations permit on January 22, 2010,[279] entitling DESA to design, construct, operate, and maintain the Agua Zarca project for a period of fifty years.[280] Agua Zarca's annual output capacity was set to 14.4 MW— enough electricity to power some 5,760 to 12,960 homes.[281] On August 8, 2011, the permit was approved through legislation by the Honduran congress.[282] Next, a second permit, likewise approved by legislation in August 2011,[283] granted DESA the right to utilize the Gualcarque River's water to generate power for a period of thirty years pursuant to Honduras's 2009 General Water Law.[284] In addition, on June 3, 2010, DESA and ENEE had entered into a Power Purchase Agreement that established a fixed price at which DESA could sell its electricity to ENEE.[285] The municipalities of San Francisco de Ojuera and Intibucá issued construction permits on October 25, 2011, and December 27, 2011, respectively.[286]

Finally, DESA also obtained an environmental permit on March 25, 2011,[287] placing Agua Zarca in Category 2,[288] which applies to hydroelectric projects with a capacity range of 3-15 MW.[289] Following optimization of the plant's design, DESA, on November 17, 2011, requested that the maximum project capacity be increased from 14.4 MW to 21.7 MW. After a review by SERNA and the Directorate of Evaluation and Environmental Control **(DECA)**,[290] SERNA on January 24, 2013, issued a revised Category 3 license[291] applicable to hydroelectric

---

[278] *See* Se Presenta Estudio de Factibilidad Para el Desarrollo del Proyecto Hidroelectrico Agua Aarca, 15 Dec. 2009.

[279] Hidroeléctrica Agua Zarca, Informe Proyecto Hidroeléctrico Agua Zarca (2017) (on file with Amsterdam & Partners LLP).

[280] AGUA ZARCA HYDROELECTRIC PROJECT: INDEPENDENT FACT FINDING MISSION, *supra* note 143, at 11.

[281] *Cf.* WHAT IS A MEGAWATT?, https://www.nrc.gov/docs/ML1209/ML120960701.pdf (last visited May 30, 2018).

[282] *See* Decreto No. 68/11, 8 Aug. 2011, Contrata de Aprovechamiento de Aguas Nacionales para la Generación de Energía Eléctrica Mediante el Proyecto Hidrolétrico Agua Zarca [Contract for the Use of National Waters for Electric Power Generation Through the Agua Zarca Hydroelectric Project], LA GACETA, 8 Aug. 2011 (Hond.).

[283] *See id.*

[284] AGUA ZARCA HYDROELECTRIC PROJECT: INDEPENDENT FACT FINDING MISSION, *supra* note 143, at 11.

[285] *See* AGUA ZARCA HYDROELECTRIC PROJECT: INDEPENDENT FACT FINDING MISSION, *supra* note 143, at 12.

[286] *See* Gerencia Ambiental Internacional, Environmental & Social Appraisal: Agua Zarca Hydroelectric Project iii (June 28, 2012) at 5 [hereinafter GAI 2012 Report] (on file with Amsterdam & Partners LLP).

[287] *See* Licencia Ambiental No. 139-2011, 25 Mar. 2011, SERNA.

[288] *See id.*

[289] Acuerdo No. 1714/10, Secretaria de Estado en los Despachos de Recursos Naturales y Ambiente, LA GACETA, 6 Oct. 2015 (Hond.).

[290] *See* Resolución No. 0100-2013, SERNA.

[291] *See* Licencia Ambiental No. 015-2013, 25 Jan. 2013, SERNA.

projects in the 15-30 MW range.[292] Likewise, both the operations and water permits were modified to allow for 21.7 MW of annual output.[293]

### D. Initial Community Consultations and Benefits

As early as 2009, DESA conducted community outreach efforts for the Agua Zarca project.[294] DESA defined the affected communities broadly, even though—as originally planned—only three communities were actually affected directly by virtue of their proximity to key project infrastructure: La Tejera (population of 600), El Barreal (population of 462), and San Ramón (population of 105).[295] The remaining communities—La Leona on the left side of the river, as well as San Bartolomé, Santa Ana, Plan de Encima, Valle de Angeles, La Unión, and Agua Caliente, on the right side of the river—were nevertheless included in DESA's community efforts.[296] Comprising an estimated total of some 4,500 Lenca and non-indigenous residents,[297] nine of the ten communities would have been located at higher elevations, away from the river shores,[298] approximately five kilometers from the original dam site, and no fewer than three to four kilometers away from any other project infrastructure, such as the tunnel or powerhouse.[299] Only San Ramón would have been closer at one kilometer upstream from the dam.[300]

Given the lack of more specific domestic law or regulation implementing ILO 169,[301] DESA engaged local communities through town hall-type events, known as cabildos abiertos.[302]

---

[292] Acuerdo No. 1714/10, Secretaria de Estado en los Despachos de Recursos Naturales y Ambiente, LA GACETA, 6 Oct. 2015 (Hond.).

[293] AGUA ZARCA HYDROELECTRIC PROJECT: INDEPENDENT FACT FINDING MISSION, *supra* note 143, at 11.

[294] *See* AGUA ZARCA HYDROELECTRIC PROJECT: INDEPENDENT FACT FINDING MISSION, *supra* note 143, at 12-13; *see also* GAI 2014 Report, *supra* note 88, at 23.

[295] GAI 2014 Report, *supra* note 88, at 15; *see also* FMO FREQUENTLY ASKED QUESTIONS ON THE AGUA ZARCA PROJECT, https://www.fmo.nl/l/library/download/urn:uuid:3068ae40-c31a-40cc-8819-4a263254f60e/faq+agua+zarca+project+fmo.pdf (last visited May 30, 2018).

[296] GAI 2014 Report, *supra* note 88, at 10.

[297] *Id.* at 15 (stating that, according to community members, the population breakdown per community is as follows: La Tejera (600), El Barreal (462), San Ramón (105), La Leona (155), Plan de Encima (300), Santa Ana (600), Valle de Angeles (400), San Bartolomé (550), La Unión (125), and Agua Caliente (200); *cf.* FMO FREQUENTLY ASKED QUESTIONS ON THE AGUA ZARCA PROJECT, https://www.fmo.nl/l/library/download/urn:uuid:3068ae40-c31a-40cc-8819-4a263254f60e/faq+agua+zarca+project+fmo.pdf (last visited May 30, 2018).

[298] *See* GAI 2012 Report, *supra* note 286, at 17.

[299] *Id.* at 4, 16.

[300] *See* GAI 2012 Report, *supra* note 286, at 17.252, at 17.252, at 17.252, at 17.

[301] *See infra* section VI.H. on ILO 169.

[302] *See* GAI 2014 Report, *supra* note 88, at 28.

For example, on July 21, 2011, DESA held a meeting in Río Blanco,[303] followed by another meeting there in October of the same year, which was attended by presidents of the local community councils,[304] along with at least eight community members from La Tejera.[305] On September 15, 2011, DESA conducted a meeting in San Francisco de Ojuera, Santa Bárbara, where representatives from nine affected communities participated.[306]

These meetings resulted in the formal signing of a Community Benefit Agreement on October 25, 2011.[307] DESA committed to carry out an electrification program in the communities of Santa Ana, Plan de Encima, El Barreal, La Tejera, San Ramón, and La Leona; build and repair specified roads connecting local communities;[308] to build seven modular classrooms in La Tejera, El Barreal, and Valle de Angeles; and to build a hanging bridge across the Gualcarque River for Valle de Angeles.[309] The following year, DESA also hired a full-time environmental and social engagement manager,[310] whose team would later be expanded even further.[311]

Coinciding with the commencement of initial construction in January 2013, DESA brought electricity to Río Blanco by extending the distribution line from Agua Caliente to Plan de Encima, Santa Ana, El Barreal, and La Tejera on the right side of the river, as well as the communities of San Ramón and La Leona on the left side of the river.[312]

Bolstering DESA's community commitments, the company in August 2013 entered into another  community agreement, referred to as a Convenio.[313] DESA committed, among other things, to boost local employment and agricultural development programs, contribute to school and medical facilities, scholarships, maintenance of roads, access to potable water, and further electrification of villages.[314] Effective with the expiration of DESA's income-tax exemption in 2025, DESA also reaffirmed its commitment to earmark 10% of its income taxes specifically for

---

[303] *See* Certificación, Corporación Municipal de Intibucá, 13 Oct. 2011; *see also* GAI 2012 Report, *supra* note 286, at 11.

[304] *See* Municipalidad de Intibucá Hoja de Inscripción de los Participantes, Cabildo Abierto Informativo, 1 Oct. 2011.

[305] *Id.*

[306] *See* Certificación, Municipalidad de San Francisco de Ojuera Santa Bárbara, 25 Oct. 2011; *see also* GAI 2012 Report, *supra* note 286, at 14.

[307] *See id.*

[308] *See* GAI 2012 Report, *supra* note 286, at 11.252, at 11.252, at 11.252, at 11.

[309] *See id.*

[310] GAI 2012 Report, *supra* note 286, at 13.252, at 13.252, at 13.252, at 13.

[311] Monkey Forest Jan. 2015 Report, *supra* note 105, at 5-6.

[312] GAI 2014 Report, *supra* note 88, at 33.

[313] *See* AGUA ZARCA HYDROELECTRIC PROJECT: INDEPENDENT FACT FINDING MISSION, *supra* note 143, at 13.

[314] *See id.*

municipal governments' social spending, benefitting equally Intibucá and San Francisco de Ojuera.[315] Annual and one-time tax and operating fees were to add further to San Francisco de Ojuera's coffers.[316] As Honduran media reported, the Convenio signing took place at President Porfirio Lobo's official residence with the leaders of the Río Blanco Lenca communities present.[317] Also witnessing the signing were the presidents of ONILH, the Lenca Indigenous Honduran Federation (**FHONDIL**), and Lenca Indigenous Movement of Honduras (**MILH**).[318] Another Lenca group, the National Council of Lenca Indigenous Women of Honduras (**CONMILH**), was likewise supportive of the project.[319]

### E.  COPINH's Early Opposition and Violence

Though initially supportive of Agua Zarca, the Lenca community of La Tejera grew disenchanted with DESA and the contractor at the time that was to construct the dam.[320] El Barreal had already been fully electrified by 2013 whereas part of La Tejera remained without electricity.[321] That said, "electrification is frequently the final culminating benefit provided to local communities, whereas in the case of Agua Zarca, it was offered [at least to some extent] from the very outset."[322]

Adding to La Tejera's grievances, the construction of a road from La Tejera to San Bartolomé remained unfinished.[323] This, it appears, fostered a perception among residents of La Tejera that DESA was prioritizing the non-indigenous community of El Barreal, which had also benefitted disproportionately from its land sales to DESA.[324] Making matters worse, the contractor at the time, which had begun work on the project in January 2013, had damaged the crops of a La Tejera resident, and failed to compensate another La Tejera resident whose property near the tunnel entrance had been damaged.[325] The contractor at the time was also behind on hiring local workers and paying local employees, among other such issues.[326] COPINH's false rumors that DESA would "'privatize' the water and would not permit the local community [of Río Blanco] to access the river could only have heightened La Tejera's

---

[315] *See* GAI 2014 Report, *supra* note 88, at 33.

[316] *See id.*

[317] *Lenca Communities of Intibucá Support Construction of Agua Zarca Hydroelectric Dam*, Proceso Digital (Sept. 5, 2013), http://www.proceso.hn/component/k2/item/15480.html (noting the presence of and signing by of representatives from La Tejera, El Barreal, Valle de Angeles, La Unión, San Bartolomé, Santa Ana, Plan de Encima, San Ramón and La Leona; José Héctor García Mejía, Donato Madrid, Victoriano del Cid, Casimiro Gonzales, Esmelin Méndez, and Natividad Díaz, among others).

[318] *See id.*

[319] GAI 2014 Report, *supra* note 88, at 41.

[320] *Id.* at 6.

[321] *See id.* at 5-6.

[322] *Id.* at 35.

[323] *Id.* at 5-6.

[324] *Id.*

[325] *See* GAI 2014 Report, *supra* note 88, at 5-6.

[326] *See id.*

concerns."[327] Moreover, "[w]hile COPINH's claims do not appear to be broadly recognized by local communities (including Lenca communities) or at regional and national levels or to be substantiated by the evidence, . . . claims of significant impacts on indigenous spiritual resources are particularly hard to refute effectively."[328]

By August 2013, DESA terminated the contractor at the time for the construction company's failure to meet its contractual obligations. Though that contractor's engagement thus lasted no longer than eight months, COPINH—whose previous presence in the project area had largely been limited to participation in public consultations 2011 and 2012[329]—meanwhile stepped up its involvement, soon employing the same kinds of radical means[330] that had established the organization's militant reputation.[331] In doing so, COPINH drew on activists bused in from outside the Agua Zarca area.[332]

Using the disappointment among La Tejera's residents[333] as a platform and exploiting an overarching political climate of distrust as to energy projects,[334] COPINH over the course of 2013 acted against Agua Zarca by setting up multiple road blocks; vandalizing trucks; setting ablaze portable toilets, generators, bulldozers, and other equipment; damaging air compressors as well vehicle windows and tires; cutting power-line poles; and destroying a wooden bridge across the Gualcarque River.[335] COPINH vandalized water supplies in Valle de Angeles, and invaded and cultivate agricultural land in La Tejera belonging to individuals who did not support COPINH.[336] Even more violent, COPINH also threatened employees of the contractor at the time on more than one occasion, and forced them to evacuate the project premises. Shots were reportedly fired at the project site, and a community member was injured by a stone thrown at a DESA vehicle.[337]

Unfortunately, the presence of police and military personnel at the construction camp only exacerbated tensions as both police and military lacked training to effectively diffuse COPINH's acts of violence and aggression.[338] When a COPINH group armed with machetes entered the construction camp on July 15, 2013, Tomás García, a COPINH supporter, was killed

---

[327] Comisionado Nacional de Los Derechos Humanos: Socialización de Proyecto Hidroeléctrico (July 11, 2013).

[328] Monkey Forest Jan. 2015 Report, *supra* note 105, at 9.

[329] *See* GAI 2014 Report, *supra* note 88, at 10-11.

[330] *See id.* at 6-7.

[331] GRAHAM, *supra* note 169, at 328.

[332] Comisionado Nacional de Los Derechos Humanos: Socialización de Proyecto Hidroeléctrico (July 11, 2013).

[333] Monkey Forest Jan. 2015 Report, *supra* note 105, at 9 (noting that "the discontent in La Tejera appears to have begun outside the group leading the Patronato").

[334] *See* GAI 2014 Report, *supra* note 88, at 7.

[335] *Id.* at 6-7; *see also* Misión Permanente de Honduras ante la Oficina de las Naciones Unidas, Informe sobre la Situacion actual de los Defensores de Derechos Humanos Indigenas (Oct. 27, 2014), at 6.

[336] *See* GAI 2014 Report, *supra* note 88, at 6-7, 21-22.

[337] GAI 2014 Report, *supra* note 88, at 7.

[338] *Id.* at 41.

and his son injured by military gunfire.[339] That same day, a COPINH supporter shot and killed Cristian Madrid, a member of the community.[340] A February 2014 social-due-diligence audit commissioned by Agua Zarca's lenders found "COPINH . . . responsible for inciting much of the conflict, aggression, misinformation and ultimately violence that occurred in connection with the project."[341]

F.   An Additional Concession: Project Relocation Across the Gualcarque River

DESA attempted to engage with COPINH directly in order to find a resolution to the escalating conflict. In conversations with COPINH's leadership, it emerged, however, that COPINH's opposition to Agua Zarca stemmed from a general opposition to Honduras's government, rather than this project in particular. In fact, Zuñiga, one of COPINH's founders, reportedly stated, "I think it could be this one," when asked whether COPINH could accept or support any hydroelectric projects.[342]

DESA in 2014 once again consulted with affected communities. The result was another Community Benefit Agreement, signed in December 26, 2014, by members of affected communities but as in 2013 none from La Tejera.[343] DESA and its partners committed to provide a drinking-water pipeline for the communities of Santa Fe, La Estancia, and San Francisco de Ojuera; hospital equipment; and a bridge to connect Santa Ana and Plan de Encima.[344] Moreover, DESA committed to give local contractors priority consideration and to share profits with San Francisco de Ojuera.[345] COPINH, for its part, denounced the agreement and claimed it was signed by individuals "co-opted by the other communities."

Next, DESA, still facing COPINH's intractable opposition and the prospect of continued violent activism, reconsidered Agua Zarca's design and location, so as to avoid any direct, physical impact on La Tejera—the sole community, indigenous or otherwise, that had come, partially, to oppose the project.[346] As a January 2015 report surmised, "People from villages on

---

[339] *See id.* at 8; *cf.* Letter from Sixty Lawmakers to the Treasury Secretary Jacob Lew and to State Department Secretary John Kerry (Mar. 16, 2016), *available at* https://hankjohnson.house.gov/media-center/press-releases/reps-johnson-ellison-call-independent-murder-investigation-human-rights (asserting that "Tomás García, a COPINH Lenca community leader, [was killed] while he was peacefully protesting against the Agua Zarca hydroelectric dam," but omitting COPINH's violence).

[340] GAI 2014 Report, *supra* note 88, at 8.

[341] *Id.* at 5.

[342] *Id.* at 26.

[343] *See* AGUA ZARCA HYDROELECTRIC PROJECT: INDEPENDENT FACT FINDING MISSION, *supra* note 143, at 14.

[344] *Id.*

[345] *Id.*

[346] FINNFUND FREQUENTLY ASKED QUESTIONS ON THE AGUA ZARCA PROJECT, https://www.finnfund.fi/ajankohtaista/uutiset17/en_GB/aqua_zarca_finnfund/ (last visited May 30, 2018);

the right and left banks of the river and the mayor of Intibucá continue to express concern about potential violence against Project supporters by members of the COPINH group from La Tejera."[347]

By mid-2015, DESA relocated the project from the right side of the river to the left side of the river, and further downstream from the original dam location.[348] Neither the road near La Tejera nor the quarry would be used going forward.[349] Moreover, the project's design was changed from an on-river dam spanning ninety-three meters to a run-of-river project with a five meter intake weir.[350] "Run-of-river dams are generally considered the best kind of hydropower for the environment because they don't require reservoirs for water storage. These projects are so named because they divert a portion of a river into a pipe and run it downhill in the direction water flows naturally. Gravity then pushes the water into turbines to generate electricity."[351] Retaining the original plans for three turbines,[352] the design was also modified so as to change all construction staging areas and work camps to the left side of the river.[353]

With the redesign, only four communities—none of them indigenous—remained directly affected (San Ramón, La Estancia, La Leona, and Valle de Angeles) in that the project would be located on land that they had sold to DESA, provided access to the project site itself, or agreed to temporary access restrictions to the river during the construction phase.[354] Another four communities (El Aguacatal, Chorrera Aspera, and Santa Fe) would provide access routes through their communities to the project site.[355] Four additional communities (El Barreal, Santa Ana,

---

*see also* JOHAN FRIJNS, *Agua Zarca Hydro Project*, BankTrack (May 18, 2018), https://www.banktrack.org/project/agua_zarca_dam/pdf; *see also* AGUA ZARCA HYDROELECTRIC PROJECT: INDEPENDENT FACT FINDING MISSION, *supra* note 143, at 13.

[347] Monkey Forest Jan. 2015 Report, *supra* note 105, at 9.

[348] AGUA ZARCA HYDROELECTRIC PROJECT: INDEPENDENT FACT FINDING MISSION, *supra* note 143, at 13.

[349] *See* GAI 2014 Report, *supra* note 88, at 3.

[350] *Id.*

[351] Cristina Maza, *Hydropower's Next Act: Becoming a Less-Controversial Renewable*, THE CHRISTIAN SCIENCE MONITOR (May 13, 2016), https://www.csmonitor.com/Environment/Energy/2016/0513/Hydropower-s-next-act-becoming-a-less-controversial-renewable.

[352] AGUA ZARCA HYDROELECTRIC PROJECT: INDEPENDENT FACT FINDING MISSION, *supra* note 143, at 13 n.28.

[353] *Id.* at 13.

[354] FMO FREQUENTLY ASKED QUESTIONS ON THE AGUA ZARCA PROJECT, https://www.fmo.nl/l/library/download/urn:uuid:3068ae40-c31a-40cc-8819-4a263254f60e/faq+agua+zarca+project+fmo.pdf (last visited May 30, 2018).

[355] *See* FMO FREQUENTLY ASKED QUESTIONS ON THE AGUA ZARCA PROJECT, https://www.fmo.nl/l/library/download/urn:uuid:3068ae40-c31a-40cc-8819-4a263254f60e/faq+agua+zarca+project+fmo.pdf (last visited May 30, 2018).

Plan de Encima, and La Tejera) would continue to benefit from DESA's social commitments along with all the other communities, but were no longer affected otherwise.[356]

As part of DESA's commitments to the community, the company, in December 2015, also signed a five-year agreement with the U.S. Agency for International Development (**USAID**) through the latter's MERCADO program in order to support agricultural producers in San Francisco de Ojuera, Santa Bárbara, and Intibucá.[357] The assistance included installing drip irrigation systems, as well as diversifying and intensifying crop yields.[358] By this time, DESA had also hired some 107 employees from local communities to work on the project—*i.e.*, more than 50% of DESA's 177 on-site employee total.[359]

G.  COPINH's Continued Violent Opposition

Following the relocation of the project, COPINH's opposition to Agua Zarca remained unaltered—even though all communities that remained affected were now in support of the project, including all affected indigenous communities.[360]

On September 13, 2015, COPINH members crossed the river and attempted to enter DESA installations. Among the protestors was a Spanish citizen, who appears in DESA video footage along with two local residents, one underage and the other brandishing a machete.[361] The two locals appear "totally intoxicated and struggling to remain on their feet while they yelled incomprehensively at DESA personnel who were filming them."[362] DESA employees asserted that COPINH "intoxicate[d] the inhabitants prior to bringing them to a protest, so that they are more aggressive and generate more chaos."[363]

---

[356] *Id.*

[357] HIDROELÉCTRICA AGUA ZARCA Y USAID FIRMAN CONVENIO DE APOYO A PRODUCTORES DE SANTA BÁRBARA E INTIBUCÁ (2015), http://hidroelectricaaguazarca.hn/assets/documentos/NOTA_DE_PRENSA_SOBRE_FIRMA_CONVENIO_CON_USAID_DICIEMBRE_2015.pdf.

[358] *Id.*; *see also* Hidroeléctrica Agua Zarca, Agua Zarca HP Environmental and Social Progress Report 12 (Nov. 2015).

[359] Hidroeléctrica Agua Zarca, Agua Zarca HP Environmental and Social Progress Report 14 (Jan. 2016); *see also* Hidroeléctrica Agua Zarca, Agua Zarca HP Environmental and Social Progress Report 12 (Feb. 2016) (putting the local communities' employee count that month at 136 out of 186).

[360] *See* GAI 2014 Report, *supra* note 88, at 6.

[361] *See id.*

[362] *Id.*

[363] *Id.*

Leading up to a November 2015 country visit from the United Nations Special Rapporteur on the rights of indigenous peoples, Victoria Tauli-Corpuz,[364] a group of COPINH protestors set up camp across the river, and on one occasion carried out another incursion, vandalizing signs and other DESA property.[365] According to DESA, "COPINH visibly [was] ma[king] an effort to mobilize their supporters and have them ready for a[n anticipated] visit" by the UN Special Rapporteur the following month.[366]

The UN Special Rapporteur visited only La Tejera,[367] and her final report failed to even mention the views of other communities also affected by the project, let alone COPINH's violent opposition.[368] However, members of neighboring communities Valle de Angeles, Santa Ana, and El Barreal—all in support of the project but opposed to COPINH's presence in Río Blanco—also sought to make their views known to the Special Rapporteur.[369] With the help of police officers and DESA's community development team, members of these communities were able to speak to and present a letter to the UN Special Rapporteur in which they expressed their grief at the killing of a child by COPINH, as well as how COPINH had dispossessed some of them of their land.[370]

On November 13, 2015, one week after the visit of the Special Rapporteur to Río Blanco, COPINH continued its activism with a protest in San Francisco de Ojuera.[371] Apparently because only twenty residents of La Tejera were willing to participate, COPINH bused in protestors from another department—Peña Blanca and San Buena Ventura in Cortés—nowhere near the project.[372]

This was not the first time that COPINH had dealt with a lack of local opposition by mobilizing residents from distant, unaffected communities. A 2013 report by CONADEH, the Honduran human rights commissioner, Ramón Custodio López, noted that:

> It is understood that the damage which has been carried out on company [DESA] property is carried out by people from outside

---

[364] *See generally* Report of the Special Rapporteur on the Rights of Indigenous People on Her Visit to Honduras, *supra* note 117.

[365] Hidroeléctrica Agua Zarca, Agua Zarca HP Environmental and Social Progress Report 13 (Oct. 2015).

[366] *Id.*

[367] *Id.* at 14.

[368] *Cf.* Report of the Special Rapporteur on the Rights of Indigenous People on Her Visit to Honduras, *supra* note 117.

[369] Hidroeléctrica Agua Zarca, Agua Zarca HP Environmental and Social Progress Report 14 (Nov. 2015).

[370] *Id.* (*See* in the Annex conversations between Berta and Aureliano about movilizing persons that were not from areas near the project.)

[371] *Id.*

[372] Hidroeléctrica Agua Zarca, Agua Zarca HP Environmental and Social Progress Report 14 (Nov. 2015).

> the community, that is, they are people that Ms. Berta Caceres
> brought from somewhere else, so that they will cause destruction
> and disorder, now that there are few people who share their ideas
> [about opposing the project].[373]

In 2016, protests became increasingly violent, to the point that many residents of La Tejera itself sought to distance themselves. Presumably, this led COPINH to bring demonstrators from other communities to show "a greater capacity to mobilize."[374] As early as January 2016, a group of COPINH members again entered DESA property, vandalizing signs and damaging water and sanitary tanks owned by the company.[375]

Repeating this pattern yet again, on February 20, 2016, COPINH bussed in approximately 120 protestors.[376] Soon the protestors entered DESA's large concrete pipes, burned a container of cement, and set fire to geomats, which had been put in place as soil-erosion mitigation.[377]

The events of that day are disputed by the parties. COPINH blamed the local police and security services for the violence, and claimed that Sergio Rodríguez, DESA's community manager and the mayor and deputy mayor of San Francisco de Ojuera threatened Cáceres, claiming that there was video evidence of such threats.[378] COPINH has given contradictory reports of when and where this supposed threat took place,[379] however, and the video in question "has never been shown to any authority in Honduras, is not part of the judicial file, nor has it been seen in the media in the country or by any local or international organizations."[380] Only the Spanish citizen accused of inciting violence in previous protests, testified that Rodríguez threatened Cáceres when, under suspicious circumstances, he testified before ATIC, the Honduran criminal investigative agency. In addition, a COPINH member from La Tejera, claimed that COPINH did not damage DESA property at all, although such damage is well documented in photographs and witness accounts.[381] Conversely, other eyewitness accounts have disputed COPINH's narrative. An employee from the office of the mayor in San Francisco de Ojuera recounted that COPINH "attacked," painted graffiti, and vandalized, and said "[w]e had to lock ourselves up because that bunch of vandals who were with her [Cáceres], causing

---

[373] Comisionado Nacional de Los Derechos Humanos: Socialización de Proyecto Hidroeléctrico (July 11, 2013).
[374] *Id.* at 93.
[375] *See id.*
[376] *See id.* at 94.
[377] *See id.*
[378] *See id.* at 14, 16.
[379] *See id.* at 95.
[380] *Id.* at 99.
[381] *Id.* at 96.

violence and wanting to go here to set fire to the mayor's office. That day, nobody attacked her."[382]

The events of February 20, 2016, aside, on March 3, 2016, Cáceres was brutally murdered in her home in La Esperanza, Intibucá.[383]

### H.  COPINH Has Spread Disinformation about ILO 169 and Community Consultation Processes

One of the most pervasive myths held up by opponents of the Agua Zarca project is that DESA violated its obligation under ILO 169,[384] which states, among other things, that "[g]overnments shall have the responsibility for developing, with the participation of the peoples concerned, co-ordinated and systematic action to protect the rights of [indigenous] peoples and to guarantee respect for their integrity,"[385] and that "governments shall... consult the peoples concerned, through appropriate procedures and in particular through their representative institutions, whenever consideration is being given to legislative or administrative measures which may affect them directly."[386] The Convention states further that:

> Governments shall ensure that, whenever appropriate, studies are carried out, in co-operation with the peoples concerned, to assess the social, spiritual, cultural and environmental impact on them of planned development activities. The results of these studies shall be considered as fundamental criteria for the implementation of these activities.
> Governments shall take measures, in co-operation with the peoples concerned, to protect and preserve the environment of the territories they inhabit.[387]

The Honduran constitution renders international treaties part of domestic law and states that international treaties preempt domestic law in the event of conflicts.[388] But this monist

---

[382] *Id.* at 95.

[383] *See* Elisabeth Malkin & Alberto Arce, *Berta Cáceres, Indigenous Activist, Is Killed in Honduras*, The N.Y. TIMES (Mar. 3, 2016), https://www.nytimes.com/2016/03/04/world/americas/berta-caceres-indigenous-activist-is-killed-in-honduras.html.

[384] *See* ILO, RATIFICATIONS FOR HONDURAS, http://www.ilo.org/dyn/normlex/en/f?p=NORMLEXPUB:11200:0::NO::P11200_COUNTRY_ID:102675 (last visited May 30, 2018).

[385] OIT 169, § 2(1).

[386] ILO 169, § 6(1)(a).

[387] *Id.* § 7(3)-(4); *see also* § 15.

[388] CONSTITUCIÓN DE LA REPÚBLICA DE HONDURAS, art. 18.

51

constitutional framework has done little to define compliance obligations under ILO 169 in Honduras.

First, from the text of the Convention itself, ILO 169 appears to impose obligations on states. Conversely, it is not at all apparent that a private, non-governmental entity—such as DESA—has any obligations under ILO 169.[389]

Second, Honduras has also failed to implement ILO 169 through domestic legislation,[390] despite states' "general duty to conform their national legislation to the international rules binding upon them," "[r]egardless of the system of incorporation" applicable under the state's constitutional order.[391] As recently as 2015, the Honduran government was in the process of drafting ILO 169 implementing legislation.[392] This process included indigenous community workshops held by the Confederation of Indigenous Peoples of Honduras (**CONPAH**).[393] Unfortunately, while other indigenous federations such as ONILH and FITH were in attendance, COPINH—apparently continuing a pattern[394]—failed to participate in these workshops, and the legislative initiative has yet to bear fruit.[395]

The lack of implementing legislation has created a permanent state of regulatory uncertainty. The Committee of Experts on the Application of Conventions and Recommendations (**CEACR**), an ILO body that evaluates signatory states' application of the Convention,[396] has noted Honduras's "flexib[le]" approach,[397] which Honduras claimed to consist of "(1) thematic meetings with indigenous participation; (2) internal community consultation; (3) participatory evaluation meetings; (4) discussion groups on socio-

---

[389] *See* AGUA ZARCA HYDROELECTRIC PROJECT: INDEPENDENT FACT FINDING MISSION, *supra* note 143, at 20-21.

[390] *See* Report of the Special Rapporteur on the Rights of Indigenous People on Her Visit to Honduras, *supra* note 117, ¶ 9.

[391] ORMAZA, *supra* note 70, at 70-71.

[392] *See* CEACR OBSERVATION (2008), http://www.ilo.org/dyn/normlex/en/f?p=NORMLEXPUB:13100:0::NO::P13100_COMMENT_ID:22965.

[393] *Id.*

[394] *Socializan Proyectos Hidroeléctricos con Indígenas y Afrodescendientes*, LA TRIBUNA, July 3, 2013, at 48, http://www.latribuna.hn/wp-content/uploads/2013/07/LA-TRIBUNA-PDF-WEB-03072013DEP.pdf.

[395] *See* CEACR OBSERVATION (2008), http://www.ilo.org/dyn/normlex/en/f?p=NORMLEXPUB:13100:0::NO::P13100_COMMENT_ID:22965.

[396] ILO COMMITTEE OF EXPERTS ON THE APPLICATION OF CONVENTIONS AND RECOMMENDATIONS, http://www.ilo.org/global/standards/applying-and-promoting-international-labour-standards/committee-of-experts-on-the-application-of-conventions-and-recommendations/lang--en/index.htm (last visited May 30, 2018).

[397] *See* CEACR OBSERVATION (2008), http://www.ilo.org/dyn/normlex/en/f?p=NORMLEXPUB:13100:0::NO::P13100_COMMENT_ID:22965.

environmental management; and (5) verification meetings."[398] Flexibility, however, leaves many questions unanswered. As a consequence, according to the Honduran National Business Council (**COHEP**), ILO 169 is "badly interpreted by state officials and by some leaders of indigenous peoples, who tend to consider that consultation is of a binding nature and that it includes the right of veto."[399] Articulating similar concerns, the International Organisation of Employers (**IOE**) added that "the difficulties to comply with the obligation of consultation [absent implementing legislation] may have an impact on the projects that enterprises may wish to carry out with a view to creating a conducive environment for economic and social development, the creation of decent and productive work and the sustainable development of society as a whole."[400] The IOE noted further that the "erroneous application and interpretation of the requirement of prior consultation can be a legal obstacle and lead to business difficulties, harm the reputation of enterprises and result in financial costs."[401]

Apart from the lack of implementing legislation in Honduras in particular, it is not at all clear that ILO 160 requires community consent. Chile, Guatemala, and Norway "have straightforwardly denied any interpretation of the right to consultation that supports an obligation to obtain consent."[402] For instance, in neighboring Guatemala, another country where ILO 169 has yet to be implemented, the Constitutional Court described the consultation process as an "obligation to institutionalize and apply a procedure," but not an obligation that may "be invoked by indigenous people to impose their position over those of other actors with legitimate interest on the issue at stake."[403] Chile's Constitutional Tribunal, furthermore, held that "the consultation requirement is not [even] a compulsory negotiation, but rather constitutes a means through which indigenous peoples can express an opinion."[404] And even in countries where the Convention has been read to mandate consent, such as Venezuela and Colombia, the application of such a requirement has been limited to instances in which "the measures at issue may severely damage the community's physical or cultural *existence*."[405] In other words, with or without implementing legislation, it is not at all a given that indigenous peoples have veto power over projects affecting their communities.

With respect to Agua Zarca, no Honduran court has found DESA in violation of Honduran law in the company's long-running consultations with the local communities. In fact,

---

[398] *Id.*
[399] CEACR OBSERVATION (2015),
http://www.ilo.org/dyn/normlex/en/f?p=1000:13100:0::NO:13100:P13100_COMMENT_ID:3255666.
[400] CEACR OBSERVATION (2012),
http://www.ilo.org/dyn/normlex/en/f?p=1000:13100:0::NO:13100:P13100_COMMENT_ID:3080300.
[401] *Id.*
[402] ORMAZA, *supra* note 70, at 105.
[403] *Id.* at 84.
[404] *Id.* at 92.
[405] *Id.* at 105 (emphasis added).

in March 2018, the Honduran Supreme Court reversed a lower court's judgment against a former SERNA official, reasoning in part that Agua Zarca did not even trigger ILO 169 as the project area concerned only private land.[406] What is more, the court noted that even if the Agua Zarca project had been subject to ILO 169, there was proof that the project had been properly socialized.[407] Similarly, in April 2018, the local court in Siguatepeque dismissed charges against the former mayor of Intibucá, who had presided over the October 1, 2011, open townhall meeting with representatives of the local communities.[408] Allegedly he had supported Agua Zarca in contravention of ILO 169.[409] But recognizing Honduras's inaction with respect to implementing legislation, the court cleared him of any wrongdoing, ruling that "due to the lack of a procedure established to carry out the prior consultation (ILO Convention 169), the most appropriate procedure was used; this procedure is that of the open town council."[410]

---

[406] *See* Corte Suprema de Justicia [Supreme Court] Mar. 21, 2018, SISTEMA DE INDEXACION JURISPRUDENCIAL (AP-777-16) (Hond.); *cf. Dejan en libertad al exviceministro de SERNA Darío Roberto Cardona*, RADIO AMERICA (May 15, 2018), http://radioamericahn.net/libertad-exviceministro-serna-dario-roberto-cardona/  (noting that another former SERNA official, who had been put on trial due to his involvement in the Agua Zarca project was recently released on bail following intervention by the Honduran Supreme Court).

[407] *See* Corte Suprema de Justicia [Supreme Court] Mar. 21, 2018, SISTEMA DE INDEXACION JURISPRUDENCIAL (AP-777-16) (Hond.).

[408] *Cf.* Intibucá Certificacion (Oct. 13, 2011).

[409] Auto de Formal Procesamiento en Contra de ex Alcalde de Intibucá en Caso Agua Zarca, MINISTERIO PÚBLICO REPÚBLICA DE HONDURAS (Sept. 14, 2016), https://www.mp.hn/index.php/author-login/40-septiembre/750-auto-de-formal-procesamiento-en-contra-de-ex-alcalde-de-intibuca-en-caso-agua-zarca.

[410] Elvin Diaz, *Caso Agua Zarca: Por falta de Procedimiento Dejan en Libertad a Exalcalde de Intibucá*, EL TIEMPO (Apr. 26, 2018), https://tiempo.hn/caso-agua-zarca-por-falta-de-procedimiento-dejan-en-libertad-a-ex-alcalde-de-intibuca/.

## VII. CONCLUSION

As should be plain, the tragic history with respect to human rights workers in Honduras, coupled with historic impunity for violence directed against these activists, stirs strong emotions and a desire for an emblematic win. Yet, no matter how sincere these emotions may be, they appear to have clouded the judgement of international NGOs and others about the Agua Zarca project.

At the root of this confusion are several assertions by COPINH that cannot pass scrutiny. The very premise of COPINH's opposition to Agua Zarca was that the project concerned and had an adverse effect on the land of indigenous communities; that DESA failed to consult the communities; that these communities were opposed to the project; and that COPINH represented the communities in their peaceful opposition. As detailed above, each of these assertions is either false or true only in part. Nonetheless, international NGOs, to this day, buy into COPINH's narrative.

The consequences are dire. For one, the Agua Zarca project has been shut down indefinitely after international lending institutions withheld further funding. This marks a step backward in terms of Honduras's harmful and unsustainable reliance on fossil fuels for electricity generation. Reportedly, the international publicity surrounding Agua Zarca, as well as threats of lawsuits by COPINH against former project funders,[411] has also had a deterrent effect on other hydroelectric development projects in Honduras.[412] In a country with abundant potential for hydroelectric power, this state of affairs is unconscionable. If COPINH and its international bullhorns in the NGO community were serious about representing local interests and promoting sustainable development, they would be "concerned with stopping bad developments but promoting good ones"[413] instead of opposing hydroelectric power en masse.[414]

---

[411] *See, e.g.*, Liz Ford & Sam Jones, *Bank Faces Lawsuit Over Honduras Dam Project as Spirit of Berta Cáceres Lives on*, THE GUARDIAN (May 18, 2018), https://www.theguardian.com/global-development/2018/may/18/bank-faces-lawsuit-over-honduras-dam-project-spirit-of-berta-caceres-fmo-agua-zarca.

[412] *See* Interview with Elsia Paz, President of the Honduran Renewable Energy Association, La Tribuna (May 26, 2018), *available at* http://www.latribuna.hn/2018/05/26/elsia-paz-presidenta-la-asociacion-hondurena-energia-renovable/.

[413] Dipak Gyawali, *Epilogue*, *in* THE NEPAL-INDIA WATER RESOURCES RELATIONSHIP: CHALLENGES 295, 300 (Dwarika N. Dhunkel & Santa B. Pun eds., 2009).

[414] *See, e.g.*, Brigitte Gynther, *Honduras Indigenous Communities Resist Dams in the Face of Threats and Violence*, UPSIDE DOWN WORD (Mar. 9, 2015), http://upsidedownworld.org/archives/honduras/honduras-indigenous-communities-resist-dams-in-the-face-of-threats-and-violence/ (noting that COPINH had filed official complaints with the Prosecutor for Indigenous Peoples regarding some forty dam projects); *see*

Throughout, opponents of Agua Zarca have neglected the legitimate rights and interests of indigenous as well as non-indigenous communities in the rural area surrounding the Agua Zarca project. Clearly, the right to economic opportunity, education, medical care, clean air, and basic infrastructure, such as roads, clean water, and electricity, all constitute rights and interests of Honduras's rural population. These rights have not been respected, let alone advanced, by COPINH and international NGOs. Clearly, we cannot make demands on the justice system to punish innocent people based on at best circumstantial evidence, while at the same time not speaking at all about justice for victims when the aggressor is COPINH itself.

Over the past two and half years, it has become increasingly clear that COPINH is not interested in justice. They are not interested in accountability for this murder, nor discovering the truth of what happened. Their goal is to callously benefit from this tragic death – to broaden their donor base and please their NGO sponsors, while at the same time destroying opportunities for Honduras to achieve growth and prosperity.

COPINH will continue the "search" for intellectual authors endlessly because it is a useful diversion technique and it is good for business. We strongly suspect that they already know who is responsible, but they are committed to making sure the rest of the world doesn't find out.

Prosecutors in the case have ignored multiple court orders to share the case file with the defense, putting them at a severe disadvantage and thus violating their rights and legal protections as the accused. Amazingly, Mr. Rodríguez has been held for more than two years based on extremely weak evidence – yet access by expert witnesses for the defense has been hampered, incomplete, and rushed to an impossible deadline to adequately evaluate the data. Prosecutors have had exclusive access to phones and devices that the defense is denied access to, while the court has decided to simply hand over non-relevant seized device data from DESA that isn't even being used by the prosecution to the private accusers – which most likely they will attempt to use outside the court in their fake news campaign.

One can only speculate that the prosecutors must be buckling under the immense public pressure brought by the COPINH, as they have also plainly weaponized the global NGO community to parrot their threats and interfere in the process. It is deeply disappointing how these organizations currently find themselves deploying their brands to campaign against presumption of innocence and against the right to a fair trial by lining up behind COPINH. The international NGO sector, as shown in this case, has incentivized further land conflicts in Honduras and frozen foreign investment and development.

---

*also* COPINH Who We Are, http://copinhenglish.blogspot.com/p/who-we-are.html (last visited July 6, 2018) (claiming to have stopped some 10 hydroelectric projects "that threatened Lenca communities").

The result is a form of state capture, whereby state institutions become instruments at the service of a private, unaccountable agenda, used to attack their opponents, to campaign for fundraising internationally, and to help further their transformation into a formal political party to expand their acquisition of power.

The violations of due process that the DESA defendants have suffered are not trivial, and they are not accidental. They are a direct result of COPINH's pressure campaign, which is why it is deeply concerning that they continue to make demands to expand the case against new targets.

Throughout this process, it should be noted, COPINH has not been an honest broker. At repeated intervals they have made false and misleading claims about the criminal case, the position of DESA, and the Agua Zarca project in general.  They have successfully fused their anti-renewable energy campaign with their campaign for Berta – and sadly, so many NGOs have been blind to the fact that trying to build a hydroelectric project does not mean that a company was involved in murder.  In fact, could there have been any other event more catastrophic to DESA's interests than the death of Berta Caceres?

Anyone who visits Río Blanco and speaks to the residents living there, would quickly understand that this is not an organization which represents the people. COPINH's own troubling record of human rights violations, threats, intimidation, and violent land grabs against other members of the community corroborates this. Information presented in this White Paper reveals a sinister side of the COPINH's past and ongoing interventions in Honduras's rural Lenca communities. In light of these revelations, it is shocking that international NGOs have partnered with COPINH and supported them without independent verification of their methods and tactics.

They have not only robbed the citizens of these communities of jobs and development opportunities, but nationwide their conduct has put a freeze on hundreds of millions of dollars of investment in energy and infrastructure. These trends contribute to a deepening of poverty and inequality in Honduras, further fueling migratory pressure to leave and seek employment abroad. It has to stop.

It is true that someone(s) is responsible for Berta's death, and we must all support justice being served in this case. But that doesn't give anyone license to falsely accuse and jail people based on no evidence or simply because they work on a project you oppose. That's not how the law works, and we should stop pretending it is any other way.

## **Annexes**

To view the complete annexes of text message transcripts referenced in this White Paper, please visit the following online directory: https://casocaceres.com/en/anexos/