# EXHIBIT 4

Greenspan
Humphrey
Weinstein

July 2, 2018

Robert Amsterdam
Amsterdam & Partners LLP
The Homer Building
601 Thirteenth Street, NW
Eleventh Floor South
Washington, DC 20005

Dear Mr. Amsterdam:

Re:    DESA — The Honduras Investigation and Prosecution

## Introduction

International human rights organizations and non-governmental organizations around the world have denounced the murder of Berta Isabel Cáceres Flores. As pressures to identify those responsible for the murder intensified, the International Advisory Group of Experts (GAIPE), formed at the request of relatives of the victim and the victim's environmental organization, conducted an "independent" analysis of the investigation and prosecution and concluded that eight individuals linked to DESA are responsible for the murder.

The GAIPE Report, while strongly accusatory, is weak on factual content. It fails to comply with the Lund-London Guidelines on fact-finding reports in numerous ways, creating a biased narrative based on speculative inferences drawn from incomplete evidence in order to point the finger at DESA. Identifying DESA as the organization ultimately responsible for the crime may fit with the preferred narrative of those that contracted GAIPE to produce the report, but such an identification is not based on an objective review of the evidence. This flawed report has resulted in misplaced international pressure on Honduras to convict the individuals charged with the murder, regardless of whether there is a sufficient evidentiary foundation to establish their guilt.

The incomplete and inadequate investigation has resulted in the pre-trial incarceration of two individuals employed by DESA: Sergio Ramon Rodriguez Orellana and Roberto David Castillo Mejia. They now face the prospect of an unfair trial based on an investigation that failed to comply with minimum international standards; the biased GAIPE Report that failed to comply with basic fact-finding requirements; and a fundamentally unfair prosecution that has repeatedly breached the defendants' fair trial rights.

## The Facts

In the late hours of March 2, 2016, at least two armed gunmen entered the home of Berta Cáceres, firing into her bedroom and the bedroom of Gustavo Castro. Berta Cáceres was fatally wounded, while Gustavo Castro survived.

Toronto, Ontario
M5R 2J7 Canada

T 416.868.1755
F 416.868.1990

15bedford.com

On May 2, 2016, Sergio Ramón Rodríguez Orellana, Douglas Giovanny Bustillo, Marinao Díaz Chávez, Emerson Duarte Meza, Edilson Atilio Duarte Meza, and Elvin Heriberto Rápalo Orellano were arrested and charged with murder.

On January 12, 2017, Henrry Javier Hernández was arrested and charged. Óscar Aroldo Torres Velásquez was arrested and charged on February 8, 2017.

On March 3, 2018, David Castillo Mejia, president of DESA, was arrested and charged with orchestrating the murder of Berta Cáceres. The symbolic date of this arrest should be noted: it was the second anniversary of Berta Cáceres' death.

At the time of writing, the trial of Sergio Rodríguez has been set for September 10 to 28, 2018. No trial dates have yet been set for David Castillo Mejia.

**International Standards**

### International Convention on Civil and Political Rights

Honduras is a signatory and has ratified the International Convention on Civil and Political Rights [ICCPR]. Article 14 of the ICCPR guarantees due process rights to all individuals. This requires that everyone charged with a criminal offence has the right to presumed innocent until proven guilty according to law. It also means that everyone charged with a criminal offence has the right to have adequate time and facilities for the preparation of a defence.

In its *General Comment No. 32*, the Human Rights Committee explained that Article 14 of the ICCPR requires the state to give the accused access to all materials that the prosecution plans to offer in court against the accused or that are exculpatory.[1] The Human Rights Committee has affirmed that it would be a breach of Article 14 to convict an accused person on the basis of evidence to which that person or his or her representatives do not have full access.[2]

### American Convention on Human Rights

Honduras is also a member of the Organization of American States, and it has signed and ratified the American Convention on Human Rights. Article 8 of the American Convention on Human Rights guarantees the right to due process and a fair trial. This includes the right to be presumed innocent as well as the right to adequate time and means for the preparation of defence.

The Inter-American Court of Human Rights has held that it is a breach of Article 8 to conduct an investigation in secrecy and to deny the accused access to the evidence gathered against him.[3] It is also a breach of Article 8 to attempt to convict the accused where the state has knowledge that its evidence against the accused is insufficient, as this presumes the accused's guilt and violates the presumption of innocence.[4]

The Inter-American Commission of Human Rights has had occasion to comment on the quality of police investigations in Honduras. It has repeatedly condemned these investigations for being inadequate and narrowly-focused. For example, in *Report No. 43/14*,[5] dealing with the investigation of the murder of a prominent environmental activist, the

[1] UN Human Rights Committee (HRC), *General comment no. 32, Article 14, Right to equality before courts and tribunals and to fair trial*, 23 August 2007, CCPR/C/GC/32, para. 33.

[2] Concluding Observations of the Human Rights Committee, Canada, U.N. Doc. CCPR/C/CAN/CO/5 (2006) at para. 13.

[3] I/A Court H.R., *Case of Palamara Iribarne v. Chile*. Merits, Reparations and Costs. Judgment of November 22, 2005, at para. 174.

[4] I/A Court. H.R., *Case of Acosta-Calderón v. Ecuador*. Merits, Reparations and Costs. Judgment of June 24, 2005 at para. 114.

[5] IACHR, Report No. 43/14, Case 12.492, Merits, Carlos Escaleras Mejia and family, Honduras, July 17, 2014.

IACHR stated that an investigation into an alleged crime "must be carried out by means of all available legal means and must be pursued with due diligence, effectively, seriously, and impartially".[6] This means that the state must act diligently at the earliest possible stage of the investigation, since "a lack of diligence in the early stages may lead to the loss of essential evidence".[7] In that case, an inadequate investigation was found to have been carried out on the basis that:

- There was an unjustified delay in carrying out the judicial inspection of the crime scene;[8]
- Nothing in the record indicated that the scene of the crime was protected following the incident or that any steps were taken to preserve the evidence at the scene;[9]
- There were no documentary or photographic records of the victim's body at the scene or of any other evidence gathered at the crime scene;[10]
- There was no record of the autopsy that was performed on the victim's body;[11]
- No reconstruction of the incident was carried out;[12]
- The investigation in the months following the murder focused exclusively on two individuals, despite the fact that there was no evidence to link them to the murder and the ballistic examination of their weapons was conducted two months after the incident.[13]

Similarly, in *Report No. 49/15*,[14] the IACHR again found that Honduran authorities had carried out an inadequate investigation of a suspected murder. It found the following inadequacies:

- There was no indication in the case file that the crime scene was protected at the time of the incident or that measures had been ordered to protect the evidence;[15]
- There were no photographic or documentary records of the victim's death;[16]
- A technical expert who arrived at the crime scene several hours after the victim's death testified that he had observed that the crime scene was tampered with;[17]
- A copy of the victim's autopsy could not be found;[18]
- Blood samples taken from the victim were accidentally destroyed;[19]
- In the first months and years following the victim's death, the investigation focused exclusively on three people in the absence of any evidence connecting these people to the crime.[20]

The IACHR has noted that due process requires a fair prosecution, which requires the prosecution to grant the accused full access to the case file against him. In *Report No. 4/17*,[21] the Commission stated:

---

[6] *Ibid* at para. 137.
[7] *Ibid* at para. 138.
[8] *Ibid* at para. 143.
[9] *Ibid* at para. 144.
[10] *Ibid*.
[11] *Ibid* at para. 145.
[12] *Ibid* at para. 145.
[13] *Ibid*.
[14] IACHR, Report No. 49/15, Case 12.585, Merits, Angel Pacheco Leon and Family, Honduras, July 28, 2015
[15] *Ibid* at para. 87.
[16] *Ibid*.
[17] *Ibid*.
[18] *Ibid* at para. 88.
[19] *Ibid* at para. 89.
[20] *Ibid* at para. 90.
[21] IACHR, Report No. 4/17, Case 12.663, Merits, Tulio Alberto Alvarez, Venezuela, January 26, 2017.

121. The Inter-American Court has held that in order to satisfy Article 8.2.b of the American Convention the State must inform the accused not only of the reason for the charges against him—that is, the acts or omissions attributed to him—but also the reasons leading the State to formulate the accusation, the evidentiary support for the charges, and the legal classification of the alleged acts. All of this information must be express, clear, comprehensive, and sufficiently detailed to allow the accused to fully exercise his right to a defense and present his version of the events to the judge. The Court has found that the timely observance of Article 8.2.b is essential for the effective exercise of the right to a defense.[22]

In that case, the IACHR found that the state had violated Article 8.2 of the American Convention because it failed to grant the accused access to the case file against him:

126. The Inter-American Commission and the Inter-American Court have acknowledged that fundamental due process rights include the right to have adequate means to prepare a defense, provided for in Article 8.2.c of the Convention, and that this requires the State to allow the accused to access the case file against him. The principle of adversarial proceedings, which guarantees the defendant's participation in the examination of the evidence, must also be respected. There is nothing on record in this case to explain, nor has the State explained, the legal basis and well-founded reasons for which the alleged victim was reportedly denied access to videos and copies of the interviews conducted with the alleged victim before the trial, which were disseminated in the media, and which supported the amendment of the criminal complaint and subsequently the defendant's conviction. Therefore, the IACHR finds that the restriction violated Article 8.2.c of the Convention.[23]

**Minnesota Protocol**

The Minnesota Protocol, otherwise known as the *United Nations Manual on the Effective Prevention of Extra-legal, Arbitrary and Summary Executions* has been adopted by the IACHR as establishing the applicable standard for police investigations of suspicious deaths, including investigations in Honduras.[24]

The Minnesota Protocol establishes four basic elements of any investigation of a suspicious death. It states that the investigation must be: (1) prompt; (2) effective and thorough; (3) independent and impartial; and (4) transparent.[25]

The Minnesota Protocol states that, upon report of a potentially unlawful death, an initial investigation should be conducted to identify lines of inquiry and further actions, which includes identifying all sources of potential evidence and prioritizing the collection and preservation of that evidence. These inquiries should be compiled into an initial report, which details the lines of inquiry pursued and the outcomes of those inquiries. It should also include information about the person making the report; the identity of the victim; the date, time, and location of the death; the location of the victim; the cause of death; the individual(s) or organization(s) believed to be responsible; and any other specific details. Areas in need of further investigation should also be identified.[26]

With respect to the victim, the investigators should also explore the lifestyle, routines, activities, and the political, religious or economic background of the victim, as these facts may indicate possible reasons for the death.

---

[22] *Ibid*, citing, in part, I/A Court H.R., Case of Lopez Alvarez v. Honduras. Merits, Reparations and Costs. Judgment of February 1 2006. Series C No. 141, para. 149.

[23] *Ibid*, citing I/A Court H.R., Case of Palamara Iribarne v. Chile. Merits, Reparations and Costs. Judgment of November 22, 2005, para. 170.

[24] See, e.g., IACHR, Report No. 43/14, Case 12.492, Merits, Carlos Escaleras Mejia and family, Honduras, July 17, 2014 at para. 141.

[25] *The Minnesota Protocol on the Investigation of Potentially Unlawful Death (2016)*, Office of the United Nations High Commissioner for Human Rights, New York/Geneva, 2017.

[26] *Ibid* at p. 12.

The crime scene should be secured at the earliest possible opportunity and unauthorized personnel must not be permitted entry. A record of all personnel entering the scene should be kept, and individuals who interact with the evidence should provide their DNA and fingerprints as reference samples.

All material located at a crime scene should be considered potentially relevant. This includes documentary evidence such as maps, photographs, and financial papers; physical evidence such as tools, weapons, and clothing fragments; biological evidence such as blood, hair, and fingernails; and digital evidence, such as mobile phones, computers, and tablets. All relevant material should be recorded in documentary and photographic form.

The investigation must gather, record, and retain all relevant material in a systematic manner. The investigation team must not withhold information that could weaken the prosecution's case in any judicial proceeding.[27]

With respect to the lifestyle of the victim, investigators should conduct lifestyle inquiries and develop a victim profile. This profile should include sensitive information such as findings of marital infidelity or other stigmatized sexual behaviour. The profile should be used to test the working hypotheses of the case and assist in generating investigative opportunities where other lines of inquiry have been exhausted. This information may also assist in identifying a motive for the crime. This information may be gathered from the victim's associations, lifestyle, behavioural patterns, and electronic devices.[28]

Investigators should seek out and interview any individuals who might have information about a potentially unlawful death. Publicizing the investigation may encourage witnesses to come forward and share information. Significant witnesses include people who heard or saw the crime being committed; people with relevant knowledge of the victim or suspected perpetrator(s); and people in the same organization or chain of command as the suspected perpetrator(s). Investigators should take full statements from these witnesses and, where feasible, video and audio recordings of their interviews.[29]

House-to-house inquiries should be conducted in the vicinity of important physical locations and the crime scene.[30]

With respect to digital evidence, mobile phone data should be requested from service providers. The phones of the deceased and all prime suspects should be legally recovered, and all relevant data should be professionally downloaded. Investigators should also consider requesting subscriber details, method of payment, call data, and mobile phone site locations for any phone identified as relevant.[31]

**Issues with the Investigation**

The investigation has failed to comply with many of the requirements of the Minnesota Protocol, thereby failing to meet the minimum standards set by the IACHR.

### Failure to Photograph the Scene

As noted by the GAIPE Report, the first inspection of the crime scene was at 3:25am on March 3, 2016. The Visual Inspection Report prepared by the agents who inspected the scene recorded the presence of individuals in the house and alterations to the crime scene.[32] This visual inspection recorded that two lead casings and two deformed bullets

---

[27] *Ibid* at pp. 13-14.
[28] *Ibid* at p. 15.
[29] *Ibid* at pp. 15-16.
[30] *Ibid* at p. 16.
[31] *Ibid* at p. 17.
[32] GAIPE Report, p. 31.

were found in Berta Cáceres' room, while no projectiles or casings were found in Gustavo Castro's room.[33] However, these were not documented by any photographs, sketches, or videos, contrary to the Minnesota Protocol. There is no definition or elaboration of the term "alterations" which leads to serious concerns as to the integrity of the crime scene and the possibility of evidence tampering.

At 11:25am on the morning of March 3, 2016, members of the Directorate for Police Investigations conducted a second inspection of the crime scene. While they recorded several possible bullet holes, they did not make any record of the cases, coatings, or other material collected for ballistics analysis.[34]

The GAIPE Report also notes that a record was created over 48 hours after the murder indicating that a new yellow casing had been found.[35] This discovery is obviously suspect.

Further, testimony has been provided in the criminal proceedings to indicate that the first persons to arrive on the scene following the murder were not police officers or law enforcement authorities: they were members of COPINH. Indeed, investigators observed that the COPINH members had altered the crime scene before any photographs or evidence could be taken. The presence of others at the murder scene after the murder but before any steps were taken to secure the scene raises serious issues about the integrity of the crime scene. Where there is reason to question the integrity of the crime scene, there is reason to doubt the reliability of evidence seized from that crime scene.

### Inconsistencies in Ballistics Analysis

The Ballistics Report, dated May 2, 2016, has several significant contradictions with the visual inspection report produced mere hours after the murder. The Ballistics Report stated that 5 elements were recovered from the crime scene, including 3 deformed bullets; one lead bullet fragment; and one aluminum bullet casing from the crime scene. An additional two lead bullets were found in the autopsy. It also stated that a firearm found in the residence of one of the defendants was used to fire one of the bullets (and related casing) that was recovered at the crime scene.[36]

As the GAIPE Report notes, there is no explanation as to why three bullets were recovered from the crime scene months after the murder, whereas only two bullets were found at the crime scene mere hours after the murders. This inconsistency raises serious questions about the validity and reliability of the ballistics analysis, as well as the integrity of the crime scene.

### Issues with Chain of Custody

The investigators seized numerous mobile phones, which were produced to the prosecution expert witness Brenda Barahona for analysis. When these mobile phones and their data were then produced to the defence expert witness for analysis, several were provided without chain of custody information. Specifically, data from the extraction of the Sony Experia phone; the Blu phone; and data from a third CD-R were produced to the defence expert witness without chain of custody information.

Further, the court has recently ruled that the prosecutors may adduce financial information that was seized from the DESA offices over two years ago as evidence against Sergio Rodríguez and David Castillo Mejia, despite the fact that no chain of custody information has been produced for these financial documents.

---

[33] *Ibid.*
[34] *Ibid.*
[35] *Ibid.*
[36] *Ibid.*

The Minnesota Protocol requires the adequate documentation of the chain of custody of all relevant evidence. Given the importance of the digital evidence to this case, the failure to appropriately document the chain of custody of this evidence indicates a failure to comply with international investigative standards.

### Failure to pursue all Lines of Investigation

From the earliest moments of the investigation, there was only one focus: DESA. There is no indication in the judicial file that the police mapped out Berta Cáceres' lifestyle and routines in order to determine who had threatened her in the past, and who she considered to be a threat at the time of the murder. DESA was not the only organization subject to COPINH protests at the time of the murder, as COPINH was also protesting projects that were completely unrelated to DESA proximate to the time of Berta Cáceres' murder.

Indeed, as COPINH itself had reported, a member of the National Direction of Criminal Investigation told Berta Cáceres on February 25, 2016 that they would not be responsible if anything happened to her.[37] Even based on COPINH's own biased allegations, DESA was not the only entity allegedly threatening Berta Cáceres in early 2016.

Further, while the case file indicates that the prosecution possesses information from a protected witness implicating the Mayor of Concepcion Del Sur in the murder, this information has not been shared with the defence. If there was investigation into these leads, these lines of inquiry and the investigative outcome were not documented in an initial report as required by the Minnesota Protocol.

### Issues with the GAIPE Report

#### The Lund-London Guidelines

The International Human Rights Fact-Finding Guidelines (otherwise known as the Lund-London Guidelines) were established by the International Bar Association's Human Rights Institute and the Raoul Wallenberg Institute in 2009.[38] They aim to set an international standard of good practice in the conduct of fact-finding visits and in the compilation of fact-finding reports. The GAIPE Report was the product of a fact-finding visit to Honduras and, as a result, should be expected to comply with the Lund-London Guidelines.

The Lund-London Guidelines state that when conducting a fact-finding mission, the delegation should "make use of all data collection techniques available", and, where it relies upon information gathered by a third party, it should "take all reasonable measures to verify the objectivity of that information gathering process in order to rely on the evidence collected".[39] It should also "endeavour to obtain and review all relevant materials and documents".[40] When facts are alleged, the delegation should attempt to verify them "with an independent third party", and should note where it was unable to do so.[41]

---

[37] *Ibid.*
[38] *Guidelines on International Human Rights Fact-Finding Visits and Reports by Non-Governmental Organisations (The Lund-London Guidelines*, International Bar Association (London, 2009).
[39] *Ibid* at para. 61.
[40] *Ibid* at para. 63.
[41] *Ibid* at para. 67.

In preparing the report, the delegation "must follow a standard of proof in a consistent manner to ensure the credibility of the findings",[42] and it must "gather sufficient information from various credible sources to meet this standard and assess the reliability of the information collected".[43] Further, the language used in the report must be "accurate, clear, and drafted in a dispassionate tone to reflect the facts objectively".[44] It should "fairly reflect all the information gathered and must refrain from bias", and "[h]earsay evidence must be clearly distinguished from direct evidence or information".[45]

The GAIPE Report fails to meet many of these guidelines. In its executive summary, the authors indicate that GAIPE conducted four on-site visits and interviewed more than 30 individuals. The authors reviewed ten criminal cases resulting from COPINH complaints as well as legal actions that had been filed due to the lack of free, prior, and informed consultation relating to the Agua Zarca Project — though it did not review any legal actions filed relating to any other hydroelectric or mining projects that were also the subject of COPINH's protests in early 2016. They also had "partial access" to the evidence in the criminal investigation of the murder of Berta Cáceres.[46]

While GAIPE had access to only a "fragment" of the digital evidence gathered in the investigation, and while GAIPE identified irregularities and shortcomings in the investigation, it nevertheless concluded that it had identified criminal conduct and the "possible" intellectual authors of the murder of Berta Cáceres.[47]

The GAIPE Report suffers from numerous flaws: it makes assertions of fact without citing a supporting source; the sources that it does cite often do not support the factual assertions it makes; it draws speculative inferences from the evidence and fails to explore alternate inferences; it makes factual conclusions based on evidence that it concedes is inadequate; and it lacks objectivity in its analysis of the facts.

### Assertions of Fact with No Source

Many of the GAIPE Report's most provocative assertions are not accompanied by any factual support. For example, the Report states that a senior DESA executive contacted Douglas Geovanny Bustillo in November 2015 to arrange the murder of Berta Cáceres.[48] Nothing is cited in support of this conclusion.

The Report then states that messages between Douglas Geovanny Bustillo, Mariano Díaz Chavez, Henrry Javier Hernández Rodríguez, and a DESA senior executives "conclusively show" that the attack on Berta Cáceres' life was intended to be carried out on February 5 and 6, 2016.[49] No messages are cited in support of this conclusion.

A similarly provocative assertion is made several paragraphs later, where the Report states:

> Communications between those involved are consistent, and establish that the operation executed on March 2, 2016 in which Berta Isabel Cáceres Flores was killed and Gustavo Castro Soto injured was not only commissioned by DESA senior executives, but also based on privileged information provided by employees of the company, and that this information was a decisive factor in the execution of the operation.[50]

---

[42] *Ibid* at para. 70.
[43] *Ibid* at para. 71.
[44] *Ibid* at para. 74.
[45] *Ibid.*
[46] GAIPE Report, p. 1.
[47] *Ibid* at p. 2.
[48] GAIPE Report, p. 21.
[49] *Ibid*, p. 22.
[50] *Ibid.*

No source is cited in support of this assertion, and neither the paragraphs that precede it or follow it elaborate on or support this conclusion. The GAIPE Report does not point to anything to support the conclusion that DESA senior executives planned the murder of Berta Cáceres, nor that the murder was based on unspecified privileged information provided by DESA employees, or even that the unspecified information was a "decisive" factor in the execution of the murder. There is simply no evidence to support any of these inferences.

**Factual Conclusions Based on Speculative Inferences**

The GAIPE Report's treatment of Sergio Rodríguez is particularly concerning. It asserts that Sergio Rodríguez is responsible for the death of Berta Cáceres based on two findings: a text message sent by Sergio Rodríguez in a group chat, and a phone call between Sergio Rodríguez and Douglas Bustillo after the death of Berta Cáceres.

The text message that the Report cites as being probative of Sergio Rodríguez's responsibility for the murder was sent on March 1, 2016. It stated:

> A group of approximately 15 persons went to Esperanza for a radio training. I was told that [...] was in the group to present Berta with a resignation from the leadership position of COPINH in La Tejera. They assured me it is an irrevocable decision.[51]

However, the GAIPE Report does little to link a mention of 15 persons in La Esperanza to Sergio Rodríguez's responsibility for the murder of Berta Cáceres. It does not provide any context for who these 15 persons are; who presented Berta with a resignation from the leadership of COPINH; or who assured Sergio Rodríguez that it was an irrevocable decision. The fact that Sergio Rodríguez was kept apprised of an attempt to remove Berta from the COPINH leadership does not lead to the inference that he is guilty of planning her murder.

Second, the fact that Sergio Rodríguez contacted Douglas Bustillo at 6:29am on March 3 does not lead to the inference that Sergio Rodríguez was guilty of planning her murder. An equally available inference is that Sergio Rodríguez was searching for information about Berta Cáceres' death, given his role as Manager of Social, Environment, and Communications Affairs for DESA.[52] No information was provided about Sergio Rodríguez's other phone calls on the morning of March 3, 2016, indicating that this was not an inference that the authors of the GAIPE Report were interested in pursuing.

Further, the news of Berta Cáceres' death was already being reported by media outlets prior to 6:00am on the morning of March 3, 2016. A single, short telephone call between Sergio Rodríguez and Douglas Bustillo after the death of Berta Cáceres had already been publicly reported is hardly evidence of Sergio Rodríguez's guilt.

Yet despite the paucity of evidence linking Sergio Rodríguez to the murder, the GAIPE Report arrives at the following conclusion:

> Sergio Ramon Rodriguez Orellana acted under the supervision of DESA partners and executives. He participated in the design and implementation of strategies intended to stigmatize, criminalize, and attack Berta Isabel Cáceres Flores and members of COPINH. This entailed hiring and maintaining a network of informants and contract killers with whom he had direct communication. He later provided information to the company's partners and leadership, those in charge of private security, those in charge of communications, as well as state security agents.

---

[51] *Ibid* at p. 22, citing Appendix II, note 143.
[52] *Ibid* at p. 6.

The type of information obtained included not only information related to public activities of Berta Isabel Cáceres Flores and members of COPINH, but also related to her personal and family life, such as dates and times she would be at certain places, domestic or international trips, and even when she would take her mother to the doctor.[53]

Not only does the Report fail to cite anything that actually substantiates these allegations, it bases them on text messages that are completely unrelated to the contents of these allegations. The text messages it cites contain a report detailing Berta Cáceres' public appearance at a DESA site with other COPINH members and members of the media. Given that Sergio Rodríguez's job title was Manager of Social, Environment, and Communications Affairs for DESA, such a report makes perfect sense. However, these messages say nothing about the details of Berta Cáceres' personal or family life. If there are messages attributable to Sergio Rodríguez that support these allegations, the GAIPE Report fails to cite them.

**Factual Conclusions Based on Incomplete Evidence**

The GAIPE Report's conclusions are based almost exclusively on digital information from telephone companies and on messages extracted from several phones. However, the GAIPE Report did not analyze all of the information obtained from all of the phones — most importantly, it did not examine any information extracted from any phone belonging to Berta Cáceres.

Further, the GAIPE Report notes that only one phone belonging to Sergio Rodríguez was analyzed, and that, though communications had been intercepted by the authorities, it was not known whose communications were intercepted nor the contents of those interceptions. While the Report goes on to state that this missing information is important because the messages "unequivocally demonstrate" that DESA executives were involved in the "path of crime" to the March 2, 2016 attack,[54] the Report leaves one other inference unexplored: the possibility that the missing information demonstrates that DESA executives or employees were not, in fact, responsible for the murder of Berta Cáceres.

The Report also recognizes that certain important witness statements were not provided, such as the statement made by one of the guards from Berta Cáceres' neighbourhood.

However, despite the acknowledged inadequate evidence, the GAIPE Report has nevertheless determined that the evidence "conclusively" establishes DESA's responsibility for the murder of Berta Cáceres. This assertion is inherently suspect: how can incomplete evidence conclusively establish anything? The fact that the evidence is incomplete means that other inferences are possible and that potentially exculpatory evidence may be suppressed or outstanding.

This failure to even raise the possibility of the existence of exculpatory information demonstrates the pervasive bias of the GAIPE Report.

**Factual Conclusions that Misstate the Evidence**

Even where the GAIPE Report provides a source for its conclusion, that source, when examined, often does not support the factual assertion contained in the GAIPE Report.

The Report states that DESA was deploying actions to "control, neutralize, and attack COPINH members and Berta Isabel Cáceres Flores". It then states that the influence of DESA executives on the state's attempt to arrest and prosecute Berta Cáceres is shown by the "investment of resources and efforts deployed to neutralize her which

---

[53] *Ibid* at p. 36.
[54] *Ibid* at p. 33.

included the hiring of lawyers and pushing court officials to manipulate the use of the justice system".[55] The Report cites a number of text messages that it claims supports this inference. However, an examination of the text messages that the Report cites indicates that:

- Most of them include only phrases selectively chosen from a longer message, with the rest of the message omitted.
- Only one message discusses COPINH: a message dated April 22, 2013, indicating that the COPINH have arrived at the camp.[56]
- Only two messages discuss Berta Cáceres: a message dated July 29, 2013, which inquires about Berta and whether "something will come out" that day; and a message dated September 13, 2013, discussing a hearing with a phrase plucked out of context that states "to continue with Berta".[57]
- The messages cited are taken from three separate time periods spread out over a span of 5 months. There is no indication that the participants are talking about the same thing in each message.

While the messages demonstrate that DESA members were concerned about COPINH members in the camp, and that DESA members were in discussions with lawyers who were involved in the justice system, they do not demonstrate any attempt to manipulate the justice system. Absent evidence of bad faith, a corporation and its employees are just as entitled to access the justice system to protect their interests — the right of access to justice applies to all.

Another example is found in the GAIPE Report's attempt to link DESA to Olvin Gustavo García Mejía who was accused of carrying out various criminal acts against opponents of the Agua Zarca project. The Report states that Olvin García was found in possession of two weapons without authorization on December 28, 2015, and that a court summons and arrest warrant was issued against him on January 14, 2015, relating to the murder of Bernardo Pérez. It states that DESA immediately "hired a lawyer to secure the release of Olvin García", but cites in support a series of 19 text messages from 2012 to 2014 — over one year prior to the detention of Olvin García.[58] It further asserts that DESA's lawyer secured Olvin García's release due to a change in the statements of those who had witnessed the incident — again citing in support the text messages from 2012 and 2013.[59] Similar mischaracterizations of the evidence appear throughout the Report.[60]

### Lack of Objectivity

Despite its unqualified conclusions that the digital evidence "conclusively" establishes DESA's responsibility for the murder, several acknowledged weaknesses are buried in the GAIPE Report that significantly weaken these conclusions.

First, the Report relies almost exclusively on cell tower data and phone records from March 2, 2016 to prove that four of the accused persons — Óscar Aroldo Torres Velásquez; Elvin Heriberto Rápalo Orellana; Henrry Javier Hernández Rodríguez; and Edilson Atilio Duarte-Meza — were in La Esperanza at the time of the murder and were therefore responsible for the murder.[61]

---

[55] Ibid at p. 18.
[56] GAIPE Report, Appendix I, note 36.
[57] Ibid, notes 56, 67.
[58] GAIPE Report, note 56, citing to Appendix I, notes 10-29.
[59] Ibid, note 57, citing to Appendix I, notes 75-81.
[60] See, e.g., ibid at p. 36, describing Sergio Rodríguez as monitoring personal details of Berta Cáceres' life while citing in support of that assertion several text messages describing a very public protest by COPINH members at a DESA site.
[61] Ibid at p. 26.

However, buried several pages later in the Report is a note indicating the startling proposition that the cell phones allegedly associated with these individuals are not, in fact, registered in the names of these individuals. For example, the cell phone associated with Rápalo Orellana was registered to a Dimas Antonio Rivera Vigil. The cell phone associated with Óscar Aroldo Torres Velásquez was registered to a Rose Mare Bodden Fords. The cell phone associated with Mariano Chávez Díaz was registered to a Wendy Patricia Amador Escoto.[62] The links between these individuals and those charged with the crime are unexplained, as is the conclusion that the individuals charged are nevertheless responsible for these phones and for the murder.

Further, despite relying on cell tower data and cell phone records to "definitively" establish DESA's responsibility for the murder, the GAIPE Report notes that calls were made on several of the phones during the time span during which the murder took place. Specifically, during that time period the phone associated with Edilson Atilio Duarte-Meza contacted the number associated with Óscar Aroldo Torres Velásquez; the phone associated with Edilson Atilio Duarte-Meza contacted the number associated with Henrry Javier Hernández Rodríguez; and the phone associated with Henrry Javier Hernández Rodríguez contacted the number associated with Edilson Atilio Duarte-Meza.[63] This indicates that during the time frame associated with the murder, three individuals were in phone contact with each other. There were only four individuals alleged to have gone to La Esperanza that day. Unless one of those individuals was on the phone while murdering Berta Cáceres — which seems unlikely — these phone calls tend to weaken the inference that at least two of these four individuals murdered Berta Cáceres between 23:25 and 23:39 on March 2, 2016.

Despite the fact that the phones were actively engaged with each other during the critical time frame, the GAIPE Report does not link these calls to the cell tower data to determine the location of each individual. The only calls that are linked to cell towers during that time frame are the calls between Edilson Atilio Duarte-Meza and Henrry Javier Hernández Rodríguez.[64] These indicate that Edilson Atilio Duarte-Meza's phone was linked to a cell tower several towers away from Berta Cáceres' residence, while Henrry Javier Hernández Rodríguez's phone was linked to cell towers close to Berta Cáceres' residence. There is no data linking the call between Edilson Atilio Duarte-Meza and Óscar Aroldo Torres Velásquez to a particular cell tower.[65]

The failure to actively attempt to determine the locations of these individuals is another example of GAIPE's apparent disinterest in the objective pursuit of the truth. An objective analysis would require GAIPE to assess all possible inferences arising from the evidence, even if those inferences do not lead to its desired conclusion.

### Summary

The GAIPE Report fails to comply with many of the Lund-London Guidelines for fact-finding reports. It makes factual conclusions based on no evidence or incomplete evidence, and draws speculative inferences from the evidence without considering available alternate inferences. The GAIPE Report appears to be written in order to justify charges against DESA executives, not to dispassionately and objectively determine the truth. Any attempt to portray it as an independent fact-finding report is, unfortunately, mistaken and tragically misleading.

### Issues with the Prosecution

The individuals charged with the murder of Berta Cáceres have been detained prior to trial with no possibility of bail based on an investigation and an "independent" report that both fail to meet basic minimum international standards. The unfairness of their detention, charge, and trial is only compounded by the prosecution's failure to respect basic

---

[62] *Ibid* at p. 32.
[63] *Ibid*.
[64] *Ibid* at p. 26.
[65] *Ibid*.

due process, as the prosecution has failed to disclose relevant evidence; proceeded to trial on inadequate evidence; and suppressed exculpatory evidence. All of these actions are serious violations of the accused persons' human rights.

### Failure to Disclose Relevant Evidence

The prosecution's failure to disclose critical evidence from the investigation to the defence — despite the fact that it has been ordered by the court to provide this evidence —seriously impairs the fairness of the trial. As the Inter-American Court of Human Rights has held, it is a breach of Article 8 to conduct an investigation in secrecy and to fail to provide the defendant with the evidence that the state holds against him.[66] This is precisely what has occurred here.

On February 9, 2018, in response to a request filed by Sergio Rodríguez's defence lawyers, the court ordered the prosecution to disclose the investigative file to the defence. Despite this court order, the prosecution has failed to disclose the file. This is a troubling breach of the defendants' right to a fair trial, as a fair trial is not possible without access to all relevant evidence in the hands of the state. If this evidence is inculpatory, the defendant requires access in order to adequately prepare a defence, whether by gathering evidence to respond to the prosecution's evidence or by analyzing the prosecution's evidence to determine its strength and validity. If this evidence is exculpatory, the defendant requires access in order to raise doubt as to his or her guilt. This is why the fundamental right to due process requires that all relevant evidence be provided to the defendant. This fundamental right of due process has been repeatedly breached here.

In a second request dated March 14, 2018, Sergio Rodríguez's lawyers again requested the disclosure of this investigative file. They specifically requested disclosure of witness statements containing information about Sergio Rodríguez's participation in any threats against Berta Cáceres; investigative reports regarding the conclusion that Sergio Rodriguez was one of the persons responsible for the murder; information regarding other individuals and investigation lines that had been excluded; and investigative records regarding the appointment of Brenda Barahona as an expert witness.

All of these documents are essential in defending a person accused of murder, and without them, a person's ability to make full answer and defence is irreparably impaired. How can a person defend a charge of murder when he has limited disclosure regarding why the state believes he is guilty of murder? How can a person present evidence of possible third party suspects if no information has been provided regarding who those suspects may be? And how can a person adequately challenge the conclusions of so-called expert witnesses without any information about that person's qualifications as an expert?

To commence a trial without disclosing this information and the investigative file to Sergio Rodríguez would be a fundamental breach of due process and could not result in a fair trial.

### Presumption of Innocence

The Inter-American Court of Human Rights has held that it is a violation of the presumption of innocence to attempt to incriminate and convict an individual with knowledge that the state's evidence against that person is insufficient. This was established in the *Case of Acosta-Calderón v. Ecuador*,[67] where the Court stated:

---

[66] I/A Court H.R., *Case of Palamara Iribarne v. Chile*. Merits, Reparations and Costs. Judgment of November 22, 2005, at para. 174.

[67] I/A Court H.R., Case of Acosta-Calderón v. Ecuador, Merits, Reparations and Costs, Judgment of June 24, 2005.

114. Despite that it was not proven by technical or scientific means, as demanded by law, that the substances which were allegedly in Mr. Acosta Calderón's possession were narcotics, the courts continued with the process against the accused based on the statement made by the police (supra para. 50(2)) who performed the arrest. This proves that they tried to incriminate Mr. Acosta Calderón without enough evidence to do so, presuming that he was guilty and violating the principle of presumption of innocence.[68]

The Honduran police and state have violated the presumption of innocence by charging Sergio Rodríguez with murder despite the complete lack of any evidence against him. The only evidence that the prosecution has to link Sergio Rodríguez to the murder is one text message and one phone call. The prosecution has no evidence of what was said in that phone call, as Douglas Bustillo has not made any statements to the police. The contents of the text message do not support a murder charge and cannot be sufficient to support a murder conviction, as the text message is about fifteen people travelling to La Esperanza to present Berta Cáceres with her resignation from the COPINH leadership. There is nothing in the investigation to link these fifteen people to the murder of Berta Cáceres and, therefore, nothing to link Sergio Rodríguez to the murder.

No other credible witness has implicated Sergio Rodríguez in the murder. There are no other documents or messages that credibly link Sergio Rodríguez to the murder. The only real link that the prosecution has is the single phone call between Sergio Rodríguez and Douglas Bustillo on March 3, 2016. One phone call after the murder occurred cannot be sufficient to establish Sergio Rodríguez's responsibility for the murder. The state appears to be attempting to incriminate Sergio Rodríguez without an evidentiary foundation to do so. This presumes his guilt and violates the presumption of innocence.

### Suppression of Exculpatory Evidence

Not only has the prosecution failed to disclose the evidence that it has against Sergio Rodríguez, it has failed to disclose exculpatory evidence that is in its possession. As noted above, there is information from a protected witness implicating the Mayor of Concepcion Del Sur in the murder of Berta Cáceres. This information has never been provided to the defence.

If the prosecution is aware of this information, its failure to provide it to the defence appears to be an intentional suppression of exculpatory evidence. The intentional suppression of exculpatory evidence is extremely troubling. It violates all aspects of due process and the basic standards for prosecutorial conduct set out in the *United Nations Guidelines on the Role of Prosecutors*.[69] It indicates a lack of impartiality and the pursuit of a criminal conviction, rather than true justice. Justice for Berta Cáceres requires an independent and impartial investigation and prosecution so that those truly responsible for her murder can be brought to justice. The state cannot convict the innocent simply because others may suspect that they are responsible.

### Conclusion

The Honduran state has failed Sergio Rodriguez and David Castillo Mejía. It has charged them with murder based on an incomplete and inadequate police investigation. It has placed them on trial without giving them access to the investigative file, the information the state has against them, and exculpatory information in the state's possession.

---

[68] *Ibid.*

[69] *Guidelines on the Role of Prosecutors*, adopted by the Eighth United Nations Congress on the Prevention of Crime and the Treatment of Offenders, Havana, Cuba, from 27 August to 7 September 1990 (UN Doc. A/CONF.144/28/Rev.1).

The evidence it has against them is weak. Yet they remain in pre-trial detention, forced to defend themselves against flawed prosecutions in both the court of law and the court of public opinion. They remain exposed to the real possibility of the injustice of a wrongful conviction. Due process and the presumption of innocence are more than mere principles: they are fundamental human rights.

Should further information be forthcoming, we look forward to assessing that material and to provide our view as to its impact on this opinion.

Yours sincerely,
Greenspan Humphrey Weinstein

Brian H. Greenspan                              Michelle M. Biddulph